# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

GABRIELLE VALDEZ, as Personal
Representative of the Wrongful Death Estate of
OMAREE VARELA, Deceased, and JILL
MARRON, as Guardian ad litem for N.V., a minor,

    Plaintiffs,

vs.                 No. CIV 15-1039 JB/SCY

JOE ROYBAL, in his personal capacity acting
under color of state law; BENNIE PLACENCIO, in
his personal capacity acting under color of state
law; JOHN DOES 1-5, in their personal capacity
acting under color of state law; and THE NEW
MEXICO CHILDREN, YOUTH AND FAMILIES
DEPARTMENT,

    Defendants.

## MEMORANDUM OPINION AND ORDER

  **THIS MATTER** comes before the Court on: (i) Defendants Bennie Placencio and the

New Mexico Children, Youth, and Families Department's Motion to Dismiss and Memorandum

in Support Thereof, filed December 15, 2015 (Doc. 10)("CYFD MTD"); and (ii) Defendant Joe

Roybal's Motion to Dismiss and Memorandum in Support Thereof, filed January 12, 2016 (Doc.

14)("Roybal MTD").  The Court held a hearing on May 5, 2016.  The primary issues are: (i)

whether the New Mexico Children, Youth, and Families Department's 2009 memorandum

("Memo"), which recommended that Synthia Varela's children, Omaree Varela and his sister

N.V., remain in family-friend Essie Sotelo's care, created a special relationship under the Due

Process Clause of the Fourteenth Amendment to the Constitution of the United States of

America; (ii) whether Defendants Joe Roybal and Bennie Placencio created or enhanced a

danger to O. Varela and N.V. when they transferred the children without following the New

Mexico Children's Code[1] procedures; (iii) whether Roybal and Placencio abdicated their professional judgment in violation of the children's constitutional rights; (iv) whether Roybal and Placencio violated the children's rights to access the courts; (v) whether the Defendants are entitled to qualified immunity; and (vi) whether the Court should exercise supplemental jurisdiction over the Plaintiffs' claim that the New Mexico Children, Youth, and Families Department ("CYFD") violated the New Mexico Tort Claims Act, N.M. Stat. Ann. §§ 41-4-1 to -30 ("NMTCA").  The Court grants the motions in part and denies them in part, because the Defendants are entitled to qualified immunity.  The Court concludes that: (i) the Complaint plausibly alleges that the Defendants had a special, custodial relationship with the children; (ii) the Complaint plausibly alleges that Roybal and Placencio created or enhanced a danger to the children, but it does not state a danger-creation claim because Roybal's and Placencio's actions do not shock the Court's conscience; (iii) the Complaint plausibly states a claim that the Defendants abdicated their professional responsibility and denied O. Varela and N.V. their right to be free from violence under the Fourteenth Amendment; (iv) the Complaint plausibly states a claim that the Defendants denied the children meaningful access to the courts in violation of the First and Fourteenth Amendments; (v) the Defendants are entitled to qualified immunity on all of the federal claims; and (vi) the Court will not exercise supplemental jurisdiction over the state-law claim.

## FACTUAL BACKGROUND

The Court takes its facts from the Complaint for Civil Rights Violations and Violations of the New Mexico Tort Claims Act, filed November 13, 2015 (Doc. 1-1)("Complaint").  It accepts as true all non-conclusory factual statements.  The Court will describe O. Varela's early life, the

---

[1]N.M. Stat. Ann. §§ 32A-4-1 through -34.

New Mexico Children, Youth, and Families Department's ("CYFD") investigations, O. Varela's move to Arizona and then back to New Mexico, and finally, his death.

    **1.**    **<u>O. Varela's Early Life</u>**

S. Varela used crack cocaine during her pregnancy and exposed O. Varela to crack cocaine in utero. <u>See</u> Complaint ¶¶ 10-11, at 3-4. O. Varela "was born prematurely in February 2004 with significant medical challenges." Complaint ¶ 10, at 3. S. Varela gave birth to O. Varela while she was in prison for drug trafficking. <u>See</u> Complaint ¶ 11, at 4. O. Varela's biological father, Christopher Clewis, was also incarcerated when O. Varela was born. <u>See</u> Complaint ¶ 11, at 4. Shortly after O. Varela's birth, S. Varela gave power of attorney for O. Varela to two female relatives while she finished her prison sentence. <u>See</u> Complaint ¶ 12, at 4.

Within one month, "there were allegations of physical neglect (inadequate food) and medical neglect (no weight gain since birth) against these care givers." Complaint ¶ 12, at 4. The CYFD is a department of the New Mexico state government that provides "an array of prevention, intervention, and rehabilitative services to New Mexico children and their families." Complaint ¶ 8, at 3. The New Mexico Children's Code requires that the CYFD's Protective Services Division "receive and investigate reports of children in need of protection from abuse and/or neglect by their parents, guardians or custodians, and to take action to protect those children whose safety cannot be assured in their home." Complaint ¶ 8, at 3. The CYFD substantiated the allegations, but later dismissed the case after placing O. Varela in the hospital for weight gain and referring the two female relatives "for parent building skills." Complaint ¶ 12, at 4. Although the State never took O. Varela into custody during this period, the CYFD placed him with a foster parent for approximately thirty days, then returned him to the same female relatives. <u>See</u> Complaint ¶ 12, at 4. In November 2004, S. Varela married Steve Casaus. <u>See</u> Complaint ¶ 13, at 4. Casaus, who had a criminal record for drug possession, also had

numerous charges of "drug trafficking, assault, domestic violence, auto theft, and multiple parole violations." Complaint ¶13, at 4. In June 2006, S. Varela signed another power of attorney for O. Varela to a family friend: Sotelo. See Complaint ¶ 14, at 4-5.

### 2.   CYFD's Investigations for Physical Abuse and Neglect.

Defendant Joe Roybal worked as a social worker for the CYFD. See Complaint ¶ 4, at 2. As a CYFD social worker, Roybal was responsible for investigating allegations of physical abuse and physical neglect that O. Varela and his siblings, minors N.V. and E.V.,[2] may have suffered. See Complaint ¶ 4, at 2. He was also responsible, in whole or in part, for preparing the Memo. See Complaint ¶ 4, at 2. This Memo: (i) declared that the CYFD was investigating S. Varela; (ii) recommended that O. Varela and N.V. remain with Sotelo, S. Varela's family friend; and (iii) stated that S. Varela should not take the children into her care. See Complaint ¶ 4, at 2.

Defendant Bennie Placencio also worked as a CYFD social worker. See Complaint ¶ 5, at 2. Like Roybal, Placencio was also responsible for investigating whether O. Varela and his siblings were suffering from physical abuse and neglect. See Complaint ¶ 5, at 2. Additionally, Placencio was responsible, in whole or in part, "for threatening Essie Sotelo with criminal prosecution for interstate kidnapping if she did not bring Omaree and his sister to New Mexico and for arranging their placement with Steve Casaus and Synthia Varela." Complaint ¶ 5, at 2. Defendants John Does 1-5 were also CYFD social workers. See Complaint ¶ 6, at 2. They were responsible, in whole or in part, for investigating whether O. Varela and his sibling were suffering from physical abuse and neglect. See Complaint ¶ 6, at 2. They were also responsible for "threatening Essie Sotelo with criminal prosecution for interstate kidnapping if she did not

---

[2]In February 2011, S. Varela gave birth to a third child, E.V., who tested positive for cocaine at birth. See Complaint ¶ 26, at 11.

bring Omaree and his sister to New Mexico, for arranging their placement with Steve Casaus and

Synthia Varela and for monitoring that placement."  Complaint ¶ 6, at 2.

In the Complaint, the Plaintiffs describe the CYFD's investigations from 2006 through

the summer of 2009:

A.   In October 2006, CYFD investigated allegations of physical neglect against
Synthia Varela regarding her care of Omaree.  Although CYFD found the
allegations to be unsubstantiated, as a result of this investigation, Synthia
Varela signed yet another power of attorney for Omaree, this one to Omaree's
maternal aunt and uncle.

B.   CYFD investigated another allegation of physical neglect against Synthia
Varela in February 2008 based on her continued drug use and lack of
supervision of Omaree.  CYFD closed this file when the social worker could
not locate the family.

C.   In November 2008, Synthia Varela had a daughter (N.V.) with a different
father.  N.V. is a minor child. To protect her privacy, she is designated in this
Complaint by her initials.  Soon after that, Steve Casaus was incarcerated with
the New Mexico Department of Corrections for 1,397 days for repeated
violations of a probation agreement.

D.   PB&J Family Services[3] (an organization that assists at-risk children) noted in
January 2009 that "Synthia feels overwhelmed with Omaree when he will not
listen to her."

E.   In April 2009, an Albuquerque Public Schools Independent Education
Program ("IEP") evaluation found that Omaree had "significant delays."  The
report found that he had made no progress on his goals since the last IEP
report because of his frequent absences from school (he attended class only 28
of 69 days).

F.   In June 2009, CYFD again investigated allegations of physical neglect and
physical abuse of Omaree and allegations of physical neglect with respect to
N.V. against Synthia Varela, all in relation to Synthia's continued drug use.
Again, CYFD found the allegations to be unsubstantiated.  Defendant Joe
Roybal performed this investigation.  He determined that it was sufficient that

_____

[3]PB&J Family Services is "a nationally recognized non-profit serving more than 1,100
families annually. . . .  PB&J remains the only program to provide intensive wrap-around
services for children and their parents, including parenting education in the homes."  About Us,
PB&J Family Services, http://pbjfamilyservices.org/about-us/.

the family was receiving in-home services through PB&J, and he took no other action.

Complaint ¶ 15, at 5-7.

Some time during the summer of 2009, S. Varela prepared a written statement that she wanted Sotelo to care for her children. See Complaint ¶ 15, at 5-7. Sotelo was not a licensed foster parent, a guardian appointed by the court, or authorized to care for O. Varela and N.V. by a parental power of attorney. See Complaint ¶ 22, at 8. In mid-September 2009, Roybal again investigated allegations that S. Varela had been physically neglecting O. Varela and N.V. by using crack cocaine. See Complaint ¶ 15, at 6. Although Roybal did not locate S. Varela, Sotelo showed Roybal S. Varela's written statement and explained that she had been caring for the children since late August 2009, because S. Varela was using drugs and had not been home. See Complaint ¶ 15, at 6. "Accepting this explanation, Defendant Joe Roybal again found that the abuse allegations were unsubstantiated, and recommended that the family continue to use PB&J Services. Defendant Joe Roybal also urged Essie Sotelo to secure a formal power of attorney while caring for the children." See Complaint ¶ 15, at 6-7. In September of 2009, S. Varela asked Sotelo to return the children. See Complaint ¶ 15, at 6-7. Sotelo relayed this information to Roybal, expressing her fear that S. Varela was incapable of caring for her children. See Complaint ¶ 15, at 6-7. Sotelo did not obtain a power of attorney from S. Varela to formalize her role as caretaker for O. Varela and N.V. See Complaint ¶ 16, at 7. On September 16, 2009, Roybal prepared the Memo on CYFD letterhead. It stated:

Re: Synthia Varela (DOB 6/08/75), Omaree Varela DOB [(]2/03/04), and [N.V.] (DOB [omitted])

To Whom It May Concern:

The Children, Youth and Families Department is currently investigating an open case regarding Synthia Varela and the above-named children. Essie Sotelo *(DOB*

*omitted)* is the current caretaker for Omaree and [N.V.].  It is the Department's recommendation that the children should remain in Essie Sotelo's care pending the current investigation.  Synthia Varela or Marnyle Barnes ([N.V.]'s biological father) should not take the children into their care until interviews and assessments of their caretaking ability can be completed.  Synthia or Marnyle should not take Omaree Varela out of school pending the Department's findings of the current investigation.

If there are any questions regarding this matter, my contact information is listed below.

Complaint ¶ 16, at 7.  In short, the Memo communicated that New Mexico had assumed the authority to place O. Varela and N.V. with Sotelo and to prevent anyone from removing the children from her care pending a determination that S. Varela was fit to parent her children.  See Complaint ¶ 17, at 7-8.  The Memo was "placed in CYFD's files" and "forwarded to the Albuquerque Public Schools."  Complaint ¶ 18, at 8.  "There is nothing in the CYFD file showing that Synthia Varela was aware of, or agreed to, this memorandum declaring Essie Sotelo to be the sole caretaker of her children."  Complaint ¶ 20, at 12.  Sotelo retained custody of O. Varela and N.V. during the next eighteen months.  See Complaint ¶ 25, at 9.

Although no records document the communication, Sotelo informed Roybal that she had "moved back and forth between New Mexico and Arizona on at least two occasions with the children."  Complaint ¶ 25, at 9.  Sotelo showed the Memo to health care providers and schools in New Mexico and Arizona to secure medical care for O. Varela and N.V. and to enroll them in school.  See Complaint ¶ 25, at 9-10.  Furthermore, she showed the Memo to the Social Security Administration to "establish that she was Omaree's guardian and to ensure that Omaree's federal benefits were sent to him in care of her at her address."  Complaint ¶ 25, at 10.  In December 2009, the CYFD closed its investigation into whether S. Varela posed a risk of harm and concluded that the allegations were unsubstantiated.  See Complaint ¶ 25, at 10.  The CYFD did not inform Sotelo of this finding and did not rescind the Memo.  See Complaint ¶ 25, at 10.

Instead, it allowed the children to remain out of state in Sotelo's home.  See Complaint ¶ 25, at 10.  There are no records indicating that the CYFD arranged for any "family preservation or support services to assist Synthia Varela with the skills needed to help the biological family remain intact and to assure that she was able to care for Omaree and his sister at home."  Complaint ¶ 25, at 10-11.

During this same time period, late 2009 to early 2011, S. Varela was incarcerated twice in the Bernalillo County Metropolitan Detention Center, once for forty-eight hours and another time for ten days.  See Complaint ¶ 26, at 11.  After having served roughly twenty-four months in prison, Casaus returned to S. Varela's home sometime after December 2010.  See Complaint ¶ 26, at 11.  In February 2011, S. Varela gave birth to a third child, E.V., who tested positive for cocaine at birth.  See Complaint ¶ 26, at 11.  "By this time, it appears that Defendant Joe Roybal no longer was assigned to this file."   Complaint ¶ 26, at 11.   Placencio performed the investigation regarding physical neglect allegations about E.V.   See Complaint ¶ 26, at 11.  Placencio concluded that the allegations were "unsubstantiated," and allowed the hospital staff to send the infant home on oxygen with S. Varela and Casaus.  Complaint ¶ 26, at 11.  Placencio referred the family to PB&J Services for family services; secured housing, furniture, and baby clothes from various agencies; and arranged for S. Varela to obtain parenting skills and substance abuse counseling.  See Complaint ¶ 26, at 11.  In all, between 2004 and February 2011, the CYFD "received at least seven allegations of abuse involving Synthia Varela."  Complaint ¶ 27, at 11.  During several of these investigations, S. Varela reported that she took medication for epilepsy, diabetes and Attention Deficit Hyperactivity Disorder, and that she had a brain tumor for which she used oxygen.  See Complaint ¶ 27, at 11.  "There is no indication that CYFD sought medical documentation from Synthia Varela or her doctors to substantiate

these claims, to learn the degree of their severity, or to evaluate what effect these conditions may have had on her parenting skills."  Complaint ¶ 27, at 11.

### 3.      O. Varela's Move to New Mexico

Around February or March, 2011, S. Varela demanded that O. Varela and N.V. be returned to her.  See Complaint ¶ 28, at 12.  The CYFD helped S. Varela regain custody by ordering Sotelo to immediately transport the children to the CYFD office in New Mexico.  See Complaint ¶ 31, at 13.  The CYFD case worker, either Placencio or one of the John Does, "threatened and promised that if Ms. Sotelo did not immediately comply with this directive, she would be charged with interstate kidnapping."  Complaint ¶ 31, at 13.  There is no record of these communications.  See Complaint ¶ 32, at 13.  Similarly, the CYFD files contain no records reflecting an analysis of the CYFD's basis for requiring Sotelo to deliver the children to New Mexico or an analysis whether the move was in the children's best interest.  See Complaint ¶ 34, at 14.

Sotelo left Arizona and delivered the children to a CYFD office in Albuquerque, New Mexico in March 2011.  See Complaint ¶ 33, at 13.  "Defendant Bennie Placencio or John Does 1-5 immediately handed Omaree and N.V. over to Steve Casaus and Synthia Varela," whom the children had not seen for at least the past eighteen months.  Complaint ¶ 33, at 13.  In O. Varela's CYFD files, there is no record of any investigation regarding S. Varela's living conditions.  See Complaint ¶ 34, at 14.  In March 2011, she lived with Casaus, her husband.  See Complaint ¶ 35, at 14.  On February 23, 2011, Placencio sent a memorandum on CYFD letterhead to the Social Security Administration, informing it that S. Varela "has legal and physical custody" of O. Varela, even though O. Varela lived with Sotelo in Arizona at that time.  Complaint ¶ 37, at 14-15.

On at least two occasions, the CYFD instructed S. Varela to secure behavioral assistance for O. Varela "at a non-profit agency that provides social and mental health services in the Albuquerque area." Complaint ¶ 39, at 15. Although S. Varela did not fully comply with these orders, she underwent voluntary intake interviews with the agencies. See Complaint ¶ 40, at 15. She reported to the agency: (i) that she had bi-polar disorder and Post-Traumatic Stress Disorder; (ii) that she had a difficult time getting out of bed each morning; (iii) that she could not stabilize her moods without medications; and (iv) that she was married. See Complaint ¶ 40, at 15-16. S. Varela never did with the agency's recommended treatments, and the CYFD never monitored whether S. Varela did them. See Complaint ¶ 41, at 16. In mid-October, 2013, two months before O. Varela died, S. Varela returned to the agency for another interview and told the agency that: (i) she was never married; (ii) she had been admitted to two psychiatric facilities; (iii) she suffered a traumatic brain injury as a result of sexual assault and had an aneurism in her brain; (iv) she had significant medical problems impacting her daily functioning; and (v) she had a hard time controlling her anger impulses. See Complaint ¶ 42, at 16.

In October, 2012, the CYFD substantiated allegations that an "unknown person" was physically abusing O. Varela. Complaint ¶ 46, at 17. He had a bruise on his right temple and marks on his leg. See Complaint ¶ 46, at 17. He told investigators various stories about how he was injured: (i) that S. Varela hit him with a telephone; (ii) that N.V. hit him with a toy telephone; (iii) that he hit himself while playing with a toy telephone; and (iv) that S. Varela hit him with a belt. See Complaint ¶ 46, at 17. S. Varela reported that he fell while playing outside. See Complaint ¶ 46, at 17. The University of New Mexico Hospital's Child Abuse Response Team ("CART") confirmed that O. Varela's injury "was consistent with being struck with a belt"

and found that "Omaree continues to be at risk for abuse without preventive services." Complaint ¶ 47, at 17.

After the CYFD performed a Child Safety Assessment, it determined that the children were "unsafe," but listed the risk level as "moderate" and recommended that S. Varela continue working with the support services already in place.  Complaint ¶ 48, at 17-18.  Two months later, in December, 2012, the CYFD noted unsubstantiated allegations of physical abuse based on an incident where S. Varela allegedly punched O. Varela in the stomach with a closed fist in a local store.  See Complaint ¶ 50, at 18.  In June, 2013, "Albuquerque police responded to a 911 call regarding possible abuse" at S. Varela's home.  Complaint ¶ 52, at 18.  The call's recording contains "several minutes of profanity, screaming and verbal abuse focused on Omaree by an adult man and woman, seemingly arising from food that he spilled on the ground."  Complaint ¶ 52, at 18.

### 4.   **O. Varela's Death.**

On December 27, 2013, nine-year-old O. Varela was found dead at home.  See Complaint ¶ 53, at 18.  The autopsy report listed O. Varela's cause of death a blunt trauma and the manner of death as homicide.  See Complaint ¶ 54, at 18.  The report states:

> There were contusions (bruises) of the chest, arms, legs and tongue; abrasions (skin scrapes) of the face; a healing laceration (skin tear) of the scalp (left parietal scalp); and hemorrhage (bleeding) into the muscles between the ribs (intercostal hemorrhage), into the soft tissues of the back, into the diaphragm (muscle that separates the chest and abdominal organs), into an abdominal wall muscle (right internal oblique muscle), into the abdominal cavity (hemoperitoneum), into the soft tissues around the pancreas and left kidney; and on the outer surface (serosa) of the bowel. On the chest were discreet [sic] injuries consistent with thermal injuries (burns).

Complaint ¶ 54, at 18-19.  New Mexico indicted both S. Varela and Casaus for O. Varela's death.  See Complaint ¶ 54, at 19.

- 11 -

In the criminal complaint against S. Varela, the Albuquerque Police Department ("APD") reported that, after initially contending that O. Varela fell off a toy horse, S. Varela confessed that she kicked O. Varela "in the stomach causing him to fall to the ground.  While falling, [O. Varela] struck his head on a dresser then struck his head on the ground.  Once [O. Varela] was on the ground, Synthia began kicking him. She kicked him at least two times, near his stomach." Complaint ¶ 55, at 19.   S. Varela pled guilty to second-degree murder, child abuse, and tampering with evidence and will receive a forty-year prison sentence.  See Plea and Disposition Agreement at 1-3, filed in State of New Mexico v. Varela-Casaus, D-202-CR-201400203, Bernalillo County, Second Judicial District, filed May 6, 2016.   Although Casaus told inconsistent versions of his involvement in O. Varela's death, further investigation revealed that Casaus permitted O. Varela "to be tortured, cruelly confined or cruelly punished," which resulted in O. Varela's death, and that Casaus participated in the violent acts which led to O. Varela's death.   Complaint ¶ 55, at 20.   Forensic evidence presented at Casaus' trial indicated that he "may have delayed calling 911 by roughly three hours as Omaree was dying."  Complaint ¶ 55, at 20.  After a week-long trial, a jury found Casaus guilty of child abuse with reckless disregard resulting in death, in addition to lesser charges of tampering with evidence and intimidation of a witness.  See Complaint ¶ 55, at 21.

The CYFD prepared a Child Protective Services Investigation Summary on the day O. Varela died.  See Complaint ¶ 56, at 21.  It substantiates the allegations of physical abuse -- death -- and physical neglect -- medical neglect -- against S. Varela.  See Complaint ¶56, at 21. The CYFD also substantiated physical neglect allegations -- lack of supervision, drug abuse, and burns -- against Casaus.  See Complaint ¶ 56, at 21.  The CYFD further concluded that: (i) S. Varela's and Casaus' behavior "is violent and/or out of control;" (ii) reasonable cause existed to

suspect that a household member caused serious physical harm to the remaining children, N.V. and E.V.; and (iii) the caregiver's impairment from drug or alcohol use "seriously affects his/her ability to supervise, protect or care for the children, placing the children in present or impending danger of serious harm."  Complaint ¶ 57, at 21.  With respect to both S. Varela and Casaus, the CYFD investigator found that they did not demonstrate a protective role, were not emotionally able to intervene and protect, did not set aside their needs in favor of the children, did not demonstrate tolerance, did not have sufficient impulse and emotional control, and did not have a strong emotional bond with the children.  See Complaint ¶ 58, at 21-22.

Following O. Varela's death, the CYFD assumed custody of N.V. and E.V.  See Complaint ¶ 60, at 22.  After removing the children in December, 2013, N.V. reported abuse against her by both S. Varela and Casaus.  See Complaint ¶ 61, at 22.  Specifically, she reported that she was: (i) hit with a belt buckle by S. Varela; (ii) punched in the forehead by Casaus; (iii) locked in a dark bedroom and in a closet; and (iv) choked by S. Varela.  See Complaint ¶22, at 61.  After evaluating N.V., the CART found that N.V.'s reports were consistent with such abuse injuries, including "a scar resembling a cigarette burn, numerous healed linear scars, and abrasions."  Complaint ¶ 62, at 23.

**PROCEDURAL BACKGROUND**

The Court will first describe the Plaintiffs' claims against the Defendants.  Then it will describe the Plaintiffs' and Defendants' arguments regarding the CYFD MTD and Roybal MTD ("the motions").

1.      **The Complaint.**

The Plaintiffs allege four claims against the Defendants.  See Complaint ¶¶ 65-133, at 24-43.  First, the Plaintiffs allege a civil rights claim against Roybal, Placencio, and John Does 1-5 for failure to exercise professional judgment.  See Complaint ¶¶ 65-89, at 24-32.  They argue that

Roybal "made the unilateral decision to remove five-year old Omaree and infant N.V. from the home of their biological parent and affirmatively place them under the exclusive care and control of a non-relative," without following the New Mexico Children's Code requirements.  Complaint ¶¶ 67-69, at 24-26.  The Plaintiffs contend that Roybal's Memo, which "admonished third parties such as the school system not to interfere with the placement -- had the purpose and effect of taking Omaree and N.V. into the State's custody."  Complaint ¶70, at 26.  The Plaintiffs explain that, by unilaterally placing the children with a non-relative without any training or licensure, Roybal "intentionally and knowingly bypassed established professional and legal procedure, and substantially departed from accepted professional judgment, practice or standards in such a way as to abdicate reliance on professional judgment."  Complaint ¶ 71, at 26.  Similarly, the Plaintiffs allege that, when Placencio or John Does 1-5 removed the children from Sotelo's care and placed them with S. Varela and Casaus without following the New Mexico Children's Code requirements and procedures, they likewise departed from professional judgment, practice, or standards and abdicated reliance on professional judgment.  See Complaint ¶ 75, at 27.  The Plaintiffs state that, as further evidence that Placencio or John Does 1-5 abdicated professional judgment, they did not investigate whether the new placement with S. Varela and Casaus would be more dangerous than their previous placement with Sotelo.  See Complaint ¶¶ 79-81, at 28-30.  The Plaintiffs assert that the Defendants breached their duty to exercise professional judgment, which violated the children's fundamental right under the Fourteenth Amendment not to be placed in a potentially abusive environment and proximately caused physical and emotional abuse.  See Complaint ¶¶ 82-83, at 30-31; id. ¶ 89, at 32.

In Count II, the Plaintiffs allege that Roybal, Placencio, and John Does 1-5 violated O. Varela's and N.V.'s Fourteenth Amendment right not to be placed in or subjected to an injurious

and unsafe environment.  See Complaint ¶¶ 91-92, at 32-33.  They argue that, by removing the children from S. Varela's care -- and later from Sotelo's care -- and asserting "custody and control over them," Defendants Roybal, Placencio, and John Does 1-5 "assumed an affirmative duty arising out of the special relationship among Defendants, the State of New Mexico, and children in the State's custody -- to protect and supervise" the children.  Complaint ¶¶ 95-97, at 33-34.  They assert that this duty requires the Defendants to ensure the "safe and proper disposition of children within their custody and control, to avoid placing any such children in situations of greater danger than those from which Defendants removed the children in the first place, and to refrain from enhancing the special dangers to which the children were already subject."  Complaint ¶ 93, at 33.  The Plaintiffs allege that the Defendants "affirmatively created the danger" to O. Varela and N.V. by: (i) assuming custody in an unreviewable manner that ignored the New Mexico Children's Code requirements; (ii) threatening Sotelo with felony criminal prosecution and demanding that she bring the children to New Mexico; (iii) placing the children with S. Varela and Casaus without following the New Mexico Children's Code requirements.  See Complaint ¶ 98, at 34-36.

In Count III, the Plaintiffs allege that Roybal, Placencio, and John Does 1-5 denied O. Varela and N.V. the Fourteenth Amendment right to petition and have access to the courts, and to use New Mexico's legal remedies and procedures for assuring their health and safety.  See Complaint ¶ 112, at 40.  They argue that the Defendants assumed custody of O. Varela and N.V. when Roybal removed the children from their biological parent, and placed them with a non-relative for an unlimited and unspecified time period.  See Complaint ¶ 107, at 38.  The Plaintiffs explain that, by failing to adhere to the New Mexico Children's Code requirements, the Defendants deprived the children of numerous statutory protections and safeguards, including the

right to access the court system.  See Complaint ¶ 109, at 38-39.  The Plaintiffs further explain that Placencio or John Does 1-5 similarly deprived the children of court access by removing them from Sotelo's care and placing them in a new home without proper investigation.  See Complaint ¶ 11, at 40.

Finally, in Count IV, the Plaintiffs allege that CYFD's involvement in the above-described incidents violated the NMTCA.  Complaint ¶¶ 117-133, at 41-43.  They argue that the CYFD orchestrated the children's placement with Sotelo, and continued its "complete control" over the children's placement when it "forcibly place[d] them" with S. Varela and Casaus.  Complaint ¶¶ 119-120, at 41-42.  The Plaintiffs explain that the CYFD "operated and/or maintained the building," because the CYFD "exclusively selected" S. Varela's home as the place to locate the children.  Complaint ¶ 121, at 42.  They argue that the CYFD breached its duty to exercise reasonable care in operating and maintaining S. Varela's residence and caused the children's abuse.  See Complaint ¶¶ 122-26, at 42.  They note that the CYFD has waived liability "to the full extent provided by the New Mexico Tort Claims Act."  Complaint ¶ 132, at 43.

### 2.  The CYFD MTD.

The CYFD and Placencio filed the CYFD MTD on December 15, 2015.  See CYFD MTD at 1.  They first argue that the Complaint fails to state a claim against Placencio.  See CYFD MTD at 9-10.  They explain that the Complaint does not allege how Placencio abdicated his professional responsibilities, because he never had custody of the children.  See CYFD MTD at 10.  The Defendants further state that Placencio did not abdicate this responsibility by neglecting to petition a court for custody.  See CYFD MTD at 10.  Next, the CYFD and Placencio explain that the Fourteenth Amendment's Due Process Clause imposes duties upon state actors to protect citizens' life, liberty, and property from deprivation by third parties only

when: (i) a state has a special, custodial relationship with the victim; and (ii) the state created the danger that harmed the victim.  See CYFD MTD at 12.  They contend that neither the Memo's recommendation that the children remain with Sotelo, nor Placencio's order that Sotelo return the children to New Mexico, created a special relationship between Placencio and the children.  See CYFD MTD at 13-14.  They further argue that Placencio's actions did not create or enhance any danger to the children.  See CYFD MTD at 15-16.  They assert that the Plaintiffs must allege that the CYFD assumed custody of the children to prove any of their claims.  See CYFD MTD at 16.  They contend that the Plaintiffs do not allege sufficient facts to support their contention that the CYFD assumed custody of the children.  See CYFD MTD at 16.  They argue that the CYFD and Placencio did not remove the children from S. Varela's custody; instead, the Plaintiffs state, S. Varela "voluntarily gave custody of Omaree Varela and N.V., without the intervention of CYFD, to Ms. Sotelo."  CYFD MTD at 17.  The CYFD and Placencio argue that "there is no clearly established law that applies the danger creation theory of recovery to an entity that does not have custody and therefore cannot create the danger alleged."  CYFD MTD at 17.  Finally, the CYFD and Placencio argue that the NMTCA does not waive liability for torts that public employees commit.  See CYFD MTD at 20-23.

> **3.**  **The Roybal MTD.**

Roybal likewise contends that the Complaint does not state a claim against him.  See Roybal MTD at 12.  First, Roybal argues that the Complaint does not allege that there was any basis for him to conclude that abuse allegations were substantiated.  See Roybal MTD at 13.  He contends that, because the Complaint does not present any facts showing that the investigative findings were incorrect, he did not abdicate his professional responsibility or otherwise violate the children's constitutional rights by concluding that the abuse was unsubstantiated.  See Roybal MTD at 13.  Second, Roybal argues that the Memo does not "state that CYFD assumed or

asserted custody over the children," so it did not create a special relationship between Roybal and the children.  Roybal MTD at 12-13.  He explains that he was unaware that Sotelo used the Memo to obtain medical treatment, to enroll the children in school, or to procure social security benefits.  See Roybal MTD at 12.  He emphasizes that S. Varela "voluntarily placed" the children with Sotelo "before CYFD began its investigation of the referral," so he "had no authority to dictate the placement of the children."  Roybal MTD at 17.  He argues that the Memo did not create a custodial relationship, because it could not "deprive a biological mother of her rights to have custody of her children."  Roybal MTD at 18.  He concludes that, without a custodial relationship, the Complaint does not sufficiently allege that he had a special relationship with the children, and therefore violated the children's constitutional rights.  See Roybal MTD at 16-18.

Next, Roybal asserts that the Complaint does not sufficiently allege that he violated the children's constitutional rights by creating or enhancing any danger to the children.  See Roybal MTD at 18.  He admits that the "CYFD has an obligation to not enhance the danger of children in its custody," but maintains that O. Varela and N.V. were not in the CYFD's custody when they lived with Sotelo.  Roybal MTD at 19.  He further argues that the Complaint does not allege the facts necessary to show that he created a danger.  See Roybal MTD at 19-20.  Specifically, he asserts that the Complaint fails to allege that any risk to the children was obvious and known.  See Roybal MTD at 19-20.  He contends that "there is no clearly established law that applies the danger creation theory of recovery to an entity that does not have custody."  Roybal MTD at 20.  Roybal therefore asserts that he is entitled to qualified immunity.  See Roybal MTD at 22-23.  Finally, Roybal contends that the NMTCA does not waive liability for torts that public employees commit.  See Roybal MTD at 22-23.

- 18 -

4.    **The Response.**

The "parties agreed that the response and reply to [the motions] will be combined."
Roybal MTD at 1.  The Plaintiffs filed the Response to both motions on February 18, 2016.  See
Plaintiffs' Consolidated Response to Motions to Dismiss Filed by Defendants Bennie Placencio
and New Mexico Children, Youth and Families Department [Doc. 10] and Defendant Joe Roybal
[Doc. 14], filed February 18, 2016 (Doc. 20)("Response").  The Plaintiffs begin by arguing that
the Complaint contains all necessary factual allegations.  See Response at 2-3.  They note that
rule 8(a)(2) of the Federal Rules of Civil Procedure and case law from the United States Court of
Appeals for the Tenth Circuit requires only that a Complaint give the defendant fair notice of the
claim and the grounds on which it rests.  See Response at 2.  Furthermore, the Plaintiffs contend,
the Defendants cannot "attempt to refute the complaint or to present a different set of
allegations" in their 12(b)(6) challenge.  Response at 4.  The Plaintiffs argue that the Defendants
violate this rule by basing their argument on factual assertions outside of the Complaint "or
directly contrary to Plaintiffs' well-pled factual allegations."  Response at 4.

Specifically, the Plaintiffs point to the Defendants' contention that S. Varela "voluntarily
placed her children with Essie Sotelo."  Response at 4.  They counter: "Plaintiffs nowhere make
this allegation, and do not allege that, as of September 2009, Synthia Varela voluntarily
transferred custody of her children."  Response at 5.  The Plaintiffs assert that the Defendants'
allegations that the children's placement with Sotelo was "voluntary" are "completely imaginary
reconstructions of the factual allegations in the Complaint, and fly in the face of this Court's
obligation to accept Plaintiffs' well-pleaded factual allegations as true."  Response at 7.
Likewise, the Plaintiffs argue that the Defendants disregard the Plaintiffs' factual assertions that
Placencio ordered Sotelo to return the children to New Mexico.  See Response at 8-9.  The
Plaintiffs argue that, instead, the Defendants "seek to replace it with a more favorable factual

characterization" that Placencio's contact with Sotelo was a mere benign, non-confrontational request.  Response at 8.  The Plaintiffs state that their "well-pleaded facts are assumed to be true, not the alternative versions of these events put forward by Defendants in their motions."  Response at 9.

Second, the Plaintiffs contend that they sufficiently allege that the Defendants abdicated their professional judgment when the State had a special relationship with the children.  See Response at 11.  They argue that, because the CYFD effectively controlled the children's fate and assumed responsibility for their welfare, the children were in state custody.  See Response at 12-13.  They explain that, even if the children were not in the state's actual custody, they were in the state's "functional custody."  Response at 14.  The Plaintiffs state that, in either situation, precedent from the Tenth Circuit and the Supreme Court of the United States of America clearly establishes that "a reasonable official would [have] underst[oo]d . . . that he had a duty to exercise professional judgment in making decisions about the children's care and custody."  Response at 15-16 (alterations in Response).  The Plaintiffs further argue that they sufficiently alleged that the Defendants knew of the danger to the children or failed to exercise professional judgment to avoid danger.  See Response at 16.  They point to their allegation that Roybal's Memo solidified Sotelo's custody through the Memo instead of petitioning to the New Mexico Children's Court, thereby abdicating the duty to act professionally in making the placements.  See Response at 17.  They assert that the Defendants' "successful effort to skirt the dictates of New Mexico law is the very antithesis of an 'exercise [of] professional judgment.'"  Response at 18 (citing Yvonne L. v. N.M. Dep't of Human Servs., 959 F.2d 883, 890 (1992)("Yvonne L.")).  The Plaintiffs then argue that the Defendants' failure to secure the children's custody through

formal legal channels prevented the children from accessing "the full panoply of protections under the Children's Code."  Response at 18.

Third, the Plaintiffs assert that the Complaint sufficiently alleges that the Defendants abdicated their professional judgment when the State subjected the children to a grave danger. See Response at 21-22.  Contrary to the Defendants' arguments, the Plaintiffs state that Tenth Circuit law clearly establishes that state actors can be liable under the danger-creation doctrine in the absence of a special or custodial relationship.  See Response at 22.  The Plaintiffs describe how the Complaint asserts all the elements necessary to establish a danger-creation theory of liability.  See Response at 23-25.

Fourth, the Plaintiffs contend that the Complaint sufficiently alleges that the Defendants violated the children's constitutional rights by denying them access to the courts.  See Response at 25.  They point to the Complaint's allegations that the Defendants engineered the children's living arrangements "without honoring any of the requirements of the Children's Code," which thereby deprived the children of court access.  Response at 25-26.  The Plaintiffs cite Tenth Circuit precedent establishing that prisoners and involuntarily committed individuals have a constitutional right to court access.  See Response at 26.  The Plaintiffs explain that "children in foster care are equivalent to persons who have been imprisoned or involuntarily committed," meaning that they too "have a clearly established right of court access."  Response at 29.  The Plaintiffs further assert that the Defendants "*personally* infringed the children's court-access rights by failing to initiate Children's Court actions to adjudicate the children's best interests." Response at 29 (emphasis in Response).  Fifth, the Plaintiffs assert that the Complaint states a claim against the CYFD under the NMTCA.  See Response at 30.

5.      **The Reply**.

The Defendants submitted their joint reply on April 22, 2016.  See Defendants Bennie
Placencio, Joe Roybal and the New Mexico Children, Youth, and Families Department's
Consolidated Reply to Plaintiffs' Response to Their Motions to Dismiss, filed April 22, 2016
(Doc. 22)("Reply").  They explain that the motions do not rely on facts outside of the Complaint.
See Reply at 4.  Although the Plaintiffs allege in the Complaint that the Defendants had custody
of the children, the Defendants argue that the "Complaint cannot and does not allege that CYFD
took any action judicially or otherwise to assume custody of the Children," because it does not
allege that the Defendants followed the statutorily required procedures for taking children into
custody.  Reply at 4-5.  In short, the Defendants argue that they could not have taken the children
into custody without following the formal procedures for doing so.  See Reply at 5 (arguing that
the Defendants' actions did not constitute a "voluntary placement outside of the home" that
would give New Mexico custody over the children, because the children's placement with Sotelo
was not made pursuant to the New Mexico Children's Code).  They argue that, even though the
Plaintiffs assert that S. Varela did not voluntarily give her children to Sotelo in September 2009,
the motions' assertions that S. Varela voluntarily gave her children to Sotelo are "warranted by
the facts."  Reply at 6.  The Defendants assert that, without such custody and in the face of S.
Varela's voluntary placement, "CYFD does not owe any duty to the Children."  Reply at 2.  See
Reply at 4 ("It is clear from the Complaint, that CYFD never assumed custody of the
Children.").

The Defendants next contend that, in the absence of a custodial relationship with the
children, Placencio acted appropriately in returning the children to S. Varela.  See Reply at 8.
They explain that, as the children's mother, S. Varela was entitled to custody unless the CYFD
was investigating an abuse allegation.  See Reply at 8-9.  The Defendants further argue that

Placencio had no need to investigate how S. Varela's medical issues might affect her caretaking ability and had no need to evaluate the new home situation, because no abuse allegations had been substantiated in the past.  See Reply at 10.

The Defendants then turn their attention to the CYFD, arguing that it did not have a special relationship with the children, because it never obtained custody of the children.  See Reply at 11; id. at 12 ("The Plaintiffs' problem is that the Children were not in the custody of CYFD.").  They argue that the "special relationship exception depends on the state assuming custody of the children."  Reply at 13.  Likewise, they maintain that without custody, "the Defendants could not create danger for the Children."  Reply at 12.

Finally, the Defendants argue that they did not violate the Plaintiffs' right to court access, because "there is no clearly establish right violated by Defendants' acts in failing to file a petition in the Children's Court."  Reply at 15.  They concede that children in foster care may be akin to imprisoned individuals with a right to court access.  See Reply at 16.  Nonetheless, they maintain that the children were not in state custody.  See Reply at 16.  They therefore argue that no law clearly establishes that "a person, not in state custody, can state a claim against Defendants for depriving the person of access to the courts."  Reply at 16.  They conclude that the Defendants "had no obligation to provide the Children with court access."  Reply at 16.

### 6.    The Hearing.

The Court held a hearing on May 5, 2016.  See Transcript of Hearing, taken May 5, 2016 ("Tr.").[4]  To begin, the Court asked the Defendants whether the CYFD frequently allows biological parents to informally give their children to relatives or to friends, like Roybal did with S. Varela and Sotelo.  See Tr. 10:11-17 (Court).  The Defendants stated that parents frequently

---

[4]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

leave their children with many different friends and relatives "when they're not on the radar of CYFD." Tr. at 10:17-22 (Williams)("And I'm sure that I can think of in my life several instances where that happens and CYFD is not involved."). The Defendants argued that informal transfers "happen[] a lot," and that the CYFD knows about these transfers, but does not insert itself into the situation unless the CYFD has custody of the child.[5] Tr. at 12:21-24 (Williams). The Defendants explained that, because S. Varela transferred her children to Sotelo using this informal process, and because the Memo "never mentions custody," the CYFD could not have formal custody over the children. Tr. at 13:6-17:2 (Williams). The Court agreed that no formal custody existed, but stated that the Complaint plausibly alleges that a functional custodial relationship could exist. See Tr. at 18:6-12 (Court). The Defendants agreed with the Court that, if the Court finds a special relationship exists between the children and the CYFD, the special relationship exists with Placencio and Roybal as well. See Tr. at 9:9-17 (Williams).

The Defendants conceded that the Memo "acknowledges the custodial relationship for [Sotelo]," Tr. at 14:10-12 (Williams), and that a "vicarious custodial relationship" existed via

---

[5]The Defendants appeared to argue that informal transfers are common and that the CYFD does not get involved unless the children are in the CYFD's formal, legal custody. The Plaintiffs have alleged, however, that the New Mexico Administrative Code's formal procedures are mandatory. See Complaint ¶ 69, at 24-25. Moreover, the Court's analysis of the relevant provisions supports the Plaintiffs' contention that the only legal way to remove children from their parents' home is through the Administrative Code's formal procedures. See N.M.A.C. § 8.10.8.10 ("When a child cannot safely remain in his or her home, PSD shall pursue legal custody of the child." (emphasis added)). Finally, the Defendants did not state that the CYFD has the option to transfer children from a parent's home using informal procedures; rather, they stated that parents accomplish such transfers when the children are not on the CYFD's radar. See Tr. at 10:17-22 (Williams). Notably, the CYFD stated that it does not get involved in the transfers. See Tr. at 12:21-24 (Williams). O. Varela's and N.V.'s situation is different. Here, the CYFD did not merely allow S. Varela to transfer her children to Sotelo; the CYFD inserted itself into the situation. Accordingly, although the Defendants suggest that informal transfers are common, this Motion is based on the Plaintiffs' factual assertions, which the Code supports, that the Code provisions are mandatory.

Sotelo, Tr. at 17:24-18:3 (Williams).   In other words, they conceded that Sotelo directly controlled the children and that the State had an indirect custodial relationship through Sotelo. See Tr. at 17:24-18:3 (Williams).   Nevertheless, they maintained that no custodial relationship could exist unless the State controlled Sotelo's behavior.   See Tr. at 16:5-9 (Williams)("So she doesn't acknowledge that CYFD has any control over her relationship with those kids.").   They emphasized that the State did not control Sotelo's behavior, because she took the children to Arizona. See Tr. at 18:14-20 (Williams).   In response, the Plaintiffs clarified that the Complaint alleges that Roybal knew about Sotelo's move to Arizona and acquiesced.   See Tr. at 29:16-30:1 (Schultz).   The Court also noted that Sotelo's absence from the State did not have constitutional significance. See Tr. at 25:14-19 (Court).   The Plaintiffs then expressed their agreement with the Court's understanding that a custodial relationship began when the CYFD refused to return the children to S. Varela and wrote the Memo.   See Tr. at 29:2-10 (Schultz).

The Court then indicated that it did not think Roybal created any danger, a proposition with which the Defendants agreed.   See Tr. at 37:14-38 (Court, Williams).   Regarding Placencio, the Defendants noted that there were no substantiated abuse allegations in S. Varela's file and stated that no red flags appeared that the children would be in danger.   See Tr. at 38:11-13 (Williams).   The Court observed that Placencio enhanced the risk that the children would be abused by conducting no inquiry or evaluation into S. Varela.   See Tr. at 39:13-17 (Court).   The Defendants maintained that the danger always existed, and Placencio did nothing to create or enhance that danger; he merely reinstated the status quo.   See Tr. at 40:10-25 (Williams).   They emphasized the balancing act between the children's right to be free from danger and the mother's rights to familial association.   See Tr. at 41:1-8 (Williams).

The Plaintiffs responded that the home that the children left when S. Varela divested herself of custody was not the same home that Placencio "forcibly required these children to return to." Tr. at 44:7-12 (Schultz). Although the biological mother remained the same, the home itself had significantly changed: (i) a cocaine-addicted baby; and (ii) Casaus lived in the home after being released from prison. See Tr. at 44:13-24 (Schultz). The Plaintiffs noted that the sheer fact that eighteen months had passed was an additional factor: "It's everything that transpired during those eighteen months, not the fact that eighteen months had passed." Tr. at 46:4-6 (Schultz). Regarding Roybal, the Plaintiffs argued that once Roybal chose to intervene, he was under a duty to intervene in a way that would not enhance their exposure to a pre-existing danger. See Tr. at 49:16-22 (Schultz). When he bypassed the Children's Code, the Plaintiffs explained, he removed the procedural safeguards that protected the children, which made the children more vulnerable to the danger that Placencio later created. See Tr. at 49:23-50:2 (Schultz).

The Court then asked the parties to address whether the Defendants violated the professional judgment standard. The Defendants argued that the Complaint merely alleges that Roybal and Placencio "failed to follow the Children's Code." Tr. at 58:20-23 (Williams). As for Placencio, the Defendants argue that he did not abdicate his judgment, because he did not know that he needed to use formal procedures to transfer the children to S. Varela. See Tr. at 59:1-7 (Williams). The Court asked the Plaintiffs whether Roybal's failure to use the Children's Code constitutes a constitutional violation. See Tr. at 30:24-31:2 (Court). They explained that the question was not whether Roybal violated the Constitution by failing to use formal procedures, but whether Roybal violated the Constitution by denying S. Varela custody in September, 2009 based on his own judgment. See Tr. at 31:3-17 (Schultz). The Plaintiffs asserted that no record

evidence demonstrates that the CYFD frequently allowed parents to accomplish such informal transfers, and that transfers could only be made pursuant to the Children's Code.  See Tr. at 62:24-25 (Schultz).  They further explained that they needed to develop how Roybal's actions varied from professional judgment through discovery.  See Tr. at 31:3-18 (Schultz).

The Defendants next argued that Roybal's and Placencio's actions did not shock the conscience.  See Tr. at 68:4-15 (Williams).  The Defendants acknowledged that S. Varela's actions were conscience-shocking, but they emphasized that Roybal's and Placencio's actions do not meet the Tenth Circuit's outrageousness requirement.  See Tr. at 67:23-68:3 (Williams). They stated: "One wrote a memo.  One returned the children to their natural mother.  Those are not things that would shock the conscience."  Tr. at 68:8-15 (Williams). In response, the Plaintiffs argued that what shocks the conscience is not clear and, "oftentimes, can only be determined in the context of discovery."  Tr. at 69:6-19  (Schultz).  The Defendants cited several Tenth Circuit cases in which the Tenth Circuit stated that the facts alleged could be conscience-shocking after discovery revealed that no CYFD social worker has ever performed the same actions as Roybal and Placencio.  See Tr. at 69:20-70:20 (Schultz)(citing Schwartz v. Booker, 702 F.3d 573, 580 (10th Cir. 2012); Currier v. Doran, 242 F.3d 905, 923 (10th Cir. 2001)).

Regarding qualified immunity, the Plaintiffs emphasized that they do not have to cite a case with identical facts to this one.  See Tr. at 82:1-6 (Schultz).  The Court observed that the Tenth Circuit has stated that defendants are entitled to qualified immunity when the case contains any facts different from prior cases that might have constitutional significance.  See Tr. at 82:7-13 (Court).  The Plaintiffs argued that the Supreme Court's most recent qualified-immunity case, Mullenix v. Luna, 136 S. Ct. 305 (2015), demonstrates that the Supreme Court requires a close factual connection only "in the Fourth Amendment context."   Tr. at 82:14-22 (Schultz).

Accordingly, the Plaintiffs stated, the law was clear that a custodial relationship between the State and an involuntarily committed individual would be sufficient to require the State to protect the individual from private acts of violence, and that children are entitled to substantive due process to the same extent as the criminally convicted or mentally committed.  See Tr. at 82:22-83:16 (Schultz).

The Court stated that it was likely stretching the law further than any case by finding functional custody existed.  See Tr. at 83:17-22 (Court).  The Plaintiffs admitted that no court had found functional custody in the child custody context.  See Tr. at 83:23-24 (Schultz).  The Court asked whether the Plaintiffs were suggesting that the Court use a different qualified-immunity test for substantive due process than it would for the Fourth Amendment.  See Tr. at 86:2-6 (Court).  The Plaintiffs responded that recent case law suggests that "the [Supreme] Court is developing a different qualified immunity standard under the Fourth Amendment that requires a higher level of factual [specificity] than in other contexts."  Tr. at 86:12-17 (Schultz).  In short, the Plaintiffs asserted that the Tenth Circuit expanded the qualified-immunity protection under the Fourth Amendment, but not necessarily in other contexts.  See Tr. at 87:2-9 (Schultz).  The Plaintiffs concluded that the law was clearly established "that a state official has violated the substantive due process rights of a child in state custody when they fail to exercise professional judgment."  Tr. at 91:20-24 (Schultz).

The Defendants argued that Roybal and Placencio did not violate the children's access to the court, because the children were not in formal, legal custody and were not entitled to formal process.  See Tr. at 96:5-10 (Williams).  Further, they explained, even if Roybal and Placencio violated the children's right to court access, they are entitled to qualified immunity.  See Tr. at 96:14-16 (Williams).  As the functional custodians of these children, they explained, the law was

not clear what was required of them.  See Tr. at 97:3-99:6 (Williams).  In response, the Plaintiffs said that Roybal and Placencio did nothing to access the Children's Code's procedural benefits, which would have given the children meaningful representation in court.  See Tr. at 99:16-23 (Schultz).  With regard to qualified immunity, the Plaintiffs stated that the right of access was not clearly established until 1985.  See Tr. at 100:4-6 (Schultz).  They asserted that foster children are entitled to the same rights as the developmentally disabled and criminally committed, which includes a right to court access.  See Tr. at 100:6-11 (Schultz).  The Plaintiffs contended that the Fifth Circuit has held that "an abused child in a claim against social workers stated a claim for a violation of her constitutional right when the social workers disregarded Mississippi statutes that required allegations of child abuse to be reported to the Children's Court."  Tr. at 101:17-24 (Schultz)(citing Chrissy F. v. Mississippi Department of Public Welfare, 925 F.2d 844 (5th Cir. 1991)).  They explained that, because the Fifth Circuit case applied in the foster care context at issue here, the law therefore clearly established that Roybal and Placencio deprived the children's of court access.  See Tr. at 101:11-15 (Schultz).

## LAW REGARDING MOTIONS TO DISMISS UNDER RULE 12(b)(6)

Rule 12(b)(6) authorizes a court to dismiss a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  "The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true."  Mobley v. McCormick, 40 F.3d 337, 340 (10th Cir. 1994)(Brorby, J.).  The complaint's sufficiency is a question of law; and, when considering a rule 12(b)(6) motion, a court must accept as true all well-pled factual allegations in the complaint, view those allegations in the light most favorable to the non-moving party, and draw all reasonable inferences in the plaintiff's favor.   See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322

(2007)("[O]nly if a reasonable person could not draw . . . an inference [of plausibility] from the alleged facts would the defendant prevail on a motion to dismiss."); Smith v. United States, 561 F.3d 1090, 1098 (10th Cir. 2009)(Briscoe, J.)("[F]or purposes of resolving a Rule 12(b)(6) motion, we accept as true all well-pled factual allegations in a complaint and view these allegations in the light most favorable to the plaintiff.")(citing Moore v. Guthrie, 438 F.3d 1036, 1039 (10th Cir. 2006)).

A complaint need not set forth detailed factual allegations, yet a "pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action" is insufficient. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)(citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Ashcroft v. Iqbal, 556 U.S. at 678. "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Bell Atl. Corp v. Twombly, 550 U.S. at 555 (citation omitted).

To survive a motion to dismiss, a plaintiff's complaint must contain sufficient facts that, if assumed to be true, state a claim to relief that is plausible on its face. See Bell Atl. Corp. v. Twombly, 550 U.S. at 570; Mink v. Knox, 613 F.3d 995, 1000 (10th Cir. 2010)(Seymour, J.). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. at 678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 556). "Thus, the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complainant must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims." Ridge at Red

Hawk, LLC v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007)(Kelly, J.)(emphasis omitted).

The United States Court of Appeals for the Tenth Circuit has stated:

> "[P]lausibility" in this context must refer to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs "have not nudged their claims across the line from conceivable to plausible." The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief.

Robbins v. Oklahoma, 519 F.3d 1242, 1247 (10th Cir. 2008)(quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 570)(citations omitted).

Although affirmative defenses must generally be pled in the defendant's answer, not argued on a motion to dismiss, see Fed. R. Civ. P. 8(c), there are exceptions where: (i) the defendant asserts an immunity defense -- the courts handle these cases differently than other motions to dismiss, see Glover v. Gartman, 899 F. Supp. 2d 1115, 1137-39, 1141 (D.N.M. 2012)(Browning, J.)(citing Pearson v. Callahan, 555 U.S. 223 (2009) and Robbins v. Oklahoma, 519 F.3d 1242 (10th Cir. 2008)); and (ii) where the facts establishing the affirmative defense are apparent on the face of the complaint, see Miller v. Shell Oil Co., 345 F.2d 891, 893 (10th Cir. 1965)(Hill, J.)("Under Rule 12(b), a defendant may raise an affirmative defense by a motion to dismiss for the failure to state a claim. If the defense appears plainly on the face of the complaint itself, the motion may be disposed of under this rule.").

## LAW REGARDING LIABILITY FOR CONSTITUTIONAL VIOLATIONS UNDER 42 U.S.C. § 1983

Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in

> any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.  For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

42 U.S.C. § 1983.  "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law."  West v. Atkins, 487 U.S. 42, 48 (1988).   Individual, non-supervisory defendants may be liable if they knew or reasonably should have known that their conduct would lead to the deprivation of a plaintiff's constitutional rights by others, and an unforeseeable intervening act has not terminated their liability.  See Martinez v. Carson, 697 F.3d 1252, 1255 (10th Cir. 2012)("The requisite causal connection is satisfied if [the defendants] set in motion a series of events that [the defendants] knew or reasonably should have known would cause others to deprive [the plaintiffs] of [their] constitutional rights.")(quoting Trask v. Franco, 446 F.3d 1036, 1046 (10th Cir. 2006)).   The Supreme Court has made clear that there is no respondeat superior liability under 42 U.S.C. § 1983.  See Ashcroft v. Iqbal, 556 U.S. at 675 ("Because vicarious liability is inapplicable to Bivens[6] and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); Bd. of Cty. Comm'rs v. Brown, 520 U.S. 397, 403 (1997).   "An entity cannot be held liable solely on the basis of the existence of an employer-employee relationship with an alleged tortfeasor."  Garcia v. Casuas, No. CIV 11-0011 JB/RHS, 2011 WL 7444745, at *25 (D.N.M. Dec. 8, 2011) (Browning, J.)(citing Monell v. Dep't of Soc. Servs., 436 U.S. 658, 689 (1978)).  Supervisors can

---

[6]In Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388 (1971), the Supreme Court held that a violation of the Fourth Amendment "by a federal agent acting under color of his authority gives rise to a cause of action for damages consequent upon his unconstitutional conduct."  403 U.S. at 389.

be held liable only for their own unconstitutional or illegal policies, and not for the employees' tortious acts.  See Barney v. Pulsipher, 143 F.3d at 1307-08.

### 1.   **Color of State Law.**

"Under Section 1983, liability attaches only to conduct occurring 'under color of law.'" Gallagher v. Neil Young Freedom Concert, 49 F.3d 1442, 1447 (10th Cir. 1995).   The under-color-of-state-law requirement is a "jurisdictional requisite for a § 1983 action, which . . . furthers the fundamental goals of preserving an area of individual freedom by limiting the reach of federal law . . . and avoiding imposing on the state, its agencies or officials, responsibility for conduct for which they cannot fairly be blamed."   Jojola v. Chavez, 55 F.3d 488, 492 (10th Cir. 1995).   "The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'"   West v. Atkins, 487 U.S. at 49 (quoting United States v. Classic, 313 U.S. 299, 326 (1941)).   "The authority with which the defendant is allegedly 'clothed' may be either actual or apparent."   Jojola v. Chavez, 55 F.3d at 493.   Accordingly, at a base level, to find that an action was taken under color of state law, the court must find that "'the conduct allegedly causing the deprivation of a federal right' must be 'fairly attributable to the State.'"   Gallagher v. Neil Young Freedom Concert, 49 F.3d at 1447 (quoting Lugar v. Edmonson Oil Co., 457 U.S. 922, 937 (1982)).

In the context of a public employee, the Tenth Circuit has directed that, while "'state employment is generally sufficient to render the defendant a state actor . . . [,]' at the same time, it is 'well settled that an otherwise private tort is not committed under color of law simply because the tortfeasor is an employee of the state.'"   Jojola v. Chavez, 55 F.3d at 493 (quoting Lugar v. Edmonson Oil Co., 457 U.S. at 935-36 n.18; Mark v. Borough of Hatboro, 51 F.3d

1137, 1150 (3d Cir. 1995)).  Thus, "before conduct may be fairly attributed to the state because it constitutes action 'under color of state law,' there must be 'a real nexus' between the employee's use or misuse of their authority as a public employee, and the violation allegedly committed by the defendant."  Jojola v. Chavez, 55 F.3d at 493.  What constitutes the required real nexus, however, is not completely clear.  As the Tenth Circuit has stated, whether there is a real nexus in a particular case depends on the circumstances:

> The under color of law determination rarely depends on a single, easily identifiable fact, such as the officer's attire, the location of the act, or whether or not the officer acts in accordance with his or her duty.  Instead one must examine "the nature and circumstances of the officer's conduct and the relationship of that conduct to the performance of his official duties."

David v. City & Cty. of Denver, 101 F.3d 1344, 1353 (10th Cir. 1996)(internal citations omitted)(quoting Martinez v. Colon, 54 F.3d 980, 986 (1st Cir. 1995)).

### 2.    Individual Liability.

Government actors may be liable for the constitutional violations that another committed, if the actors "set in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights," thus establishing the "requisite causal connection" between the government actor's conduct and a plaintiff's constitutional deprivations.  Trask v. Franco, 446 F.3d at 1046.  The Tenth Circuit has explained that § 1983 liability should be "'read against the background of tort liability that makes a man responsible for the natural consequences of his actions.'"  Martinez v. Carson, 697 F.3d at 1255 (quoting Monroe v. Pape, 365 U.S. 167, 187 (1961), overruled in part by Monell v. Dep't of Soc. Servs., 436 U.S. at 663).  "Thus, Defendants are liable for the harm proximately caused by their conduct."  Martinez v. Carson, 697 F.3d at 1255 (citing Trask v. Franco, 446 F.3d at 1046).  As the Court has previously concluded, "a plaintiff who establishes liability for deprivations of

constitutional rights actionable under 42 U.S.C. § 1983 is entitled to recover compensatory damages for all injuries suffered as a consequence of those deprivations.  The recovery should be guided by common-law tort principles -- including principles of causation . . . ."  Train v. City of Albuquerque, 629 F. Supp. 2d 1243, 1251 (D.N.M. 2009)(Browning, J.).

The Tenth Circuit has found liability for those defendants who proximately caused an injury alleged under § 1983 and stated that the fact that the "conduct of other people may have concurrently caused the harm does not change the outcome as to [the defendant]," so long as there was not a superseding-intervening cause of a plaintiff's harm.  Lippoldt v. Cole, 468 F.3d 1204, 1220 (10th Cir. 2006).

> Even if a factfinder concludes that the residential search was unlawful, the officers only "would be liable for the harm 'proximately' or 'legally' caused by their tortious conduct."  Bodine v. Warwick, 72 F.3d 393, 400 (3d Cir. 1995). "They would not, however, necessarily be liable for all of the harm caused in the 'philosophic' or but-for sense by the illegal entry."  Id.  In civil rights cases, a superseding cause, as we traditionally understand it in tort law, relieves a defendant of liability.  See, e.g., Warner v. Orange Cty. Dep't of Prob., 115 F.3d 1068, 1071 (2d Cir. 1997); Springer v. Seaman, 821 F.2d 871, 877 (1st Cir. 1987), abrogated on other grounds by Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701 . . . (1989).

Trask v. Franco, 446 F.3d at 1046.  Thus, in the context of a claim under the Fourth Amendment, the Tenth Circuit has held that government actors "may be held liable if the further unlawful detention and arrest would not have occurred but for their conduct and if there were no unforeseeable intervening acts superseding their liability."  Martinez v. Carson, 697 F.3d at 1255. The Tenth Circuit gave an example of a superseding-intervening cause, quoting the Honorable Samuel J. Alito, then-United States Circuit Judge for the United States Court of Appeals for the Third Circuit, now-Associate Justice for the Supreme Court:

> Suppose that three police officers go to a suspect's house to execute an arrest warrant and that they improperly enter without knocking and announcing their presence.  Once inside, they encounter the suspect, identify themselves, show him

the warrant, and tell him that they are placing him under arrest. The suspect, however, breaks away, shoots and kills two of the officers, and is preparing to shoot the third officer when that officer disarms the suspect and in the process injures him. Is the third officer necessarily liable for the harm caused to the suspect on the theory that the illegal entry without knocking and announcing rendered any subsequent use of force unlawful? The obvious answer is "no." The suspect's conduct would constitute a "superseding" cause, see Restatement (Second) of Torts § 442 (1965), that would limit the officer's liability. See id. § 440.

Trask v. Franco, 446 F.3d at 1046 (quoting Bodine v. Warwick, 72 F.3d at 400). Additionally, "[f]oreseeable intervening forces are within the scope of the original risk, and . . . will not supersede the defendant's responsibility." Trask v. Franco, 446 F.3d at 1047 (quoting William Lloyd Prosser et al., Prosser and Keeton on Torts § 44, at 303-04 (5th ed. 1984)). If

the reasonable foreseeability of an intervening act's occurrence is a factor in determining whether the intervening act relieves the actor from liability for his antecedent wrongful act, and under the undisputed facts there is room for reasonable difference of opinion as to whether such act was wrongful or foreseeable, the question should be left for the jury.

Trask v. Franco, 446 F.3d at 1047 (citing Restatement (Second) of Torts § 453 cmt. b (1965)).

## 3. **Supervisory Liability.**

The Tenth Circuit has held that supervisors are not liable under § 1983 unless there is "'an affirmative link . . . between the constitutional deprivation and either the supervisor's personal participation, . . . exercise of control or direction, or . . . failure to supervise.'" Gallagher v. Shelton, 587 F.3d 1063, 1069 (10th Cir. 2009)(quoting Green v. Branson, 108 F.3d 1296, 1302 (10th Cir. 1997))(internal alterations omitted). Because supervisors can be held liable only for their own constitutional or illegal policies, and not for the torts that their employees commit, supervisory liability requires a showing that such policies were a "deliberate or conscious choice." Barney v. Pulsipher, 143 F.3d at 1307-08 (citations omitted)(internal quotation marks omitted). Cf. Bd. of Cty. Comm'rs v. Brown, 520 U.S. at 404 ("[I]t is not

enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality. The plaintiff must also demonstrate that, through its <u>deliberate</u> conduct, the municipality was the 'moving force' behind the injury alleged." (emphasis in original)).

The Tenth Circuit has recognized that <u>Ashcroft v. Iqbal</u> limited, but did not eliminate, supervisory liability for government officials based on an employee's or subordinate's constitutional violations. See <u>Garcia v. Casuas</u>, 2011 WL 7444745, at *25-26 (citing <u>Dodds v. Richardson</u>, 614 F.3d 1185 (10th Cir. 2010)). The language that may have altered the landscape for supervisory liability in <u>Ashcroft v. Iqbal</u> is as follows: "Because vicarious liability is inapplicable to <u>Bivens</u> and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." <u>Ashcroft v. Iqbal</u>, 556 U.S. at 676. The Tenth Circuit in <u>Dodds v. Richardson</u> held:

> Whatever else can be said about <u>Iqbal</u>, and certainly much can be said, we conclude the following basis of § 1983 liability survived it and ultimately resolves this case: § 1983 allows a plaintiff to impose liability upon a defendant-supervisor who creates, promulgates, implements, or in some other way possesses responsibility for the continued operation of a policy the enforcement (by the defendant-supervisor or her subordinates) of which "subjects, or causes to be subjected" that plaintiff "to the deprivation of any rights . . . secured by the Constitution . . . ."

614 F.3d at 1199. The Tenth Circuit noted that <u>Ashcroft v. Iqbal</u> "does not purport to overrule existing Supreme Court precedent," but stated that "<u>Iqbal</u> may very well have abrogated § 1983 supervisory liability as we previously understood it in this circuit in ways we do not need to address to resolve this case." <u>Dodds v. Richardson</u>, 614 F.3d at 1200. It concluded that <u>Ashcroft v. Iqbal</u> did not alter "the Supreme Court's previously enunciated § 1983 causation and personal involvement analysis." <u>Dodds v. Richardson</u>, 614 F.3d at 1200. The Tenth Circuit, based on this conclusion, set forth a test for supervisory liability under § 1983 after <u>Ashcroft v. Iqbal</u>:

> A plaintiff may . . . succeed in a § 1983 suit against a defendant-supervisor by demonstrating: (1) the defendant promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation.

Dodds v. Richardson, 614 F.3d at 1199-1200 (citing Summum v. City of Ogden, 297 F.3d 995, 1000 (10th Cir. 2002)).  The Tenth Circuit noted, however: "We do not mean to imply that these are distinct analytical prongs, never to be intertwined."  Dodds v. Richardson, 614 F.3d at 1200 n.8.  Relying on the Supreme Court's opinion in Board of County Commissioners v. Brown, the Tenth Circuit reasoned that two of the prongs often, if not always, are sufficient proof that the third prong has been met also:

> Where a plaintiff claims that a particular municipal action itself violates federal law, or directs an employee to do so, resolving these issues of fault and causation is straightforward.  Section 1983 itself contains no state-of-mind requirement independent of that necessary to state a violation of the underlying federal right. In any § 1983 suit, however, the plaintiff must establish the state of mind required to prove the underlying violation.  Accordingly, proof that a municipality's legislative body or authorized decisionmaker has intentionally deprived a plaintiff of a federally protected right necessarily establishes that the municipality acted culpably.  Similarly, the conclusion that the action taken or directed by the municipality or its authorized decisionmaker itself violates federal law will also determine that the municipal action was the moving force behind the injury of which the plaintiff complains.

Dodds v. Richardson, 614 F.3d at 1200 n.8 (quoting Bd. of Cty. Comm'rs v. Brown, 520 U.S. at 404-05)(internal quotation marks omitted).  The Tenth Circuit noted that "[w]e think the same logic applies when the plaintiff sues a defendant-supervisor who promulgated, created, implemented or possessed responsibility for the continued operation of a policy that itself violates federal law."  Dodds v. Richardson, 614 F.3d at 1200 n.8.  Thus, the Tenth Circuit reduced the test to what can be seen as a two-part test for supervisor liability, requiring the plaintiff to prove "an 'affirmative' link . . . between the unconstitutional acts by their subordinates and their 'adoption of any plan or policy . . . -- express or otherwise -- showing

their authorization or approval of such misconduct.'" Dodds v. Richardson, 614 F.3d at 1200-01 (quoting Rizzo v. Goode, 423 U.S. 362, 371 (1976)).

4.   **Municipal Liability.**

A municipality will not be held liable under § 1983 solely because its officers inflicted injury.  See Graves v. Thomas, 450 F.3d 1215, 1218 (10th Cir. 2006).  Rather, to establish municipal liability under § 1983, a plaintiff must demonstrate: (i) that an officer committed an underlying constitutional violation; (ii) that a municipal policy or custom exists; and (iii) that there is a direct causal link between the policy or custom, and the injury alleged.  See Graves v. Thomas, 450 F.3d at 1218.  When a claim is brought against a municipality for failing to train its officers adequately, the plaintiff must show that the municipality's inaction was the result of deliberate indifference to the rights of its inhabitants.  See Graves v. Thomas, 450 F.3d at 1218.

**LAW REGARDING SUBSTANTIVE DUE-PROCESS CLAIMS**

The Fourteenth Amendment's Due Process Clause provides that "no State shall . . . deprive any person of life, liberty, or property without due process of law."  U.S. Const. amend. XIV, § 1.  In general, state actors may be held liable under § 1983 only for their own affirmative acts that violate a plaintiff's due process rights and not for third parties' acts.  See Robbins v. Oklahoma, 519 F.3d at 1251 (citing DeShaney v. Winnebago Cty. Dep't of Soc. Servs., 489 U.S. 189, 197 (1989)("DeShaney")).  "[N]othing in the language of the Due Process Clause itself requires the State to protect the life, liberty and property of its citizens against invasion by private actors."  DeShaney, 489 U.S. at 195.  In other words, the Due Process Clause is not a guarantee of a minimal level of safety and security.  See DeShaney, 489 U.S. at 195.

1.      **Exceptions to the General Rule**.

There are, however, two exceptions to this general rule.  The first exception -- the special-relationship doctrine -- "exists when the state assumes control over an individual sufficient to trigger an affirmative duty to provide protection to that individual."  Christiansen v. City of Tulsa, 332 F.3d 1270, 1280 (10th Cir. 2003)(quoting Armijo v. Wagon Mound Public Schools, 159 F.3d 1253, 1260 (10th Cir. 1998)).  See Graham v. Indep. Sch. Dist. No. 1-89, 22 F.3d at 994-95.  The second exception -- the danger-creation theory -- provides that a state may also be liable for an individual's safety "only when 'a state actor affirmatively acts to create, or increases a plaintiff's vulnerability to, or danger from private violence.'"  Robbins v. Oklahoma, 519 F.3d at 1251 (quoting Currier v. Doran, 242 F.3d 905, 923 (10th Cir. 2001)).  "If either the special-relationship or danger-creation exception applies, the conduct of the state actor must go beyond negligence to the point of 'shocking the conscience.'"  Glover v. Gartman, 899 F. Supp. 2d at 1135 (citing Johnson ex rel. Estate of Cano v. Holmes, 455 F.3d 1133, 1142 (10th Cir. 2006)("The shocks the conscience standard applies to both types of suits.")).

2.      **The Special-Relationship Doctrine**.

The first exception to the general principle that a state's negligent failure to protect an individual cannot trigger liability under the Due Process Clause is the special-relationship doctrine.  A plaintiff must show: (i) that the state has restrained his or her "freedom to act to protect himself or herself through a restraint on that individual's personal liberty"; and (ii) that the restraint was involuntary.  Christiansen v. City of Tulsa, 332 F.3d at 1280 (quoting Armijo v. Wagon Mound Public Schools, 159 F.3d at 1261).  See A.M. ex rel. Youngers v. N.M. Dep't of Health, 65 F. Supp. 3d 1206 (D.N.M. 2014)(Browning, J.)("[T]he Tenth Circuit has concluded that whether an individual is involuntarily committed to the state -- and is, therefore, entitled to

- 40 -

substantive due-process protections -- 'turn[s] on the dependent and involuntary nature of the custodial relationship.'")(quoting Schwartz v. Booker, 702 F.3d 573, 580 (10th Cir. 2012)). "Absent involuntary restraint, however, no duty to protect arises under the special-relationship theory." Christiansen v. City of Tulsa, 332 F.3d at 1280.  See Liebson v. N.M. Corr. Dep't, 73 F.3d 274, 276 (10th Cir. 1996)(finding no special relationship existed in a consensual employment relationship); Uhlrig v. Harder, 64 F.3d at 572 ("A special relationship exists when the state assumes control over an individual sufficient to trigger an affirmative duty to provide protection to that individual . . . ."). Notably, the State must impose the limitation on the individual's freedom. See Christiansen v. City of Tulsa, 332 F.3d at 1280. Mere knowledge of the individual's predicament is insufficient. See Christiansen v. City of Tulsa, 332 F.3d at 1280 (noting that the State's "affirmative duty to protect arises not from the State's knowledge of the individual's predicament . . . but from the limitation which it has imposed on his freedom to act on his own behalf").

The Tenth Circuit does not determine whether the special-relationship doctrine applies using only formalistic distinctions. See Maldonado v. Josey, 975 F.2d 727 (10th Cir. 1992). It analyzes the nature and effect of the restraint on the individual's freedom. See Christiansen v. City of Tulsa, 332 F.3d at 1280 (concluding that the police had no special relationship with a quarantined individual, not because the police had not taken the individual into custody, but because the policy had not sufficiently restrained the individual's freedom to leave the area or make calls). Accordingly, whether an individual is in "custody" is not sufficient to determine whether the restraint on the individual rises to such a level that it creates a special relationship

with the state.[7]  See Maldonado v. Josey, 975 F.2d at 732-33 (noting that the special relationship does not apply to school officials, even though they may have "custody" of the children during school hours).  Instead, the restraint must restrict an individual's liberty to such a degree that it makes the individual involuntarily dependent upon the state to meet the individual's basic needs. See Maldonado v. Josey, 975 F.2d at 732-33.  Accordingly, "[a]lthough a child may well be in the 'custody' of the school authorities during school hours, this custody does not amount to a restraint that prohibits the child and his parents from caring for the basic needs of the child." Maldonado v. Josey, 975 F.2d at 732-33.  In contrast, when a foster child is in the state's custody, the child depends on the state to meet his or her basic needs.  See Yvonne L. v. N.M. Dep't of Human Servs., 959 F.2d at 885; Maldonado v. Josey, 975 F.2d at 732-33 (noting that children in foster homes "depend completely on the state to satisfy their basic human needs").

### 3.    The Danger-Creation Exception.

The Due Process Clause protects against "deliberately wrongful government decisions rather than merely negligent government conduct."  Uhlrig v. Harder, 64 F.3d at 573.  The danger-creation exception to this rule applies only when "a state actor affirmatively acts to create, or increases a plaintiff's vulnerability to, or danger from private violence."  Currier v. Doran, 242 F.3d at 923.  See Estate of B.I.C. v. Gillen, 702 F.3d 1182, 1187 (10th Cir. 2012) ("[S]tate officials can be liable for the acts of private parties where those officials created the very danger that caused the harm."); Gray v. Univ. of Colo. Hosp. Auth., 672 F.3d 909, 916 (10th Cir. 2012)("'[I]naction by the state in the face of a known danger is not enough to trigger the obligation' unless the State has 'limited in some way the liberty of a citizen to act on his on

---

[7]Although a custodial relationship may not be sufficient to determine whether a special relationship exists, it is necessary.  See Gray v. Univ. of Colo. Hosp. Auth., 672 F.3d 909, 923 n.10 (10th Cir. 2012)("By definition, the special relationship theory necessarily only applies where a 'custodial relationship' exists between the victim and the State.").

behalf.'"").  Under a danger-creation theory, there is no § 1983 liability absent "an intent to harm" or "an intent to place a person unreasonably at risk of harm."[8]  Uhlrig v. Harder, 64 F.3d at 573. A plaintiff must show "sufficient[] 'affirmative conduct on the part of the state in placing the plaintiff in danger.'"  Estate of B.I.C. v. Gillen, 702 F.3d at 1187 (quoting Gray v. Univ. Colo. Hosp. Auth., 672 F.3d at 916).

To state a prima facie case, the plaintiff must show that his or her danger-creation claim for due-process violations meets a six-part test: (i) the state and individual actors must have created the danger or increased the plaintiff's vulnerability to the danger in some way; (ii) the plaintiff must be a member of a limited and specifically definable group; (iii) the defendant's conduct must put the plaintiff at substantial risk of serious, immediate, and proximate harm; (iv) the risk must be obvious and known; (v) the defendant must have acted recklessly in conscious disregard of that risk; and (vi) the defendant's actions shock the conscience.  See Pena v. Greffet, 922 F. Supp. 2d 1187, 1227 (D.N.M. 2013)(Browning, J.)(citing Rost ex rel. K.C. v. Steamboat Springs RE-2 Sch. Dist., 511 F.3d 1114, 1126 (10th Cir. 2008)).  Additionally, a plaintiff "must allege a sufficient *causal link* between the danger created by an affirmative act of the State and the harm inflicted upon the victim by a private party."  Gray v. Univ. Colo. Hosp. Auth., 672 F.3d at 917 (emphasis in original).

In determining whether the danger-creation exception applies, the Tenth Circuit has focused on the deliberateness of the conduct in relation to the caused harm.  See Christiansen v. City of Tulsa, 332 F.3d at 1281.  The defendant must recognize the unreasonableness of the risk

---

[8]The Tenth Circuit explained that the "latter form of intent is frequently referred to as 'reckless' conduct."  Uhlrig v. Harder, 64 F.3d at 573 n.8.  It differs from gross negligence because, in reckless conduct, "the defendant recognizes the unreasonable risk and actually intends to expose the plaintiff to such risks without regard to the consequences to the plaintiff." Uhlrig v. Harder, 64 F.3d at 573 n.8.

of the conduct and act "with an intent to place a person unreasonably at risk."  Medina v. City & Cty. of Denver, 960 F.2d 1493, 1496 (10th Cir. 1992), overruled on other grounds by Morris v. Noe, 672 F.3d 1185 (10th Cir. 2012).  The intent to place a person unreasonably at risk is present where the defendant "is aware of a known or obvious risk" creating a high probability that serious harm will follow, and the defendant nonetheless proceeds with a "conscious and unreasonable disregard of the consequences."   Medina v. City & Cty. of Denver, 960 F.2d at 1496.

### 4.     What Shocks the Conscience.

A government actor's official conduct intended to injure in a way that cannot reasonably be justified by any government interest most likely shocks the conscience.   See Cty. of Sacramento v. Lewis, 523 U.S. 833, 849 (1998)("[C]onduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level.").  "[A] plaintiff must do more than show that the government actor intentionally or recklessly caused injury to the plaintiff by abusing or misusing government power."  Camuglia v. City of Albuquerque, 448 F.3d 1214, 1222 (10th Cir. 2006)(quoting Moore v. Guthrie, 438 F.3d 1036, 1040 (10th Cir. 2006))(internal quotation marks omitted).  "The plaintiff must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking."  Camuglia v. City of Albuquerque, 448 F.3d at 1222-23 (quoting Uhlrig v. Harder, 64 F.3d at 574)(internal quotation marks omitted).

> Establishing these limits advances "three basic principles highlighted by the Supreme Court in evaluating substantive due process claims: (1) the need for restraint in defining their scope; (2) the concern that § 1983 not replace state tort law; and (3) the need for deference to local policymaking bodies in making decisions impacting upon public safety."

Camuglia v. City of Albuquerque, 448 F.3d at 1223 (quoting Uhlrig v. Harder, 64 F.3d at 574).

"Whether the conduct shocks the conscience is an objective test, based on the circumstances, rather than a subjective test based on the government actor's knowledge." Pena v. Greffet, 922 F. Supp. 2d at 1227 (citing James v. Chavez, 830 F. Supp. 2d 1208, 1276 (D.N.M. 2011)(Browning, J.)(finding that the use of deadly force did not shock the conscience even if the suspect did not have an intent to harm the officer, because the officer "had sufficient facts before him to conclude that there was a threat of serious physical harm" and the "courts must evaluate a [government actor's] conduct objectively"), aff'd, 511 F. App'x 742 (10th Cir. 2013)).

In Martinez v. Uphoff, 265 F.3d 1130 (10th Cir. 2001), the widow of a corrections officer sued the director, deputy director, warden, and deputy wardens of the department of corrections, alleging that the defendants deliberately failed to ensure proper training and supervision of penitentiary personnel, failed to provide safe and adequate staffing, and failed to take corrective action to protect her husband, all of which resulted in him being killed during the escape of three inmates.  See 265 F.3d at 1132.  The district court found that the plaintiff failed to state a § 1983 claim for violation of the Due Process Clause under a danger-creation theory, because the defendants' actions were "not of such a magnitude that the Court is able to conclude they shock the conscience."  265 F.3d at 1134.  The Tenth Circuit agreed with the district court's conclusion, stating: "[U]nder the circumstances of this case, inaction in the face of known dangers or risks [was] not enough to satisfy the danger-creation theory's conscience shocking standard."  265 F.3d at 1135.

In Schaefer v. Las Cruces Public School District, the plaintiffs alleged that the defendants -- the school district, superintendent, principal, and vice principal of a middle school -- violated the plaintiffs' substantive due-process rights when they did not take sufficient action to prevent a

student at the school from "racking"[9] the plaintiffs' son.  716 F. Supp. 2d at 1072-73.  The Court

concluded that the defendants' conduct did not shock the conscience.  See 716 F. Supp. 2d

at 1074-75.  The Court explained:

> Assuming the absolute worst from the Schaefers' alleged facts, the Defendants were aware of three instances of an unknown eighth-grade student racking various sixth-grade students within the span of a month, and failed to implement policies to improve hallway monitoring and stop this conduct from occurring in time to prevent [the plaintiffs' son] from falling victim to the same fate.  Further, the Defendants indicated to the sixth graders that it had policies in place to punish individuals that assaulted other students but did not, in fact, have such policies.
>
> While such behavior may be worthy of remedy under tort law, and perhaps worthy of punishment in the form of punitive damages, the Court's conscience is not shocked . . . .
>
> Any number of actions by the Defendants might have remedied the problem, but the Court's conscience is not shocked by the Defendants' failure to consider or implement such a policy.  Even if the Defendants knew that students frequently -- more than three times per month -- attacked other students in the halls and declined to implement safety measures to minimize that conduct, the Court is not convinced that it would rise to the level of shocking the conscience.

716 F. Supp. 2d at 1074-75.

## LAW REGARDING THE RIGHT TO COURT ACCESS

State constitutions mentioned open courts as early as the eighteenth century.  The

Delaware Declaration of Rights of 1776, for example, provided that "every freeman for every

injury done him in his goods, lands or person, by any other person, ought to have remedy by the

course of the law of the land."  Del. Declaration of Rights of 1776, art. 12.  Delaware's 1792

Constitution added that "[a]ll courts shall be open."  Del. Const. of 1792, art. 1 § 9.  Other state

---

[9]The parties in Schaefer v. Las Cruces Public School District defined being "racked" as being "kicked and/or punched in the testicles."  716 F. Supp. 2d at 1059 n.2 (citations omitted) (internal quotation marks omitted).

constitutions drafted in the late eighteenth century contained similar language.[10]  Pennsylvania's

1776 Constitution states that "all courts shall be open, and justice shall be impartially

administered without corruption or unnecessary delay."  Pa. Const. of 1776, § 26.  The Supreme

Court explained in Chambers v. Baltimore & Ohio Railroad, 207 U.S. 142 (1907):

> The right to sue and defend in the courts is the alternative of force.  In an organized society it is the right conservative of all other rights, and lies at the foundation of orderly government.  It is one of the highest and most essential privileges of citizenship, and must be allowed by each state to the citizens of all other states to the precise extent that it is allowed to its own citizens.  Equality of treatment in this respect is not left to depend upon comity between the states, but is granted and protected by the Federal Constitution.

207 U.S. at 148.  The right of access to the courts, however, did not fully develop in the case law

until the mid-to late-twentieth century.  Moreover, courts have recognized the right of access to

the courts as being rooted in the Due Process Clause of the Fourteenth Amendment, the Due

Process Clause of the Fifth Amendment, the Equal Protection Clause of the Fourteenth

Amendment, the Privileges and Immunities provisions of Article IV and the Fourteenth

Amendment, and the Petition Clause of the First Amendment.  See Christopher v. Harbury, 536

U.S. 403, 415 & n.12 (2002); Smith v. Maschner, 899 F.2d 940, 947 (10th Cir. 1990); Ryland v.

Shapiro, 708 F. 2d 967, 971-72 (5th Cir. 1983); U.S. Const. amend. XIV; U.S. Const. amend. I;

U.S. Const. amend. V; U.S. Const. art. IV, § 2, cl. 1.

### 1.    The Right to Court Access in the Prisoner Context.

The right of access to the courts emerged primarily in the prisoners' rights context.  The

Supreme Court first examined a prisoner's right to access the courts in Ex parte Hull, 312 U.S.

546 (1941).  See Bounds v. Smith, 430 U.S. 817, 822 (1977)(noting that the Supreme Court first

---

[10]See Judith Resnik, Diffusing Disputes: The Public in the Private of Arbitration, the Private in Courts, and the Erasure of Rights, 124 Yale L.J. 2804, 2819 (2015)(discussing the historical context of open court access).

recognized prisoners' right to court access in Ex parte Hull).  In Ex parte Hull, a prisoner sought judicial relief for prison officials' actions in preventing him from filing of a writ of habeas corpus.  See 312 U.S. at 548.  The prisoner had been convicted of a statutory sex offense and had twice attempted to file a petition for writ of habeas corpus without success.  See 312 U.S. at 547-48.  Prison officials blocked both attempts: first, a prison official refused to notarize the documents; second, the prison guards confiscated documents that the prisoner had attempted to mail to his father for filing.  See 312 U.S. at 547-48.  The Supreme Court issued an order to show cause why the petition for writ of habeas corpus should not be granted.  See 312 U.S. at 548.  In response, the prison ward stated that, in November, 1940, he had published a regulation stating that all prisoner documents and petitions had to be submitted first to the institutional welfare office and then, upon approval, to the Parole Board's legal investigator.  See 312 U.S. at 548.  The prisoner subsequently challenged the validity of the regulation, alleging that he had been denied procedural due process.  See 312 U.S. at 549.   The Supreme Court held that the prison's regulation was invalid, and that the state and its officers "may not abridge or impair [a] petitioner's right to apply to a federal court for a writ of habeas corpus."  312 U.S. at 549.  Whether a petition for habeas corpus addressed to a federal court is valid and proper "are questions for that court alone to determine," the Supreme Court stated.  312 U.S. at 549.  While Ex parte Hull was the first Supreme Court case recognizing a prisoner's right of court access, the Supreme Court did not discuss the roots and origins of the right.

A series of prisoner court access cases followed Ex parte Hull, which involved indigent prisoners who could not afford appellate docket fees, or who could not obtain trial transcripts and counsel.  See Griffin v. Illinois, 351 U.S. 12, 18-19 (1956)(holding that the state must provide trial records for indigent prisoners on appeal, and noting that "at all stages of the proceedings the

Due Process and Equal Protection Clauses protect persons like petitioners from invidious discriminations"); Burns v. Ohio, 360 U.S. 252 (1959)(holding that it violated due process and equal protection when a state required an indigent prisoner to pay a filing fee before filing a motion for leave to appeal); Smith v. Bennett, 365 U.S. 708 (1961)(holding that an indigent's inability to file a petition for writ of habeas corpus for lack of finances violated the Equal Protection Clause); Douglas v. California, 372 U.S. 353 (1963)(holding that a state must provide indigent prisoners with counsel for direct appeal to comply with the Equal Protection Clause); Williams v. Oklahoma City, 395 U.S. 458, 459 (1969)(stating that avenues of appellate review "must be kept free of unreasoned distinctions that can only impede open and equal access to courts," and holding that indigents are entitled to receive free transcripts of a petty offense trial under equal protection principles); Gardner v. California, 393 U.S. 367 (1969)(holding that an indigent prisoner must receive habeas corpus proceeding transcripts under the Equal Protection Clause); Mayer v. Chicago, 404 U.S. 189 (1971)(holding that refusing to provide indigent defendants with non-felony trial transcripts violated equal protection).

The Supreme Court expanded beyond the indigent prisoner category in Johnson v. Avery, 393 U.S. 483 (1969), holding it unconstitutional to prevent prison inmates from helping each other prepare petitions for post-conviction relief, unless the prison provided an alternative form of aid. See 393 U.S. at 490. In that case, a prisoner was serving a life sentence at the Tennessee State Penitentiary and had been transferred to a maximum security building for violation of a prison regulation prohibiting writ preparation assistance between inmates. See 393 U.S. at 484. The prisoner challenged the regulation, and on appeal, the Supreme Court found it invalid. See 393 U.S. at 485-90. The Supreme Court held that Tennessee's adoption and enforcement of a rule which, in effect, prohibited illiterate or poorly educated prisoners from filing habeas corpus

petitions was unconstitutional. See 393 U.S. at 487, 490. The Supreme Court noted that, while state or federal courts had no general obligation to appoint counsel for prisoners expressing a will to seek post-conviction relief, without some form of aid, the prisoner is denied access to the courts. See 393 U.S. at 488. Justice Douglas' concurring opinion observed that the Due Process Clause secures the right of "reasonable access to the courts." 393 U.S. at 498 n.24 (Douglas, J., concurring).

Two years later, the Supreme Court affirmed a district court decision requiring "basic codes and references" in a prison's law library. Younger v. Gilmore, 404 U.S. 15, 15 (1971). In Wolff v. McDonnell, 418 U.S. 539 (1974), the Supreme Court then expanded the principles of prisoner habeas court access under the Fourteenth Amendment to prisoner civil rights actions, noting that the required assistance in an inmate's initial preparation of petitions extended to actions arising under the Civil Rights Act of 1871. See 418 U.S. at 579. In that case, a prisoner filed a complaint under 42 U.S.C. §1983 on behalf of himself and other prisoners alleging, among other things, that the inmate legal assistance program did not comply with constitutional standards. See 418 U.S. at 542-43. The relevant prison regulation stated: "No other offender than the legal advisor is permitted to assist you in the preparation of legal documents unless with the specific written permission of the Warden." 418 U.S. at 577-78. The Supreme Court applied the habeas corpus inmate assistance principles of Johnson v. Avery and held that inmates can assist one another in preparing civil rights actions. See Wolff v. McDonnell, 418 U.S. at 580. The Supreme Court explained that "[b]oth … [petitions for habeas corpus and civil rights actions] serve to protect basic constitutional rights," concluding that a lack of assistance with civil rights actions also deprives prisoners of their right to court access. See 418 U.S. at 579.

By 1977, the Supreme Court recognized in Bounds v. Smith that "it is now established beyond a doubt that prisoners have a constitutional right of access to the courts [. . .] and that such access must be adequate, effective and meaningful."  430 U.S. at 821-22.  In that case, prisoners in North Carolina filed actions under 42 U.S.C. § 1983 alleging violations of their Fourteenth Amendment right of access to the courts because of the state's "failure to provide legal research facilities."  430 U.S. at 818.  The Supreme Court first discussed at length the inmate court access right and its development in the case law, without directly discussing its constitutional origin.  See 430 U.S. at 821-826 (citing primarily Ex parte Hull, 312 U.S. at 549; Burns v. Ohio, 360 U.S. at 252; Griffin v. Illinois, 351 U.S. at 20; Johnson v. Avery, 393 U.S. at 489; and Wolff v. McDonnell, 418 U.S. at 577-80).  The Supreme Court noted that "[m]eaningful access is the touchstone" of the inmate right to court access.  430 U.S. at 823.  It held that all states have "affirmative obligations to assure all prisoners meaningful access to the courts."  430 U.S. at 824.  The Supreme Court suggested training inmates as paralegals to work under attorney supervision; using volunteer law students, paraprofessionals, volunteer attorneys, and staff attorneys; and hiring part-time attorneys as non-exhaustive alternatives.  See 430 U.S. at 831 (encouraging "local experimentation").  Finally, the Supreme Court articulated that all remedial plans are subject to evaluation for compliance with constitutional standards.  See 430 U.S. at 832 (citing Stevenson v. Reed, 530 F.2d 1207 (5th Cir. 1976)).  The Supreme Court later interpreted Bounds v. Smith as "suggest[ing] that the State must enable the prisoner to *discover* grievances, and to *litigate effectively* once in court."  Lewis v. Casey, 518 U.S. 343, 354 (1996)(emphasis in original)(citing Bounds v. Smith, 430 U.S. at 825-26 & n.14).

Prison regulations that infringe on an inmate's constitutional rights are valid if they are "reasonably related to legitimate penological interests."  Gee v. Pacheco, 627 F.3d 1178, 1187

(10th Cir. 2010)(citing <u>Turner v. Safley</u>, 482 U.S. 78, 89 (1987)).  Prisoners bringing civil rights claims have to plead "sufficient factual allegations to raise relief above the speculative level." <u>Gee v. Pacheco</u>, 627 F.3d at 1187 (internal quotation marks omitted).  A prisoner must demonstrate actual injury from the interference with his or her access to the courts; this principle derives from the doctrine of standing.  <u>See Lewis v. Casey</u>, 518 U.S. at 349.  In other words, the state's alleged shortcomings must have "hindered [the prisoner's] efforts to pursue a legal claim." <u>Lewis v. Casey</u>, 518 U.S. at 351.  <u>See Harmon v. Keith</u>, 383 F. App'x 770, 771 (10th Cir. 2010)("An inmate lacks standing to raise a right-of-access claim unless he is able to demonstrate actual injury.").  The prisoner must further show that "any denial or delay of access to the court prejudiced him in pursuing litigation." <u>Treff v. Galekta</u>, 74 F.3d 191, 194 (10th Cir. 1996).  Finally, a prisoner must exhaust all available administrative remedies before filing an action under 42 U.S.C § 1983.  <u>See Jones v. Bock</u>, 549 U.S. 199, 211 (2007).  <u>See also</u> 42 U.S.C. § 1997e(a).

### 2.   The Right to Court Access in the Civil Context.

The Fourteenth Amendment right to court access began to develop beyond the prisoner setting in the early 1970's, particularly in the context of civil indigents' inability to pay court fees.  In <u>Boddie v. Connecticut</u>, 401 U.S. 371 (1971), the Supreme Court held that the Fourteenth Amendment's Due Process Clause "prohibit[s] a State from denying, solely because of inability to pay, access to its courts to individuals who seek judicial dissolution of their marriages." 401 U.S. at 374.  In that case, the indigent plaintiffs brought an action challenging Connecticut procedures that required a filing fee to initiate a divorce.  <u>See</u> 401 U.S. at 372.  The plaintiffs alleged that, because of their inability to pay the necessary filing fees, the state had restricted their access to the courts.  <u>See</u> 401 U.S. at 372.  The Supreme Court recognized that the

possibility of a due process court access claim in the civil context was novel, and noted the importance of court access when a judicial proceeding is the only available remedy.  See 401 U.S. at 375-76.  The Supreme Court found it proper to engage in a due-process analysis, because marriage "involves interests of basic importance in our society" and because the dissolution of a marriage requires a resort to state courts.  See 401 U.S. at 376-77.  The Supreme Court explained two important principles embedded in due-process jurisprudence: (i) due process requires, at minimum, a "meaningful opportunity to be heard" for persons whose claims must be settled through the judicial process; and (ii) a statute or a rule may be held constitutionally invalid "when it operates to deprive an individual of a protected right."  401 U.S. at 377-79.  The Supreme Court concluded that Connecticut's refusal to admit the plaintiffs to its courts, solely based on their inability to pay the filing fee, "must be regarded as the equivalent of denying them an opportunity to be heard upon their claimed right to a dissolution of their marriages, and, in the absence of a sufficient countervailing justification for the State's action, a denial of due process." 401 U.S. at 380-81.  Moreover, the Supreme Court recognized that the state's interest in the required fee did not justify the denial of access, and that the Due Process Clause protects the right of court access only in circumstances where resorting to the judicial process is the only available remedy.  See 401 U.S. at 382-83.

Two subsequent civil indigent filing fee cases, however, limited the right of court access in the civil context to issues of "constitutional significance."  Ortwein v. Shwab, 410 U.S. 656, 659 (1973)(holding that obtaining discharge of one's debts in bankruptcy was not a fundamental right, and thus the filing fee did not deny the plaintiff court access); United States v. Kras, 409 U.S. 434, 446 (1973)(holding that plaintiffs seeking an increase in welfare payments did not have an interest that rose to the constitutional significance as that of the plaintiffs in Boddie v.

Connecticut; therefore, the filing fee did not violate the plaintiffs' right to court access). According to the Supreme Court, while "resort[ing] to state courts was the only avenue to dissolution of marriages," bankruptcy and welfare payment disputes could be handled by other means.  United States v. Kras, 409 U.S. at 443-44.  See Ortwein v. Shwab, 401 U.S. at 659.  The claims in Ortwein v. Shwab and United States v. Kras, therefore, did not rise to the constitutional level of the claims in Boddie v. Connecticut and thus did not fall within the scope of the right to court access.  See United States v. Kras, 409 U.S. at 443-44; Ortwein v. Shwab, 401 U.S. at 659. Welfare payment and bankruptcy disputes, unlike marriage dissolution, were not recognized as "fundamental . . . demand[ing] the lofty requirement of a compelling governmental interest before they may be significantly regulated."   United States v. Kras, 409 U.S. at 446.  See Ortwein v. Shwab, 401 U.S. at 659.

        While much of the case law has focused on a right to court access under the Fourteenth Amendment, a separate strand of jurisprudence recognized a right to court access rooted in the First Amendment's "right to petition" language.  U.S. Const. amend. I.  The First Amendment right to court access, however, initially developed narrowly in the antitrust context.  With respect to the Sherman Act, 15 U.S.C. §§ 1 et seq., the Supreme Court noted in 1961 that "[t]he right to petition is one of the freedoms protected by the Bill of Rights, and we cannot [. . .] lightly impute to Congress an intent to invade these freedoms."  E. R. R. Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 138 (1961).  Subsequently in California Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508 (1982), the Supreme Court recognized that "the right of access to courts is indeed but one aspect of the right to petition," concluding:

> [I]t would be destructive of rights of association and of petition to hold that groups with common interests may not, without violating the antitrust laws, use the channels and procedures of state and federal agencies and courts to advocate

their causes and points of view respecting resolution of their business and economic interests vis-a-vis their competitors.

404 U.S. at 510-11.

It was not until 1983 that the Supreme Court expanded the First Amendment right to access the courts outside of the antitrust context. See Bill Johnson's Rests., Inc. v. N.L.R.B., 461 U.S. 731 (1983). Bill Johnson's Restaurants, Inc. v. N.L.R.B. affirmed the Supreme Court's acknowledgement in California Motor Transport Co. v. Trucking Unlimited that the right of court access is an aspect of the First Amendment right to petition and applied it to a labor dispute. See 461 U.S. at 741. Bill Johnson's Restaurants, Inc. v. N.L.R.B. involved a labor dispute between a restaurant and its waitresses, who had complained of unfair labor practices and picketed the restaurant site in protest. See 461 U.S. at 733. The restaurant filed a complaint against the waitresses in state court, alleging that the waitresses had engaged in mass picketing, harassing customers, and blocking the restaurant's entrance and exit areas, creating a threat to the public. See 461 U.S. at 734. Upon review of the dispute, the National Labor Relations Board ordered, among other things, that the restaurant withdraw its state court complaint. See 461 U.S. at 737. The primary issue before the Supreme Court was whether the National Labor Relations Board could issue a cease-and-desist order to halt an allegedly retaliatory lawsuit that the restaurant filed in a state court. See 461 U.S. at 737. The Supreme Court identified the right to court access as deriving from the First Amendment's "right to petition the Government for redress of grievances." 461 U.S. at 741. The Supreme Court concluded that an employer's well-founded lawsuit "may not be enjoined as an unfair labor practice" and that the restaurant's lawsuit should be allowed to proceed under the First Amendment principle of a right to access the courts. See 461 U.S. at 742-43.

3.     **Court Access for the Developmentally Disabled.**

Various courts and jurisdictions have identified mentally disabled, institutionalized patients as a group with specific needs who possess a right of court access similar to that of prisoners in the state's custody.  The right of court access "is guaranteed to people who are involuntarily committed to a mental institution," and this right "is not limited to people who are committed following criminal proceedings."  Cornett v. Donovan, 51 F.3d 894, 897-98 (9th Cir. 1995)(citing King v. Atiyeh, 814 F.2d 565, 568 n.2 (9th Cir. 1987)).  "[I]nvoluntary mental commitment to a mental treatment facility implicates an important, constitutionally-protected liberty interest of the person committed."  Doe v. Gallinot, 657 F.2d 1017, 1021 (9th Cir. 1981).  Commitment to a mental hospital is a "massive curtailment of liberty" and is "more than a loss of freedom from confinement," and thus requires due-process protection.  Doe v. Gallinot, 657 F.2d at 1021 (quoting Humphrey v. Cady, 405 U.S. 504, 509 (1972), and Addington v. Texas, 441 U.S. 418, 425-26 (1979)).  With respect to a state's involvement in the commitment of the mentally ill, the Supreme Court has noted:

> The state has a legitimate interest under its parens patriae powers in providing care to its citizens who are unable because of emotional disorders to care for themselves; the state also has authority under its police power to protect the community from the dangerous tendencies of some who are mentally ill.

Addington v. Texas, 441 U.S. at 426 (evaluating the proper standard for civil commitment proceedings for the mentally ill).  Indeed, "[p]ersons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish."  Youngberg v. Romeo, 457 U.S. 307, 321-22 (1982).  While the specific court access rights of a developmentally disabled, involuntarily committed person have not been comprehensively articulated, a few pivotal cases provide guidance.

One of the earliest and most cited cases to identify a developmentally disabled, involuntarily committed person's right to judicial process is Doe v. Gallinot, 657 F.2d at 1019-21. There, the United States Court of Appeals for the Ninth Circuit evaluated the constitutionality of California's Lanterman-Petris-Short Act ("LPS"), Cal. Welf. & Inst. Code, §§ 5000-5466. Under the LPS Act, a person judged to be "gravely disabled" because of mental illness could be committed to a mental institute for "72 hours on an emergency basis, and up to 14 more days for involuntary treatment, with no requirement that the state initiate a hearing before an independent tribunal to determine whether adequate cause for commitment exists." Doe v. Gallinot, 657 F.2d at 1019. See Cal. Welf. & Inst. Code §§ 5000-5466. In Doe v. Gallinot, police officers found the plaintiff in a hospital parking lot "acting apprehensively" and transported him to a nearby mental health facility. 657 F.2d at 1020. At the facility, a psychiatric nurse examined the plaintiff and determined him to be "gravely disabled." 657 F.2d at 1020. On the nurse's certification pursuant to the LPS Act, the plaintiff was committed to a state hospital for seventy-two hours. See 657 F.2d at 1020. The plaintiff received medications, and physician certification committed the plaintiff to the additional fourteen days of involuntary commitment. See 657 F.2d at 1020. The plaintiff was informed of his right to judicial review and subsequently requested review. See 657 F.2d at 1020. After appearing in court, the plaintiff was released, but was later confined pursuant to the LPS Act on six additional occasions before filing suit for declaratory, injunctive, and monetary relief in 1976. See 657 F.2d at 1020-21. The Ninth Circuit evaluated the procedural aspects of the LPS Act and held that "a mandatory hearing must be afforded every individual in connection with a certification for 14-day intensive treatment under the LPS Act, at which a neutral decisionmaker will verify that sufficient cause for such confinement exists." 657 F.2d at 1024. The Ninth Circuit concluded that due process

requires a hearing after the seventy-two-hour period.  See 657 F.2d at 1025.  While the Ninth Circuit did not specifically mention a right of court access, it discussed the Fourteenth Amendment's Due Process Clause as it relates to mentally disabled persons and their involuntary confinement.  See 657 F.2d at 1025 (affirming the district court ruling that "due process requires a probable cause hearing after the 72-hour emergency detention period for persons alleged to be gravely disabled").

The Tenth Circuit had previously recognized the right to court access for prisoners, consistent with Supreme Court precedent.  In 1985, however, the Tenth Circuit extended the general principles of a prisoner's right of court access to an institutionalized, mentally ill patient who was found not guilty of an offense by reason of insanity.  See Ward v. Kort, 762 F2d at 856-57.  The Colorado State Hospital, where the plaintiff had been admitted, had a contract with a law firm for patient counseling, and the attorneys typically provided services "such as making wills, helping draft contracts and legal pleadings, handling disputes with the patients and the Colorado State Hospital."  762 F.2d at 857.  The plaintiff met with an attorney under contract to discuss legal issues, but the attorney told the plaintiff that he could not file an action on his behalf.  See 762 F.2d at 857.  The plaintiff did not pursue the action further and he did not request that the attorney do any research.  See 762 F.2d at 857.  The plaintiff ultimately filed a civil rights complaint consisting of three claims, including one for denial of access to the courts, alleging that the Colorado State Hospital had failed to provide him with adequate access to legal and research materials.  See 762 F.2d at 857.  Further, the plaintiff alleged that the hospital's attorney contract: (i)"provide[d] too little an allocation of counsel's time to fulfill the needs to the patient;" (ii) did not provide for any representation; and (iii) did "not provide for adequate research on behalf of the patients."  762 F.2d at 858.  On appeal, the plaintiff contended that "a

right of access to the courts should be recognized for inmates confined under a civil commitment, as he is, to afford those patients a reasonable opportunity to identify their fundamental rights, to recognize violations of those rights, and to bring such violations before the courts for relief."  762 F.2d at 858.

The Tenth Circuit held that "plaintiff, as a person under mental commitment, is entitled to protection of his right of access to the courts," noting that there was "no logic in holding that persons under mental commitments like plaintiff are on a lower plane than convicted inmates and are not entitled to protection of the basic constitutional guarantee of access to the courts."  762 F.2d at 858.  "Access to the courts of the United States," the Tenth Circuit explained, "is a constitutional right guaranteed by the due process clauses of the fifth and fourteenth amendments.  This right of access to the courts cannot be infringed upon or burdened."  762 F.2d at 858 (quoting Silver v. Cormier, 529 F.2d 161, 163 (10th Cir. 1976)).  The Tenth Circuit relied on Wolff v. McDonnell, Johnson v. Avery, and Bounds v. Smith, among others, for the principles and scope of a prisoner's right of access to the courts.  See Ward v. Kort, 762 F.2d at 858.  The Tenth Circuit affirmed that the "right of access to the courts requires prison authorities to assist inmates in the preparation and filling of meaningful legal papers."  762 F.2d at 858 (quoting Bounds v. Smith, 430 U.S. at 828).

Moreover, the Tenth Circuit adhered to the long-standing holding that "there is no constitutional right to representation by counsel in habeas proceedings in the federal courts" and that legal representation for an indigent party is not mandatory in civil rights actions but remains "within the discretion of the federal court."  Ward v. Kort, 762 F.2d at 860.  The Tenth Circuit concluded that the Colorado State Hospital's arrangement infringed on the plaintiff's right of access to the courts and that a modification of the hospital's contractual agreement for patient

legal counseling was required to protect the right.  See 762 F.2d at 860.  The contract's modification was to be such that the plaintiff would "have assistance of counsel through the completion of a federal habeas or civil rights complaint, including necessary research and consideration of the facts and the law."  762 F.2d at 860-861.  Finally, the Tenth Circuit stated that "such protection of plaintiff's rights will follow the Supreme Court's teaching that 'meaningful access to the courts is the touchstone.'"  762 F.2d at 861 (citing Bounds v. Smith, 430 U.S. at 823).

Although Ward v. Kort involved a criminally-charged person, federal district court decisions involving non-criminally charged, mentally disabled plaintiffs held in state institutions have cited the case.  See Armstead v. Pingree, 629 F. Supp. 273, 277 (M.D. Fla. 1986)(Melton, J.)(holding that the state's withholding of medical records belonging to involuntarily confined, mentally ill patients, from counsel was a violation of the right to court access under the Fourteenth Amendment); Holly v. Anderson, No. 04-CV-1489 JMR/FLN, 2008 WL 1773093, at *7 (D. Minn. Apr. 15, 2008)(Rosenbaum, J.)(stating that the application of prisoner court access principles to civilly committed mental patients is appropriate and noting that the plaintiff did not have a claim for court access violations, because he did not show that an inability to access a lawyer or legal materials prevented him from filing a claim); Robbins v. Budke, 739 F. Supp. 1479 (D.N.M. 1990)(Mechem, J.).  Cases involving criminal defendants have also cited to Ward v. Kort for the proposition that prisoner court access principles can extend beyond the prisoner context.  See John L. v. Adams, 750 F. Supp. 288, 291 (M.D. Tenn. 1990)(Sandidge, J.)(stating that "[c]ourts also recognize that people in involuntary institutionalized settings other than penal institutions are entitled to an affirmative right of access to the courts" and noting that Ward v.

Kort held "that *Bounds* applies to individuals who are under involuntary civil commitment to a mental hospital"), aff'd in part, rev'd in part, 969 F.2d 228 (6th Cir. 1992).

In 1990, the Honorable Edwin Leard Mechem, Senior District Judge of the United States District Court for the District of New Mexico, evaluated whether psychiatric patients at the Las Vegas Medical Center ("LVMC") in Las Vegas, New Mexico, had been deprived of their right of access to the courts.  See Robbins v. Budke, 739 F. Supp. at 1479.  The Protection and Advocacy System of New Mexico ("P & A"), P & A's executive director, and LVMC's patients brought a claim against the state officials and LVMC administrators, alleging that LVMC's policies and procedures that govern P & A's access to patients and records "violate the patients' constitutional right of access to the courts as guaranteed by the due process clause of the Fourteenth Amendment and the Protection and Advocacy for Mentally Ill Individuals of 1986, 42 U.S.C. § 10801 *et seq.*"  Robbins v. Budke, 739 F. Supp. at 1481.  Further, the plaintiffs alleged that the defendants violated P & A's "constitutional right of access to LVMC patients, facilities, and records as guaranteed under the First Amendment and the Act[.]"  Robbins v. Budke, 739 F. Supp. at 1481.  Judge Mechem began by acknowledging the history of "abhorrent" LMVC conditions, some of which contributed to Congress's passing of the P & A Act in 1986 to address "conditions and instances of gross abuse and neglect" of the mentally ill. Robbins v. Budke, 739 F. Supp. at 1481.  Judge Mechem noted that the purpose of the P & A Act was to "assure that the constitutional and statutory rights of the mentally ill are protected and to assure investigation of abuse and neglect."  Robbins v. Budke, 739 F. Supp. at 1481.  P & A had begun visiting patients at LMVC in 1986; at the time, they were granted unlimited twenty-four-hour access to patient living units and staff.  See Robbins v. Budke, 739 F. Supp. at 1481.

After P & A submitted a negative report to the Joint Commission on Accreditation of Health Care Organizations ("JCAHO") about the LVMC's conditions, the LVMC reevaluated its previous policies for P & A's access to patients and their records. See Robbins v. Budke, 739 F. Supp. at 1481-82. It passed new regulations that severely limited P & A's access to patients. See Robbins v. Budke, 739 F. Supp. at 1482. P & A's access to the LVMC's mentally ill or developmentally disabled patients, which accounted for five out of 150 patients, was also severely limited. See 739 F. Supp. at 1483. Restrictions for all patients included, among other things, that a patient had to request a P & A visit, that the hospital had to be informed of that patient's identity and unit, that a LVMC employee had to schedule an appointment, that a staff member had to escort a patient to the meeting, and that private patient questions were not permitted during P & A's presentations for the mentally ill. See 739 F. Supp. at 1482-83. Additionally, with respect to the mentally ill and developmentally disabled, P & A could inspect the facilities only "upon request, during regularly scheduled visiting hours, [. . .] with advance notice," and accompanied by the LVMC director. 739 F. Supp. at 1483. Judge Mechem noted that conditions at the LVMC had improved significantly since 1985, but that "complaints of abuse and neglect continue[d] and require[d] investigation." 739 F. Supp. at 1483.

Relying on Ward v. Kort, Judge Mechem began his analysis by acknowledging that "residents institutionalized at LVMC have a constitutional right of meaningful access to the courts." Robbins v. Budke, 739 F. Supp. at 1485. Judge Mechem observed that "no minimum requirements have been established which a state must meet in order to provide adequate access;" instead, a court "should focus on whether the individual plaintiffs before it have been denied meaningful access." 739 F. Supp. at 1485 (citing King v. Atiyeh, 814 F.2d at 568). Judge Mechem stated that, to determine whether access is adequate, effective, and meaningful,

the defendants' "policies and practices must be viewed in light of the characteristics and needs of the patients, including their need for a therapeutic environment and treatment of their illnesses." Robbins v. Budke, 739 F. Supp. at 1485.  While the LVMC defendants had a right to impose "reasonable restrictions" on all visitors, regulations and practices that "unjustifiably obstruct the availability of representation or other aspects of the right of access to the courts are invalid."  739 F. Supp. at 1485-86 (citing Procunier v. Martinez, 416 U.S. 396, 419 (1974); Mississippi Prot. & Advocacy Sys., Inc. v. Cotten, No. CIV. A. J87-0503(L), 1989 WL 224953, at *2 (S.D. Miss. Aug. 7, 1989)(Lee, J.) aff'd sub nom Mississippi Prot. & Advocacy Sys., Inc. v. Cotten, 929 F.2d 1054 (5th Cir. 1991)).

Judge Mechem stated that the mentally ill are vulnerable to abuse and neglect, "because many mentally ill individuals have difficulty recognizing the concept that they have rights and will not necessarily identify even the most egregious abuse as a violation of their rights."  739 F. Supp. at 1486.  Judge Mechem observed that mentally ill patients have difficulty assessing whether their rights have been violated or what remedies exist; in addition, they struggle to form trusting relationships and may fear asking about their rights in front of their caregivers.  See 739 F. Supp. at 1486.  Judge Mechem stated that, as a constitutional matter, states can choose among several methods of providing adequate court access, but that institutionalized mentally ill individuals warrant "special considerations" because of their general characteristics, and their inability to recognize rights violations and resources.  See 739 F. Supp. at 1487 (citing Doe v. Gallinot, 657 F.2d at 1022-23 n.7).  Judge Mechem held that many of the LVMC's new restrictions on P & A were impermissible, and that P & A also has a right of access to patients and records that both the Constitution and statutes protect.  See 739 F. Supp. at 1487.

In 1995, the Ninth Circuit again addressed the rights of involuntarily confined, mentally disabled persons.  See Cornett v. Donovan, 51 F.3d 894, 897 (9th Cir. 1995).  In that case, involuntarily committed patients at the Idaho State Hospital South ("SHS") filed a lawsuit alleging a violation of the right of access to the courts.  See 51 F.3d at 896.  Specifically, the plaintiffs alleged that SHS' failure to provide a law library or legal assistance to handle matters beyond the initial preparation of a habeas corpus petition or civil rights action violated their right of access to the courts.  See 51 F.3d at 896.  The plaintiffs contended that institutionalized mental patients have a right of court access which extends beyond the pleading stage, because they "have difficulty prosecuting their claims."  51 F.3d at 898.  The primary issue on appeal was the scope of the plaintiffs' right to court access, and whether the state was constitutionally required to provide legal assistance to an institutionalized person "only at the pleading stage or through a later stage, conceivably even through final disposition of a cause of action."  51 F.3d at 897.  First, the Ninth Court stated that there were three requirements to establish standing: "the plaintiffs must show 1) injury in fact, 2) that the injury is traceable to the challenged action, and 3) that it is likely the injury will be redressed by the relief requested."  51 F.3d at 897.  Because one of the plaintiffs was no longer institutionalized at the time of the lawsuit, he failed to meet the third standing requirement; the remaining plaintiffs were found to have standing to pursue the action.  See 51 F.3d at 897.

In discussing the right of access to the courts, the Ninth Circuit began with an evaluation of the right to court access in the prisoner context and stated that the right of court access also applies to "people who are involuntarily committed to a mental institution."  51 F.3d at 897-98.  The Ninth Circuit noted that the right of access "helps ensure that the unlawfully detained obtain their freedom [. . .] and that the lawfully detained have recourse for violation of fundamental

constitutional rights."  51 F.3d at 898 (citing Johnson v. Avery, 393 U.S. at 485, and Wolff v. McDonnell, 418 U.S. at 579).  Relying on the well-developed federal case law on prisoner court access, the Ninth Circuit found that precedent did not support a right of access that extends beyond the pleading stage.  See Cornett v. Donovan, 51 F.3d at 899.  The Ninth Circuit noted that the pleading stage encompasses a complaint, an answer, and counter claims or cross-claims, which "enables the inmate to rebut the State's arguments."  See 51 F.3d at 899.  Further, the Ninth Circuit noted the distinction between the right of access to the courts and the right to counsel.  51 F.3d at 899 ("The right of access is a right of 'access' and not of 'representation.'").  The Ninth Circuit concluded that the right of access "requires the state to provide assistance through the pleading stage, including preparation of a reply to an answer, cross-claim or counterclaim."  51 F.3d at 900 (noting the consistency of its holding with other U.S. Courts of Appeals, including the Tenth Circuit).

The Supreme Court evaluated the right of court access for disabled citizens in Tennessee v. Lane, 541 U.S. 509 (2004).  There, paraplegics alleged that they had been denied physical access to Tennessee's courthouses in violation of the Americans with Disabilities Act of 1990 ("ADA").  Tennessee v. Lane, 541 U.S. at 513-14.  The ADA provided that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation or denied the benefits of the services, programs or activities of a public entity."  Tennessee v. Lane, 541 U.S. at 513.  See 42 U.S.C. § 12132.  The question presented in Tennessee v. Lane was whether Title II of the ADA exceeded Congress' power under Section 5 of the Fourteenth Amendment.  See Tennessee v. Lane, 541 U.S. at 513.  While the Supreme Court had previously held that Eleventh Amendment Immunity barred private ADA Title I suits for monetary compensation, the question whether the Eleventh Amendment permitted suits for money

damages under Title II remained an open question.  See Tennessee v. Lane, 541 U.S. at 514; Bd. of Tr. of Univ. of Ala. v. Garrett, 531 U.S. 356, 360 (2001).

The Supreme Court held that Title II of the ADA was a valid exercise of Congress' Section 5 powers and discussed the Fourteenth Amendment due process right to court access as it applies to disabled persons.  See Tennessee v. Lane 541 U.S. at 523, 533.  The Supreme Court observed that the respondent was a criminal defendant, and that the Due Process Clause and the Sixth Amendment Confrontation Clause afford court access, but also explained that the Due Process Clause "requires the States to afford certain civil litigants a 'meaningful opportunity to be heard' by removing obstacles to their full participation in judicial proceedings."  Tennessee v. Lane, 541 U.S. at 523 (citing Boddie v. Connecticut, 401 U.S. at 379).  The Supreme Court emphasized that the ADA's Title II does not require States to employ "any and all means to make judicial services accessible to persons with disabilities," nor to "compromise their essential eligibility criteria for public programs."  Tennessee v. Lane, 541 U.S. at 531-32.  Instead, according to the Supreme Court, Title II requires "reasonable modifications" and a variety of possible measures.  541 U.S. at 532.  "The duty to accommodate," the Supreme Court explained, "is perfectly consistent with the well-established due process principle that 'within the limits of practicability, a State must afford to all individuals a meaningful opportunity to be heard' in its courts."  541 U.S. at 532 (citing Boddie v. Connecticut, 401 U.S. at 379).  The Supreme Court concluded that Title II validly imposed an "affirmative obligation [on the state of Tennessee] to accommodate persons with disabilities in the administration of justice."  Tennessee v. Lane, 541 U.S. at 533.

4.        **Procedural Requirements for a Court Access Claim.**

The Supreme Court has recognized that the basis for the constitutional right of court access is "unsettled," but has identified the Privileges and Immunities Clause of Article IV, the First Amendment Petition Clause, the Fifth Amendment Due Process Clause, and the Fourteenth Amendment Equal Protection and Due Process Clauses as sources.  See Christopher v. Harbury, 536 U.S. at 415 & n.12.   In Lewis v. Casey, 518 U.S. 343 (1996), the Honorable Clarence Thomas, Associate Justice of the Supreme Court, expressed his concern as to the vague constitutional roots of the right to court access.  See 518 U.S. at 365-85 (Thomas, J., concurring). Justice Thomas noted the Supreme Court's "inability . . . to agree upon the constitutional source of the supposed right" and stated that "in no instance . . . [has the Supreme Court] engaged in rigorous constitutional analysis of the basis for the asserted right."  518 U.S. at 367 (Thomas, J., concurring).  Despite the uncertainties of the right's constitutional roots, the present framework for the analysis of a court access claim is grounded in decades of case law in the prisoner and civil contexts.  The Honorable Stephanie K. Seymour, now Senior Judge for the Tenth Circuit, has noted that the right of court access is "basic to our system of government" and well established as a fundamental right that the Constitution protects.   Smith v. Maschner, 899 F.2d at 947 (quoting Nordgren v. Milliken, 762 F.2d 851, 853 (10th Cir. 1985)).  The elements of a court access claim, under any source, appear to be uniform.  See Christopher v. Harbury, 536 U.S. at 413-16 (discussing the various roots of the right to court access and the general elements of a court access claim).  "Interference with the right of access to the courts gives rise to a claim for relief under section 1983."  Ryland v. Shapiro, 708 F.2d 967, 972 (5th Cir. 1983).

The Fourteenth Amendment mandates that "[n]o State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any

State deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The right of court access under the Fourteenth Amendment's due-process right is substantive rather than procedural; "[i]ts exercise can be shaped and guided by the state, but cannot be obstructed, regardless of the procedural means applied." Morello v. James, 810 F.2d 344, 346 (2nd Cir. 1987)(citing Bounds v. Smith, 430 U.S. at 823-824). The First Amendment mandates that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peacefully to assemble, and to petition the Government for a redress of grievances." U.S. Const. amend. I. It has long been established that the First Amendment rights of free speech, free assembly, and freedom to petition for redress of grievances are "protected by the Fourteenth Amendment from invasion by the States." Edwards v. South Carolina, 372 U.S. 229, 235 (1963).

The Supreme Court has divided court access claims into two categories: "forward looking claims" and "backwards looking claims." Jennings v. City of Stillwater, 383 F.3d at 1208 (citing Christopher v. Harbury, 536 U.S. 403, 413 (2002)). Forward looking claims involve official action that "frustrates a plaintiff's ability to bring a suit at the present time," and backwards looking claims "arise when plaintiffs allege that a specific claim cannot be tried [. . .] because past official action causes the loss or inadequate settlement of a meritorious claim." Jennings v. City of Stillwater, 383 F.3d at 1208 (quoting Christopher v. Harbury, 536 U.S. at 413-414)(internal quotations omitted). When a court access claim looks backwards, it must "identify a remedy that may be awarded as recompense but not otherwise available in some suit that may yet be brought." Christopher v. Harbury, 536 U.S. at 404. To give a defendant fair notice, a complaint must address the underlying cause of action and its lost remedy. See 536 U.S. at 404.

A prisoner court access claim seeking relief through a law library or through legal assistance is an example of a forward-looking court access claim, because official action "is presently denying an opportunity to litigate for a [future] class of potential plaintiffs." 536 U.S. at 413 (citing Bounds v. Smith, 430 U.S. at 828, and Lewis v. Casey, 513 U.S. at 346-48). In cases challenging filing fees as a denial of court access, "the object is an order requiring waiver of a fee to open the courthouse door for [future] desired litigation." Christopher v. Harbury, 536 U.S. at 413 (citing Boddie v. Connecticut, 410 U.S. at 372, and M.L.B. v. S.L.J., 519 U.S. 102, 106-07 (1996)). In forward-looking claims, "the opportunity has not been lost for all time;" rather, it has been lost in the short term. Christopher v. Harbury, 536 U.S. at 413. The objective of a forward-looking claim is to "place the plaintiff in a position to pursue a separate claim for relief once the frustrating condition has been removed." Christopher v. Harbury, 536 U.S. at 413. In contrast, backward-looking claims "cannot now be tried (or tried with all material evidence), no matter what official action may be in the future." Christopher v. Harbury, 536 U.S. at 413-14. Examples of backward-looking claims include police cover-ups over a period of time that resulted in a plaintiff's inability to seek redress. See Christopher v. Harbury, 536 U.S. at 414 (citing Foster v. Lake Johnson, 28 F.3d 425, 429 (5th Cir. 1994), and Swekel v. River Rouge, 119 F.3d 1259, 1261 (6th Cir. 1997)). The ultimate objective of a backward-looking claim is "not the judgment in a further lawsuit, but simply the judgment in the access claim itself, in providing relief obtainable in no other suit in the future." Christopher v. Harbury, 536 U.S. at 414.

Whether a claim turns on "a litigating opportunity yet to be gained or an opportunity already lost," the purpose of recognizing a court access claim "is to provide some effective vindication for a separate and distinct right to seek judicial relief for some wrong." Christopher v. Harbury, 536 U.S. at 414-15. "However unsettled the basis of the constitutional right of access

to courts," court access cases "rest on the recognition that the right is ancillary to the underlying claim, without which a plaintiff cannot have suffered injury by being shut out of court." Christopher v. Harbury, 536 U.S. at 415.  A plaintiff bringing a court access claim, whether forward- or backward-looking, must identify a "nonfrivolous, arguable underlying claim." Christopher v. Harbury, 536 U.S. at 415 (internal quotation marks omitted).  See Lewis v. Casey, 513 U.S. at 353 & n.3.  The plaintiff's complaint must describe the underlying cause of action, "whether anticipated or lost," and the official action which frustrated the litigation.  Christopher v. Harbury, 536 U.S. at 415.  If the plaintiff has a backward-looking claim, the complaint "must identify a remedy that may be awarded as recompense but not otherwise available in some suit that may yet be brought."  Christopher v. Harbury, 536 U.S. at 415.  All elements in a court access claim must be "addressed by allegations in the complaint sufficient to give fair notice to a defendant."  Christopher v. Harbury, 536 U.S. at 416 (citing Swierkiewicz v. Sorema N.A., 534 U.S. 506, 513-15 (2002)).

Backward-looking claims inherently pose a "particular risk" and require careful examination, because the actions underlying this claim "will not be tried independently, a fact that enhances the natural temptation on the part of plaintiffs to claim too much, by alleging more than might be shown in a full trial focused solely on the details of the predicate action." Christopher v. Harbury, 536 U.S. at 416.  Therefore, the application of the "nonfrivolous" test and the claim's "arguable" nature are of particular importance.  Christopher v. Harbury, 536 U.S. at 416.  In Christopher v. Harbury, the plaintiff brought a backward-looking claim alleging that government officials' deliberate concealment of information that military officers in Guatemala detained, tortured and killed her husband, was a violation of court access.  See 536 U.S. at 405. The Supreme Court held that the plaintiff's complaint failed to identify "an underlying cause of

action for relief that the plaintiff would have raised had it not been for the deception alleged."
536 U.S. at 405, 418.  The Supreme Court noted that the plaintiff's request for relief was "nearly
unintelligible," because the plaintiff failed to show that the Government official's action had
compromised an underlying action.  536 U.S. at 418 ("The District Court and the defendants
were left to guess at the unstated cause of action supposed to have been lost.").

In Jennings v. City of Stillwater, the Tenth Circuit applied the backward- and forward-
looking categories to a case alleging that destruction of a rape kit, and police officers'
investigative omissions and irregularities, violated the plaintiff's right to court access.  See 383
F.3d at 1200.  The Tenth Circuit rejected the plaintiff's backward-looking claim, noting that any
remedy "that could conceivably be awarded to Plaintiff as a result of the alleged police
misconduct" had already been sought and obtained in a suit against Oklahoma State University
and the four football players that had allegedly raped her.  383 F.3d at 1209.  Notably, the Tenth
Circuit stated that, unlike other Courts of Appeals, the Tenth Circuit "has not recognized a
constitutional cause of action based on denial of access to the courts under [the] circumstances
[of police cover-ups]."  383 F.3d at 1208-09.

Recently, in Lynch v. Barrett, 703 F.3d 1153 (10th Cir. 2013), cert. denied, 133 S. Ct.
2352 (2013), the Tenth Circuit evaluated a backward-looking claim in the civil rights context.
The plaintiff brought a § 1983 civil rights action alleging violation of his right to court access
against police officers who had allegedly refused to disclose "who [had] exercised excessive
force against [the plaintiff] in the course of an arrest."  703 F.3d at 1155.  In addition, the plaintiff
alleged that the City of Denver violated his right of access to the courts by "adopting a policy
and practice that precipitated the 'conspiracy of silence' waged against him."  703 F.3d at 1155.
The plaintiff had already litigated the underlying claim of excessive force unsuccessfully, and

had thus lost his opportunity to recover.  See 703 F.3d at 1157.  The defendants argued that qualified immunity barred plaintiff's suit.  See 703 F.3d at 1158.  The Tenth Circuit found that the plaintiff had an actionable backward-looking denial-of-access claim.  See 703 F.3d at 1157.  In the subsequent analysis of qualified immunity, the Tenth Circuit stated that, "while the precise source of the constitutional right to court access remains ambiguous, the existence of such right, generally speaking, is quite clear."  703 F.3d at 1161.  The Tenth Circuit stated that in Christopher v. Harbury, the Supreme Court "was careful not to endorse the validity of . . . backwards looking [right-of-access] claims."  703 F.3d at 1161 (citing Jennings v. City of Stillwater, 383 F.3d at 1209).  Because the question "whether an evidentiary cover-up by police officials may violate an individual's constitutional right to court access was not clearly established at the time of the alleged violation," the Tenth Circuit concluded that the defendants were entitled to qualified immunity.  703 F.3d at 1162.  "[T]hat we are 'morally outraged' by the alleged conduct,'" the Tenth Circuit concluded, "does not mean necessarily that the offic[ers] should have realized that [they] violated a constitutional right of access."  703 F.3d at 1163 (citing Foster v. City of Jackson, 28 F.3d 425, 430 (5th Cir. 1994)).

Under a § 1983 court access claim, therefore, the second prong of a qualified immunity analysis requires that the contours of the right "be sufficiently clear that a reasonable official would understand that what he was doing violates that right."  Lynch v. Barrett, 703 F.3d at 1161.  To overcome a defendant's claim of qualified immunity, a plaintiff must show that the scope of his or her court access right "was sufficiently clear" such that a reasonable state actor would have understood that his or her actions against the plaintiff "were not merely ill-advised, but violate that right."  703 F.3d at 1161.  To simply say that "the Constitution recognizes a right to court access casts too high a level of generality over our inquiry."  Lynch v. Barrett, 703 F.3d at 1161.

- 72 -

For a plaintiff to show that his or her right to court access was "clearly established in the proper sense," the plaintiff "should identify cases of controlling authority . . . at the time of the incident . . . [or] a consensus of cases of persuasive authority clearly establishing the scope of the right encompasses the facts presented, such that a reasonable officer could not have believed that his actions were [consistent with that right]."  703 F.3d at 1161 (citing Wilson v. Layne, 526 U.S. 603, 617 (1999))(internal quotations omitted).

## LAW REGARDING QUALIFIED IMMUNITY

Qualified immunity recognizes the "need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority."  Harlow v. Fitzgerald, 457 U.S. 800, 807 (1982).  "Qualified immunity protects federal and state officials from liability for discretionary functions, and from 'the unwarranted demands customarily imposed upon those defending a long drawn-out lawsuit.'"  Roybal v. City of Albuquerque, No. CIV 08-0181 JB/LFG, 2009 WL 1329834, at *10 (D.N.M. Apr. 28, 2009)(Browning, J.)(quoting Siegert v. Gilley, 500 U.S. 226, 232 (1991)).  The Supreme Court deems it "untenable to draw a distinction for purposes of immunity law between suits brought against state officials under § 1983 and suits brought directly under the Constitution against federal officials."  Butz v. Economou, 438 U.S. 478, 504 (1978).  "The qualified immunity analysis is the same whether the claims are brought under Bivens or pursuant to the post-Civil War Civil Rights Acts."  Breidenbach v. Bolish, 126 F.3d 1288, 1291 (10th Cir. 1997), overruled on other grounds as recognized in Currier v. Doran, 242 F.3d 905 (10th Cir. 2001).

> Under § 1983 (invoked in this case) and Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388 . . . (1971), a plaintiff may seek money damages from government officials who have violated her constitutional or statutory rights.  But to ensure that fear of liability will not "unduly inhibit officials in the discharge of their duties," Anderson v. Creighton, 483 U.S. 635, 638 . . . (1987), the officials may claim qualified immunity; so long as they have not violated a "clearly

established" right, they are shielded from personal liability, <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 . . . (1982).  That means a court can often avoid ruling on the plaintiff's claim that a particular right exists.  If prior case law has not clearly settled the right, and so given officials fair notice of it, the court can simply dismiss the claim for money damages.  The court need never decide whether the plaintiff's claim, even though novel or otherwise unsettled, in fact has merit.

<u>Camreta v. Green</u>, 131 S. Ct. 2020, 2030-31 (2011).

Issues of qualified immunity are best resolved at the "earliest possible stage in litigation."

<u>Pearson v. Callahan</u>, 555 U.S. at 232 (quoting <u>Hunter v. Bryant</u>, 502 U.S. 224, 227 (1991)(per curiam)).  "If qualified immunity is to mean anything, it must mean that public employees who are just doing their jobs are generally immune from suit."  <u>Lewis v. Tripp</u>, 604 F.3d 1221, 1230 (10th Cir. 2010).

Qualified immunity shields government officials from liability where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  <u>Pearson v. Callahan</u>, 555 U.S. at 231 (quoting <u>Harlow v. Fitzgerald</u>, 457 U.S. at 818).  Qualified immunity also shields officers who have "reasonable, but mistaken beliefs," and operates to protect officers from the sometimes "hazy border[s]" of the law.  <u>Saucier v. Katz</u>, 533 U.S. 194, 205 (2001).  When a defendant asserts qualified immunity, the plaintiff must demonstrate: (i) that the defendant's actions violated his or her constitutional or statutory rights; and (ii) that the right was clearly established at the time of the alleged misconduct.  See <u>Riggins v. Goodman</u>, 572 F.3d 1101, 1107 (10th Cir. 2009).

## 1.   Procedural Approach to Qualified Immunity.

The Supreme Court recently revisited the proper procedure for lower courts to evaluate a qualified immunity defense.  In <u>Pearson v. Callahan</u>, the Supreme Court held that lower courts "should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the

particular case at hand."  555 U.S. at 236.  The Supreme Court also noted that, while no longer mandatory, the protocol outlined in Saucier v. Katz -- by which a court first decides if the defendant's actions violated the constitution, and then the court determines if the right violated was clearly established -- will often be beneficial.  See Pearson v. Callahan 555 U.S. at 241.  In rejecting the prior mandatory approach, the Supreme Court recognized that "[t]here are cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right," and that such an approach burdens district court and courts of appeals with "what may seem to be an essentially academic exercise."  555 U.S. at 237.  The Supreme Court also recognized that the prior mandatory approach "departs from the general rule of constitutional avoidance and runs counter to the older, wiser judicial counsel not to pass on questions of constitutionality unless such adjudication is unavoidable."   555 U.S. at 241 (alterations omitted)(internal quotation marks omitted).  See Reichle v. Howards, 132 S. Ct. 2088, 2093 (2012)(affirming Pearson v. Callahan's procedure and noting that deciding qualified immunity issues on the basis of a right being not "clearly established" by prior case law "comports with our usual reluctance to decide constitutional questions unnecessarily").  Once the plaintiff establishes an inference that the defendant's conduct violated a clearly established constitutional right, a qualified immunity defense generally fails.  See Cannon v. City & Cty. of Denver, 998 F.2d 867, 870-71 (10th Cir. 1993).

The Supreme Court recognizes seven circumstances where district courts should proceed directly to and "should address only" the clearly established prong of the qualified immunity analysis: when (i) the first, constitutional violation question "is so factbound that the decision provides little guidance for future cases"; (ii) "it appears that the question will soon be decided by a higher court"; (iii) deciding the constitutional question requires "an uncertain interpretation

of state law"; (iv) "qualified immunity is asserted at the pleading stage," and "the precise factual

basis for the . . . claim . . . may be hard to identify"; (v) tackling the first element "may create a

risk of bad decisionmaking," because of inadequate briefing; (vi) discussing both elements risks

"bad decisionmaking," because the court is firmly convinced the law is not clearly established

and is thus inclined to give little thought to the existence of the constitutional right; or (vii) the

doctrine of "constitutional avoidance" suggests the wisdom of passing on the first constitutional

question when "it is plain that a constitutional right is not clearly established but far from

obvious whether in fact there is such a right." Kerns v. Bader, 663 F.3d 1173, 1180-81 (10th

Cir. 2011)(quoting Pearson v. Callahan, 555 U.S. at 236-42).[11]  Regarding the last of these seven

---

[11]As former-Tenth Circuit judge, and now Stanford law school professor, Michael McConnell, has pointed out, much of what lower courts do is read the implicit, unwritten signs that the superior courts send them through their opinions. See Michael W. McConnell, Address at the Oliver Seth American Inn of Court: How Does the Supreme Court Communicate Its Intentions to the Lower Courts: Holdings, Hints and Missed Signals (Dec. 17, 2014).  This practice is good for the nation's judicial system to achieve uniformity in a nation of 319 million people. See, e.g., Michigan v. Long, 463 U.S. 1032, 1040 (1983)(stating that "there is an important need for uniformity in federal law"). But see Amanda Frost, Overvaluing Uniformity, 94 Va. L. Rev. 1567 (2008)(criticizing courts' focus on uniformity of the law).  If a district court in New Mexico is trying -- as it does diligently and faithfully -- to receive and read the unwritten signals of its superior courts, it would appear that Justice Alito in Pearson v. Callahan and Judge Gorsuch in Kerns v. Bader are trying to suggest that district courts should, whenever possible, decide qualified immunity on the clearly established prong.  For example, Justice Alito and Judge Gorsuch gave seven situations that the Court should decide a case solely on the clearly established element and not "avoid avoidance." See Kerns v. Bader, 663 F.3d at 1180-81 (noting the seven situations in which a court should skip step one and decide a case on the clearly established prong). Even the phrase "avoid avoidance" suggests that the district court is to avoid, not decide, the constitutional issue.

The Court is concerned about this push to not decide constitutional issues, for a number of reasons.  The Court set forth some of these in Kerns v. Board of Education, which the Court quotes in Note 5. See infra Note 5.  Additionally, there is a practical problem.  Sometimes, for a district court to really know whether a right is clearly established, it has to do the first analysis, and thoroughly explore whether there is a right and whether it has been violated.  If it jumps to the mushy, hazy area of clearly established without knowing what the right is, the analysis lacks any precision.  However, while appellate courts may think that jumping to the clearly established prong saves district courts a lot of trouble, in the Court's experience, the old rule -- in Saucier v. Katz -- made more sense and, practically, is the way the Court still has to go in many cases.

circumstances, the Supreme Court has clarified that courts may "avoid avoidance" and address the first prong before the second prong in cases involving a recurring fact pattern, where guidance on the constitutionality of the challenged conduct is necessary, and the conduct is likely only to face challenges in the qualified immunity context.  Camreta v. Greene, 131 S. Ct. 2020, 2031-32 (2011).  See Kerns v. Bader, 663 F.3d at 1181.[12]  "Courts should think carefully

_____

[12]In Kerns v. Bader, the Tenth Circuit reversed the Court's decision that an officer was not entitled to qualified immunity, noting that the Court "analyzed both aspects of the qualified immunity test before agreeing" with the plaintiff that the qualified immunity defense did not protect the officer.  663 F.3d at 1183.  In reversing, the Tenth Circuit stated:

> Because we agree with Sheriff White on the latter (clearly established law) question, we reverse without addressing the former (constitutional violation) question.  And we pursue this course because doing so allows us to avoid rendering a decision on important and contentious questions of constitutional law with the attendant needless (entirely avoidable) risk of reaching an improvident decision on these vital questions.

663 F.3d at 1183-84.  The Tenth Circuit did not analyze whether the officer violated the plaintiff's constitutional rights and stated that guidance on the particular constitutional issue would be more appropriate in a case not involving qualified immunity: "Neither do we doubt that the scope of the Constitution's protection for a patient's hospital records can be adequately decided in future cases where the qualified immunity overlay isn't in play (e.g., through motions to suppress wrongly seized records or claims for injunctive or declaratory relief)."  663 F.3d at 1187 n.5.  On remand, the Court stated:

> While the Court must faithfully follow the Tenth Circuit's decisions and opinions, the Court is troubled by this statement and the recent trend of the Supreme Court's hesitancy in § 1983 actions to address constitutional violations.  A Reconstruction Congress, after the Civil War, passed § 1983 to provide a civil remedy for constitutional violations.  See Mitchum v. Foster, 407 U.S. 225, 238-39 (1972).  In Mitchum v. Foster, the Supreme Court explained:
>
> > Section 1983 was originally § 1 of the Civil Rights Act of 1871 . . . and was enacted for the express purpose of "enforc(ing) the Provisions of the Fourteenth Amendment." . . .  The predecessor of § 1983 was thus an important part of the basic alteration in our federal system wrought in the Reconstruction era through federal legislation and constitutional amendment.

407 U.S. at 238-39.  Congress did not say it would remedy only violations of "clearly established" law, but that

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

42 U.S.C. § 1983 (emphasis added).  The Supreme Court established the qualified immunity defense in Pierson v. Ray, 386 U.S. 547 (1967), and held that officials were not liable for constitutional violations where they reasonably believed that their conduct was constitutional.  See E. Clarke, Safford Unified Sch. Dist. No. 1 v. Redding: Why Qualified Immunity is a Poor Fit in Fourth Amendment School Search Cases, 24 B.Y.U. J. Pub. L. 313, 329 (2010).  The Supreme Court first introduced the "clearly established" prong in reference to an officer's good faith and held that a compensatory award would only be appropriate if an officer "acted with such an impermissible motivation or with such disregard of the [individual's] clearly established constitutional rights that his action cannot reasonably be characterized as being in good faith."  Wood v. Strickland, 420 U.S. 308, 322 (1975).  In Harlow v. Fitzgerald, when the Supreme Court moved to an objective test, the clearly-established prong became a part of the qualified immunity test. See 457 U.S. at 818 ("We therefore hold that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights.").  It seems ironic that the federal courts would restrict a congressionally mandated remedy for constitutional violations -- presumably the rights of innocent people -- and discourage case law development on the civil side -- and restrict case law development to motions to suppress, which reward only the guilty and is a judicially created, rather than legislatively created, remedy. Commentators have noted that, "[o]ver the past three decades, the Supreme Court has drastically limited the availability of remedies for constitutional violations in" exclusionary rule litigation in a criminal case, habeas corpus challenges, and civil litigation under § 1983.  J. Marceau, The Fourth Amendment at a Three-Way Stop, 62 Ala. L. Rev. 687, 687 (2011).  Some commentators have also encouraged the courts to drop the suppression remedy and the legislature to provide more -- not less -- civil remedies for constitutional violations.  See Christopher Slobogin, Why Liberals Should Chuck the Exclusionary Rule, 1999 U. Ill. L. Rev. 363,

before expending 'scarce judicial resources' to resolve difficult and novel questions of
constitutional or statutory interpretation that will 'have no effect on the outcome of the case.'"
Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2080 (2011)(quoting Pearson v. Callahan, 555 U.S.
at 236-37).  See Camreta v. Greene, 131 S. Ct. at 2032 ("In general, courts should think hard, and
then think hard again, before turning small cases into large ones.").[13]  The Tenth Circuit will

---

390-91 (1999)("Behavioral theory suggests that the exclusionary rule is not very
effective in scaring police into behaving. . . .  These theories also suggest that a
judicially administered damages regime . . . would fare significantly better at
changing behavior at an officer level."); Hon. Malcolm R. Wilkey, Constitutional
Alternatives to the Exclusionary Rule, 23 S. Tex. L.J. 531, 539 (1982)(criticizing
the exclusionary rule and recommending alternatives).  In Hudson v. Michigan,
547 U.S. 586 (2006), the Supreme Court noted that civil remedies were a viable
alternative to a motion to suppress when it held that the exclusionary rule was
inapplicable to cases in which police officers violate the Fourth Amendment when
they fail to knock and announce their presence before entering.  See 547 U.S. at
596-97.   Rather than being a poor or discouraged means of developing
constitutional law, § 1983 seems the better and preferable alternative to a motion
to suppress.  It is interesting that the current Supreme Court and Tenth Circuit
appear more willing to suppress evidence and let criminal defendants go free, than
have police pay damages for violations of innocent citizens' civil rights.  It is odd
that the Supreme Court has not adopted a clearly established prong for
suppression claims; it seems strange to punish society for police violating unclear
law in criminal cases, but protect municipalities from damages in § 1983 cases.

Kerns v. Bd. of Comm'rs, 888 F. Supp. 2d 1176, 1224 n.36 (D.N.M. 2012)(Browning, J.),
abrogated on other grounds as recognized in Ysasi v. Brown, No. CIV 13-0183 JB/CG, 2014 WL
936835, at *9 n.24 (D.N.M. Feb. 28, 2014)(Browning, J.).  See Richard E. Myers, Fourth
Amendment Small Claims Court, 10 Ohio St. J. Crim. L. 571, 590-97 (2013)(arguing that
municipalities should establish small-claims courts to adjudicate police officers' Fourth
Amendment violations and award monetary judgments).

[13]In Kerns v. Board of Commissioners, the Court expressed concern with Justice Elena
Kagan's comments about "large" and "small" cases:

While the Court is, of course, obligated to follow faithfully the Supreme Court's
decisions and opinions, the Court has always been unenlightened and even
troubled by Justice Elena Kagan's comments in Camreta v. Greene about "large"
and "small" cases.  131 S. Ct. at 2032.  As a trial judge, the Court has tried
assiduously to avoid thinking about or categorizing some cases as "large" and
some as "small."  It usually is not mentally healthy for a judge to put all his or her

_____

energy into "large" cases and slight "small cases"; to the litigants, their case is the most important case on the Court's docket, and it is usually wise for the judge to treat each case on which he or she is working -- at that moment -- as the most important case at that moment.  Getting the decision "right," i.e. getting the law and facts correct and accurate, is obviously important, but getting it right is only one-half of a judge's task, particularly a trial judge's job.  The other half of dispensing justice is the appearance of justice -- did the Court listen to the litigant's arguments, wrestle with those arguments, and deal with them in an intellectually honest way.  Americans are pretty good about accepting a judicial decision -- even an adverse one -- and cease obsessing over an issue, if they are convinced that an authority figure has dressed up, taken them seriously, listened patiently and politely, wrestled with the arguments, addressed them, and accurately stated the facts.  The Court believes that, if it starts looking at some cases before it as "large" and some as "small," it begins a slippery slope that does not accomplish both halves of the task of dispensing justice.  The justice system depends so much on the nation respecting and accepting the courts' proceedings and decisions, because courts have very little "power" that does not depend on that acceptance.  Thus, Justice Kagan's comments are not only not self-defining, but they are disturbing.

If, perhaps, a "large" case is a Supreme Court case or one that comes from the East Coast or California, rather than one in a district court in New Mexico, then it helps to look at what cases the Supreme Court has decided for the plaintiff.  The three most recent qualified immunity cases, the Supreme Court dealt with are: (i) Reichle v. Howards, 132 S. Ct. 2088 (2012); (ii) Filarksy v. Delia, 132 S. Ct. 1657 (2012); and (iii) Messerschmidt v. Millender, 132 S. Ct. 1235 (2012).  In Reichle v. Howards, the Supreme Court determined that secret service agents were entitled to qualified immunity for arresting a protestor who touched the Vice President and held that it was not clearly established that an arrest supported by probable cause could give rise to a First Amendment violation.  See 132 S. Ct. at 2092, 2097.  In Filarsky v. Delia, the Supreme Court held that a private individual that the government hires to do its work, an internal affairs review, is entitled to seek qualified immunity for Fourth and Fourteenth Amendment violations.  See 132 S. Ct. at 1660, 1668.  In Messerschmidt v. Millender, the Supreme Court held that police officers in Los Angeles, California were entitled to qualified immunity when they relied on an invalid warrant to search a home, because a reasonable officer would not have realized the error.  See 132 S. Ct. at 1241, 1250.  The Supreme Court has not denied qualified immunity since 2004 in Groh v. Ramirez, 540 U.S. 551 (2004), where it held that an officer unreasonably relied on a deficient warrant.  See 540 U.S. at 565. The Court does not think those presumably "large" cases (they are Supreme Court cases, after all) are any different -- substantively, legally, or factually -- than this case involving the search of a citizen's home after someone shot down a police helicopter and then detained that suspect for nine months until the United States realized that J. Kerns could not have shot down the helicopter.

remand a case to the district court for further consideration when the district court has given cursory treatment to the clearly established prong of the qualified immunity analysis.  See Kerns v. Bader, 663 F.3d at 1182.

### 2.      Clearly Established Rights in the Qualified Immunity Analysis.

To determine whether a right was clearly established, a court must consider whether the right was sufficiently clear that a reasonable government employee in the defendant's shoes would understand that what he or she did violated that right.  See Casey v. W. Las Vegas Indep. Sch. Dist., 473 F.3d 1323, 1327 (10th Cir. 2007).  "A clearly established right is generally defined as a right so thoroughly developed and consistently recognized under the law of the jurisdiction as to be 'indisputable' and 'unquestioned.'"  Lobozzo v. Colo. Dep't of Corr., 429 F. App'x 707, 710 (10th Cir. 2011)(quoting Zweibon v. Mitchell, 720 F.2d 162, 172-73 (D.C. Cir. 1983)).

"Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains."  Currier v. Doran, 242 F.3d at 923.  On the other hand, the Supreme Court has observed that it is generally not necessary to find a controlling decision declaring the "very action in question . . . unlawful."  Anderson v. Creighton, 483 U.S. 635, 640 (1987).  "In determining whether the right was 'clearly

---

On the flip side, treating large cases like they are large cases can create an appearance problem to the public and to the litigants -- that only big cases deserve the Court's attention.  A trial judge can overwork a "large" case.  It is better to treat even "large" cases like every other case; large cases and their litigants need to know and appreciate that they are not the only case on the court's docket, and realize that the scarcity of judicial resources applies to them too.

Kerns v. Bd. of Comm'rs, 888 F. Supp. 2d at 1222 n.35.

established,' the court assesses the objective legal reasonableness of the action at the time of the alleged violation and asks whether 'the contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'"   Holland ex rel. Overdorff v. Harrington, 268 F.3d 1179, 1186 (10th Cir. 2001)(alteration in original)(quoting Saucier v. Katz, 533 U.S. at 202).   A court should inquire "whether the law put officials on fair notice that the described conduct was unconstitutional" rather than engage in "a scavenger hunt for cases with precisely the same facts."   Pierce v. Gilchrist, 359 F.3d 1279, 1298 (10th Cir. 2004).

The Supreme Court has clarified that the clearly established prong of the qualified immunity test is a very high burden for the plaintiff: "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Ashcroft v. al-Kidd, 131 S. Ct. at 2083.  "In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate.'"   Reichle v. Howards, 132 S. Ct. at 2093 (quoting Ashcroft v. al-Kidd, 131 S. Ct. at 2083).   "The operation of this standard, however, depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified." Anderson v. Creighton, 483 U.S. at 639.  "The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established." Ashcroft v. al-Kidd, 131 S. Ct. at 2084.  The level of generality at which the legal rule is defined is important, because qualified immunity shields officers who have "reasonable, but mistaken beliefs" as to the application of law to facts and operates to protect officers from the sometimes "hazy border[s]" of the law.  Saucier v. Katz, 533 U.S. at 205.

The Tenth Circuit held in <u>Kerns v. Bader</u> that, although "a case on point isn't required if the impropriety of the defendant's conduct is clear from existing case law," the law is not clearly established where "a distinction <u>might</u> make a constitutional difference."  663 F.3d at 1188 (emphasis in original).  In <u>Kerns v. Bader</u>, dealing with the search of a home, the Tenth Circuit explained that the relevant question "wasn't whether we all have some general privacy interest in our home," but "whether it was <u>beyond debate</u> in 2005 that the officers' entry and search lacked legal justification."  663 F.3d at 1183 (emphasis added).  Earlier Tenth Circuit cases, clarifying the level of generality at which a legal rule must be defined, applied a sliding scale to determine when the law is clearly established.  <u>See Casey v. City of Fed. Heights</u>, 509 F.3d 1278, 1284 (10th Cir. 2007)("The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation.").  "[W]hen an officer's violation . . . is particularly clear . . . , [the Tenth Circuit] does not require a second decision with greater specificity to clearly establish the law."  <u>Casey v. City of Fed. Heights</u>, 509 F.3d at 1284.  Furthermore, "general statements of the law are not inherently incapable of giving fair and clear warning . . . ."  <u>Hope v. Pelzer</u>, 536 U.S. 730, 741 (2002).

## LAW REGARDING SUPPLEMENTAL JURISDICTION

It is a fundamental precept of American law that the federal courts are "courts of limited jurisdiction."  <u>Exxon Mobil Corp. v. Allapattah Servs., Inc.</u>, 545 U.S. 546, 552 (2005).  Federal courts "possess only that power authorized by Constitution and statute."  <u>Kokkonen v. Guar. Life Ins. Co. of Am.</u>, 511 U.S. 375, 377 (1994).  Among the powers that Congress has bestowed upon the courts is the power to hear controversies arising under federal law -- federal-question jurisdiction -- and controversies arising between citizens of different states -- diversity jurisdiction.  <u>See</u> 28 U.S.C. §§ 1331-32.

1.      **Congressional Authority.**

Although a statutory basis is necessary for federal courts to exercise jurisdiction over a controversy, "it is well established -- in certain classes of cases -- that, once a court has original jurisdiction over some claims in the action, it may exercise supplemental jurisdiction over additional claims that are part of the same case or controversy."  Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. at 552.  The term "supplemental jurisdiction" is now used to refer collectively to the common-law doctrines of ancillary jurisdiction, pendent jurisdiction, and pendant-party jurisdiction.  28 U.S.C. § 1367, statutorily codifying Owen Equip. & Erection Co. v. Kroger, 437 U.S. 365 (1978)(outlining the doctrine of ancillary jurisdiction), and United Mine Workers of Am. v. Gibbs, 383 U.S. 715 (1966)(outlining the doctrine of pendent jurisdiction), and invalidating Finley v. United States, 490 U.S. 545 (1989)(rejecting the doctrine of pendent-party jurisdiction).  Federal courts may exercise pendent jurisdiction over state-law claims when "state and federal claims . . . derive from a common nucleus of operative fact." United Mine Workers v. Gibbs, 383 U.S. 715, 725 (1966).  Supplemental jurisdiction gives federal courts the flexibility to hear a cause of action after the introduction of third parties whose insertion into the litigation lacks support of any independent grounds for federal jurisdiction, when those parties share a common interest in the outcome of the litigation and are logical participants in it.  See Owen Equip. & Erection Co. v. Kroger, 437 U.S. 365, 375 n.18 (1978).

In 1988, the Honorable William H. Rehnquist, Chief Justice of the Supreme Court of the United States, created the Federal Courts Study Committee to analyze the federal court system and to recommend reforms.  See James v. Chavez, No. CIV 09-0540 JB/CG, 2011 WL 6013547, at *5 (D.N.M. Nov. 21, 2011)(Browning, J.)(citing 16 James W. Moore et al., Moore's Federal Practice § 106.04[5] (Matthew Bender 3d ed.)).  In response to the Committee's findings

regarding pendent, ancillary, and pendent-party jurisdiction, Congress codified the doctrines

when it passed the Judicial Improvements Act of 1990:

> [I]n any civil action of which the district courts have original jurisdiction, the
> district courts shall have supplemental jurisdiction over all other claims that are so
> related to claims in the action within such original jurisdiction that they form part
> of the same case or controversy under Article III of the United States
> Constitution.  Such supplemental jurisdiction shall include claims that involve the
> joinder or intervention of additional parties.

28 U.S.C. § 1367(a).  In enacting 28 U.S.C. § 1367, Congress conferred upon federal district

courts "supplemental forms of jurisdiction . . . [that] enable them to take full advantage of the

rules on claim and party joinder to deal economically -- in single rather than multiple litigation --

with matters arising from the same transaction or occurrence."  Report of the Federal Courts

Study Committee, Part II.2.B.2.b. (April 2, 1990), reprinted in 22 Conn. L. Rev. 733, 787 (1990).

### 2.  **District Court Discretion.**

The Tenth Circuit has followed the Supreme Court's lead in classifying supplemental

jurisdiction, not as a litigant's right, but as a matter of judicial discretion.  See Estate of

Harshman v. Jackson Hole Mountain Resort Corp., 379 F.3d 1161, 1165 (10th Cir. 2004)(citing

City of Chi. v. Int'l Coll. of Surgeons, 522 U.S. 156, 173 (1997)).  In circumstances where the

supplemental jurisdiction statute may support supplemental jurisdiction, the district court retains

discretion to decline to exercise that jurisdiction.  The traditional analysis, based on the Supreme

Court's opinion in United Mine Workers v. Gibbs, compelled courts to consider "judicial

economy, convenience and fairness to litigants" when deciding whether to exercise supplemental

jurisdiction.  383 U.S. at 726.  Similarly, Congress' supplemental jurisdiction statute enumerates

four factors that the court should consider:

**(1)**      the claim raises a novel or complex issue of State law,

> **(2)**     the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
>
> **(3)**     the district court has dismissed all claims over which it has original jurisdiction, or
>
> **(4)**      in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c).   In applying these factors, district courts should seek to exercise supplemental jurisdiction in an effort to "vindicate values of economy, convenience, fairness, and comity." Estate of Harshman v. Jackson Hole Mountain Resort Corp., 379 F.3d at 1164.

Numerous courts have acknowledged that 28 U.S.C. § 1367(c) necessarily changed the district courts' supplemental jurisdiction discretion analysis and that, unless one of the conditions of 28 U.S.C. § 1367(c) exists, courts are not free to decline jurisdiction.  See Itar-Tass Russian News Agency v. Russian Kurier, Inc., 140 F.3d 442, 447 (2d Cir. 1998)("[S]ection 1367 has indeed altered Gibbs' discretionary analysis."); McLaurin v. Prater, 30 F.3d 982, 985 (8th Cir. 1994)("The statute plainly allows the district court to reject jurisdiction over supplemental claims only in the four instances described therein."); Exec. Software N. Am. v. U.S. Dist. Court, 24 F.3d 1545, 1557 (9th Cir. 1994)("By codifying preexisting applications of Gibbs in subsections (c)(1)-(3), however, it is clear that Congress intended the exercise of discretion to be triggered by the court's identification of a factual predicate that corresponds to one of the section 1367(c) categories."), overruled on other grounds by 533 F.3d 1087 (9th Cir. 2007); Palmer v. Hosp. Auth., 22 F.3d 1559, 1569 (11th Cir. 1994) ("[S]upplemental jurisdiction must be exercised in the absence of any of the four factors of section 1367(c)."); Bonadeo v. Lujan, No. CIV 08-0812 JB/ACT, 2009 WL 1324119, at *8 (D.N.M. Apr. 30, 2009)(Browning, J.)("28 U.S.C. § 1367(c) changed the district courts' supplemental jurisdiction discretion analysis to prohibit courts from declining jurisdiction unless one of the conditions of 28 U.S.C. §

1367(c) exists.").  At least one other district court in the Tenth Circuit besides this Court has reached the same conclusion.  See Gudenkauf v. Stauffer Commc'ns, Inc., 896 F. Supp. 1082, 1084 (D. Kan. 1995)("[A]ny exercise of discretion declining jurisdiction over pendent claims or parties cannot occur until 'triggered' by the existence of one of the four conditions enumerated.").

The Tenth Circuit has held that district courts should generally decline jurisdiction over state claims when federal claims no longer remain: "When all federal claims have been dismissed, the court may, and usually should, decline to exercise jurisdiction over any remaining state claims."  Koch v. Del City, 660 F.3d at 1228, 1248 (10th Cir. 2011)(quoting Smith v. City of Enid ex rel. Enid City Comm'n, 149 F.3d 1151, 1156 (10th Cir. 1998)).  The Supreme Court has also recognized:

> Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law.  Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.

United Mine Workers of Am. v. Gibbs, 383 U.S. at 726.  The Court has previously stated that a district court should usually decline to exercise supplemental jurisdiction when one of the 28 U.S.C. § 1367(c) factors applies.  See Armijo v. New Mexico, No. CIV 08-0336, 2009 WL 3672828, at *4 (D.N.M. Sept. 30, 2009)(Browning, J.).  The Tenth Circuit has recognized that a district court does not "abuse [its] discretion" when it declines to exercise supplemental jurisdiction over a claim "under 28 U.S.C. § 1367(c)(3) . . . where it 'has dismissed all claims over which it has original jurisdiction.'"  Muller v. Culbertson, 408 F. App'x at 197 (quoting 28 U.S.C. § 1367(c)(3)).

<u>**ANALYSIS**</u>

The Court will grant the motions in part and deny them in part.  First, the Complaint plausibly alleges that the Defendants had a special relationship with the children.  Second, although the Complaint plausibly alleges that Roybal's and Placencio's actions in transferring the children created or enhanced a danger, the Complaint does not sufficiently allege all of the Tenth Circuit's elements to state a danger-creation claim.  Third, the Complaint plausibly alleges that Roybal and Placencio abdicated their professional judgment when they transferred the children to Sotelo and then back to S. Varela without making any inquiry into their caretaking abilities or following the New Mexico Children's Code.  Fourth, the Complaint plausibly alleges that Roybal and Placencio violated the children's right to court access.  Even if Roybal and Placencio abdicated their professional judgment, created a danger, and violated the children's right to court access, however, they are entitled to qualified immunity on all federal claims.  Accordingly, the Plaintiffs cannot make a § 1983 claim against either Placencio or Roybal.  Furthermore, the Court declines to exercise supplemental jurisdiction and will remand the state-law claim to state court.

I.     **THE COMPLAINT PLAUSIBLY ALLEGES THAT ROYBAL AND PLACENCIO VIOLATED THE CHILDREN'S CONSTITUTIONAL RIGHTS, BUT THE <u>DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY.</u>**

The Plaintiffs allege that the Defendants violated the children's constitutional rights not to be placed in danger by state officials.  First, the Complaint contains sufficient factual allegations to show that the Defendants had a special, custodial relationship with the children.  Second, the Plaintiffs plausibly allege that the Defendants created or enhanced a danger to the children, even though the Plaintiffs do not sufficiently allege all of the elements necessary to establish a state-created danger claim.  Third, the Plaintiffs plausibly allege that Roybal and Placencio abdicated their professional judgment when the Defendants had a special relationship

with the children.  Because the law was not clearly established, however, the Defendants are entitled to qualified immunity.

### A.   THE COMPLAINT PLAUSIBLY ALLEGES THAT THE DEFENDANTS HAD A SPECIAL, CUSTODIAL RELATIONSHIP WITH THE CHILDREN.

To determine whether the special-relationship doctrine applies, the Tenth Circuit avoids formalistic distinctions, and instead analyzes a restraint's nature and effect on an individual's freedom.  See Maldonado v. Josey, 975 F.2d 727 (10th Cir. 1992).  The restraint must restrict an individual's liberty to such a degree that it makes the individual involuntarily dependent upon the state to meet the individual's basic needs.  See Maldonado v. Josey, 975 F.2d at 732-33; Gray v. Univ. of Colo. Hosp. Auth., 672 F.3d at 923.  Despite the Tenth Circuit's flexible analysis, the Defendants argue that formal, legal custody must be present to establish the Plaintiffs' claims.  See Reply at 5-8.  They maintain that no custodial relationship exists, and, therefore, no special relationship exists, because: (i) following formal procedures is the sole avenue to a custodial relationship; and (ii) S. Varela voluntarily gave her children to Sotelo.

On their first contention, the Defendants argue that formal procedures are the only way to take children into custody.  See Reply at 5, 8 (arguing that "[t]here is no means for CYFD to assume custody in the absence of a court order or finding of abuse").  The Defendants may be correct that the only way to legally take a child into custody is through a court order or abuse finding.  Nevertheless, less formal actions may amount to a custodial relationship sufficient to create a special relationship, even if those actions do not follow statutorily prescribed procedures.  The Supreme Court in DeShaney defined custody as the result of "the State's affirmative act of restraining the individual's freedom to act on his own behalf."  DeShaney, 489 U.S. at 200.  Case law demonstrates that formal, legal custody is not the only way to take children into custody.  The Tenth Circuit has concluded that "effective" custodial relationships

can exist when an individual is entirely dependent upon the state.  Schwartz v. Booker, 702 F.3d 573, 585 (10th Cir. 2012)(concluding that, whether an individual is involuntarily committed to the state "turn[s] on the dependent and involuntary nature of the custodial relationship").  See Smith v. Cochran, 339 F.3d 1205, 1216 (10th Cir. 2003)(concluding that a defendant "acted as the functional equivalent of a prison guard by virtue of the penological responsibility delegated to [him] by the state").

In Schwartz v. Booker, the Tenth Circuit concluded that a defendant county's intervention in a child's life "effectively exercised custody over" the child, even though a different county had formal legal custody over the foster child.  Schwartz v. Booker, 702 F.3d at 585.  The Tenth Circuit explained that the special-relationship doctrine seeks to protect individuals who involuntarily become reliant on the state to meet their basic human needs.  See Schwartz v. Booker, 702 F.3d at 585.  To apply the special-relationship doctrine only to the formal, legal relationship that existed with the other county "would artificially constrain the doctrine beyond reason."  Schwartz v. Booker, 702 F.3d at 585.  On the basis of this functional custody, the Tenth Circuit held that a special relationship existed.  See Schwartz v. Booker, 702 F.3d at 585; Gray v. Univ. of Colo. Hosp. Auth., 672 F.3d at 923-24)(explaining that a custodial relationship is necessary to succeed on a special-relationship theory, and that the "restraint of liberty necessary" to create that special relationship "requires state action involving force, the threat of force, or a show of authority, with the intent of exercising dominion and control over the person").

Courts outside of the Tenth Circuit have similarly found that custodial relationships may arise when social workers functionally exercise custody over a child.   See Henry A. v. Wilden, 678 F.3d 991, 1003 (9th Cir. 2012)(finding that a plaintiff sufficiently pled that a custodial

relationship existed, despite the defendant-officials' argument that the foster children were technically in a specific county's custody rather than the State's custody); Niarchos v. City of Beverly, 831 F. Supp. 2d 423, 430-31 (D. Mass. 2011)(Gertner, J.)(stating that the DeShaney exception has been applied "based on allegations that the plaintiff was in the functional custody of the state"). The restraint's nature and effect, therefore, is more important in determining whether a special relationship exists than the State's use of formalistic legal procedures. See D.R. by L.R. v. Middle Bucks Area Vo. Tech. School, 972 F.2d 1364, 1370 (3d Cir. 1992); Regalbuto v. City of Philadelphia, 937 F. Supp. 374, 379-80 (E.D. Pa. 1995)(Padova, J.), aff'd, 91 F.3d 125 (3d Cir. 1996) (holding that the "state must affirmatively act to curtail the individual's freedom such that he or she can no longer care for him or herself").

For example, in Horton v. Flenory, 889 F.2d 454 (3d Cir. 1989), the United States Court of Appeals for the Third Circuit used the concept of functional custody to uphold a § 1983 claim against a police sergeant for a nightclub owner's fatal beating of his own employee. See 889 F.2d at 455-56. The club owner detained the employee, whom he suspected of theft, and requested police assistance. See 889 F.2d at 455-56. A police officer assessed the situation at the club, then "used his official status to confirm that [the owner] was free to continue the custodial interrogation even though [the employee] was in fear for his safety and wanted to leave." 889 F.2d at 458. After the officer left the employee in the owner's hands, the owner beat the employee to death. The Third Circuit determined that the officer had so limited the employee's ability to act in his own interest that he effectively placed the employee in state custody. See 889 F.2d at 458. The Third Circuit observed:

> Even if one were to posit that the custodial relationship between the owner . . . and [the suspect] was, up to the time of [the officer's] arrival, purely private, [the officer's] arrival, his interrogation, his direction to [the suspect] to remain seated while he went next door to investigate [the suspect's] story, and his refusal to

> remove [the suspect] from the club significantly changed the nature of the custody.    [The owner] was given carte blanche to continue his custodial interrogation . . . .

889 F.2d at 458. "Clearly," the Third Circuit concluded, the officer "was a participant in the custody which led to the victim's death."  889 F.2d at 458.

In the foster-care context, a custodial relationship sufficient to establish a special relationship arises when the State assumes control of a child's environment and replaces whatever private source of protection the child had in the free world with a new source of protection.  See Norfleet ex rel. Norfleet v. Ark. Dep't of Human Servs., 989 F.2d 289, 293 (8th Cir. 1993)("In foster care, a child loses his freedom and ability to make decisions about his own welfare, and must rely on the state to take care of his needs."); A.M. ex rel. Youngers v. N.M. Dep't of Health, 65 F. Supp. 3d 1206, 1259 (Browning, J.)(observing that Courts of Appeals decisions determine whether a special, custodial relationship exists by considering "which individual or agency society deems most responsible for a child or individual's well-being"); Nicini v. Morra, 212 F.3d 798, 808 (3d Cir. 2000)(en banc)(noting that "[f]oster children, like the incarcerated or the involuntarily committed, are placed . . . in a custodial environment . . . [and are] unable to seek alternative living arrangements")(alterations in original).   The Third Circuit explained that a custodial relationship "arises out of the state's affirmative act in finding the children and placing them with state-approved families."   D.R. v. Middle Bucks Area Vocational Technical Sch., 972 F.2d at 1372 ("By so doing, the state assumes an important continuing, if not immediate, responsibility for the child's well-being.").  New Mexico law states that a "child is eligible for foster care . . . services when in [CYFD] custody under a court's jurisdiction or through a voluntary placement agreement."  N.M.A.C. § 8.26.2.9(A) (emphasis

added).  See N.M.A.C. § 8.10.8.11 (describing the voluntary placement process).  Under New Mexico law, foster parents are state actors.  See N.M. Stat. Ann. § 41-4-3(F)(4).

Here, by denying S. Varela's request to regain her children in September, 2009, the State effectively stripped S. Varela and the children's control over their living arrangements and placed the children with Sotelo.  See Response at 12 ("CYFD controlled the children's fate -- and assumed responsibility for their welfare -- as surely as if it had confined them in a state-operated lock-up.").  It directed schools and others not to release the children to S. Varela and N.V.'s biological father "until interviews and assessments of their caretaking ability can be completed."  Response at 13 (citing Complaint ¶ 15, at 5-7).  As the Plaintiffs allege, these "actions effectively removed the children from 'the free world'" and placed them with someone in the State's control.  Response at 13 (quoting DeShaney, 489 U.S. at 201).  Although the Defendants deny that they controlled Sotelo like they would a foster parent, the Plaintiffs allege various facts that evidence the State's control.  For instance, the Memo, which was on official CYFD letterhead, served as the CYFD's formal approval to care for the children.  It enabled Sotelo to obtain medical care, enroll the children in school, and to receive Social Security benefits.  See Complaint ¶ 37, at 14-15.  Although the State itself did not pay for Sotelo to care for the children, its actions constituted a "show of authority" that enabled Sotelo to obtain compensation and benefits.  Gray v. Univ. of Colo. Hosp. Auth., 672 F.3d at 924.  Moreover, S. Varela contacted the CYFD -- not Sotelo -- to obtain her children back.  See Complaint ¶ 28, at 12.  "Had Essie's custody of the children been the product of nothing more than a private agreement between friends, CYFD would have had no cause to intervene."  Response at 13.  Finally, Placencio controlled when the children were returned.  His ability to order Sotelo to return the children across state lines within seventy-two hours evidences this control.

In sum, while the State did not financially provide for the children's welfare, it dictated who would provide for them, it controlled how long Sotelo would provide for them, and it shaped how Sotelo was able to care for them.  The children became dependent upon the State's designated caretaker to meet their basic needs.  Refusing to apply the doctrine here would leave the children at the mercy of the State's designated caretaker, without requiring the State to ensure the children's safety.  Similarly, as in Horton v. Flenory, the CYFD did not merely acknowledge S. Varela's arrangement with Sotelo.  It actively encouraged the arrangement and used the Memo to cement it.  In short, the CYFD "significantly changed the nature of the custody" and made it the state's own.  Horton v. Flenory, 889 F.2d at 458.  That the CYFD accomplished a voluntary placement arrangement from S. Varela to Sotelo, and then to S. Varela again, extrajudicially -- violating state legal procedures -- does not immunize the Defendants from their actions.  These facts, if true, create a custodial relationship sufficient to invoke the special-relationship doctrine. See K.H. ex rel. Murphy v. Morgan, 914 F.2d 846 (7th Cir. 1990)("It should have been obvious from the day *Younger* was decided that a state could not avoid the responsibilities which that decision had placed on it merely by delegating custodial responsibility to irresponsible private persons.").

Second, the Defendants argue that no custodial relationship existed here, because S. Varela voluntary placed the children with Sotelo without the State's involvement.  See Reply at 6 (arguing that, even though the Plaintiffs assert that S. Varela did not voluntarily give her children to Sotelo in September 2009, the motions' assertions that S. Varela voluntarily gave her children to Sotelo are "warranted by the facts").  The Defendants maintain that, in the face of S. Varela's voluntary placement, the Defendants never had custody and do "not owe any duty to the Children."  Reply at 2.  When parents voluntarily place their children in the foster care system,

the state has no constitutional duty to protect the children against private violence.  <u>See</u> <u>Christiansen v. City of Tulsa</u>, 332 F.3d at 1280; <u>Uhlrig v. Harder</u>, 64 F.3d at 572; <u>Mulburn v. Anne Arundel Cty. Dep't of Soc. Servs.</u>, 871 F.2d 474, 476-78 (4th Cir.), <u>cert. denied</u>, 493 U.S. 850 (1989).  The facts as the Plaintiffs have alleged them, however, show that the children's placement with Sotelo was not S. Varela's voluntary decision.  In fact, the Plaintiffs allege that the State was highly involved.  <u>See</u> Response at 4-7, 12.  The Plaintiffs point to several factual allegations that document the State's alleged involvement and belie any notion that S. Varela voluntarily left her children with Sotelo.

First, S. Varela had prepared written documentation directing others to care for her children on three separate occasions before September 2009.  <u>See</u> Complaint ¶¶ 12-15, at 4-5.  S. Varela's failure to execute a similar document in September 2009 indicates her unwillingness to make a similar transfer on this occasion.  Second, although S. Varela had previously prepared a document asking Sotelo to care for her children "during the summer of 2009," Complaint ¶ 15, at 6, she later revoked that permission, <u>see</u> Complaint ¶ 15, at 6.  This revocation meant that Sotelo "was not able to obtain a power of attorney from Synthia Varela."  Complaint ¶ 16, at 7.  Nothing in the CYFD file demonstrates that S. Varela was aware of, or agreed to, the Memo's recommendation that Sotelo be the sole caretaker, especially for an indefinite duration.  <u>See</u> Complaint ¶ 20, at 8.  Furthermore, the CYFD did not conduct a "voluntary placement" outside of the home pursuant to the New Mexico Children's Code.  Complaint ¶ 20, at 8.  Finally, when S. Varela asked Sotelo to return her children in August or September of 2009, Sotelo reported this communication to Roybal, yet Sotelo kept control of the children.  <u>See</u> Complaint ¶¶ 15-16, at 6-7.  Roybal's Memo directed Sotelo to retain control of the children and ordered schools not to release the children to S. Varela.  <u>See</u> Complaint ¶ 16, at 7 (stating that "the children should

remain in Essie Sotelo's care pending the current investigation," and stating that S. Varela "should not take the children into [her] care until interviews and assessments of [her] caretaking ability can be completed").   The Memo not only sanctioned Sotelo's caretaking, but affirmatively maintained the placement pending an investigation.   See Complaint ¶ 16, at 7. Finally, the CYFD "continued to prevent" S. Varela from caring for her children "even after it completed its investigation of her."   Response at 7 (noting that the CYFD did not reunify the children with S. Varela or even alert her that the CYFD investigation had ended and that she could have her children again).   Accordingly, even if Roybal and the CYFD did not decide to place the children with Sotelo initially, by prohibiting them from returning to S. Varela and not placing them with a foster parent pending the investigation, they affirmatively placed the children with Sotelo.   See Response at 12.   Moreover, the children had no ability to act on their own behalf.   By preventing the children from accessing the New Mexico Children's Code legal safeguards, Roybal limited their ability to pursue their own interests.   Had the Defendants placed the children with Sotelo -- and returned them to S. Varela -- pursuant to the New Mexico Children's Code procedures, the children would have had the chance to speak on their own behalf and be involved in choosing their placement.   Instead, however, the State chose their placement for them, without their involvement.   The children had no choice or even voice in their placement.

Unlike a school situation, where parents are free to remove their children if they believe the school is threatening their children's welfare, S. Varela could not remove her children from Sotelo's custody.   The Memo prevented her from regaining such control.   It gave Sotelo the full-time responsibility for providing for the children's basic physical and emotional needs.   The Memo's effect of preventing her from removing her children from Sotelo's custody amounted to

a "full time severe and continuous state restriction of liberty."  D.R. v. Middle Bucks Area Vocational Technical Sch., 972 F.2d 1364, 1371-72 (3d Cir. 1992)(en banc)( concluding that schoolchildren are not in the state's custody, because their parents are free to remove their children from school if the school threatens the children's welfare), cert. denied, 113 S. Ct. 1045 (1993).  See Maldonado v. Josey, 975 F.2d 727, 732 (10th Cir. 1992)(determining that "compulsory attendance laws do not create an affirmative constitutional duty to protect students from the private actions of third parties while they attend school"), cert. denied, 113 S. Ct. 1266 (1993).

Public policy also counsels for finding a special relationship on the Plaintiffs' allegations, even though the State bypassed formal procedures to take children into custody.  Without finding a special relationship here, states could routinely take children into functional custody and determine who would take care of them, but escape all duties to financially provide for the children and to ensure their safety.  States might place children with people who are not appropriate caretakers, assuming that they will not be responsible if the children are abused.  In contrast, by following the New Mexico Children's Code, the State must take care to choose appropriate foster parents, knowing that they might be held liable for placing the children with dangerous foster parents.  To those outside of the legal profession, which include most school and health officials that children encounter, an official CYFD memorandum may appear sufficient to confer custody to a non-parent.  Further, such a memorandum would likely convince a non-relative like Sotelo that she had official custody of the children.  Here, the Memo had exactly that effect.  In short, the Memo convinced Sotelo, school officials, health-care providers, the Social Security Administration, and even the children's own mother that the State had placed the children with Sotelo.  Allowing the Defendants to disclaim custody on a formality conflicts

with the Memo's apparent purpose and effect -- to take custody of the children and place them with Sotelo.  Enabling the Defendants to escape liability by circumventing New Mexico's legal procedures is also contrary to public policy.  It encourages future CYFD employees to effectively take custody by skirting the rules.  In sum, when viewing the facts in the light most favorable to the Plaintiffs, the Plaintiffs have plausibly alleged that the State had functional custody over the children sufficient to create a special relationship.

Although the Complaint plausibly alleges that the Defendants had a special relationship with the children while they were in the State's functional custody, the children were not "mistreated [or] abused when they were in the custody of Essie Sotelo."  Roybal MTD at 13. Rather, the children were harmed when they were in S. Varela's custody.  See Roybal MTD at 13.  A social worker's duty to use professional judgment while the state has custody of a child does not create a never-ending special relationship.  Nonetheless, the Tenth Circuit has held that social workers must use professional judgment in determining a child's placement while the child is in state custody.  See Johnson ex rel. Estate of Cano v. Holmes, 455 F.3d 1133 (10th Cir. 2006).  In Johnson ex rel. Estate of Cano v. Holmes, the CYFD conducted several home studies to find permanent adoptive parents for a child in foster care.  See 455 F.3d at 1135-36.  The CYFD eventually placed the child with Veronica Bogey, despite "mild" concerns that Bogey may have been unable to properly care for the child.  455 F.3d at 1144.  Because the defendant CYFD employee placed the child with Bogey after consulting with the CYFD's adoption consultant, conducting numerous home studies, and conferring with the CYFD's adoptions committee, the Tenth Circuit concluded that the employee's placement decision did "not constitute a failure to exercise professional judgment" when the CYFD had only "mild" concerns about Bogey's parenting ability.  455 F.3d at 1144.  Nevertheless, while the child was in the

CYFD's custody, the CYFD had a "duty to investigate" that created a special relationship and a "duty of protection from harm." Johnson ex rel. Cano v. Homes, 377 F. Supp. 2d 1039, 1047 (D.N.M. 2004)(Browning, J.)("First D. Ct. Johnson MOO"), aff'd sub nom. Johnson ex rel. Estate of Cano v. Holmes, 455 F.3d 1133 (10th Cir. 2006). Thus, the Complaint plausibly alleges that the Defendants had a special relationship with the children while the children were in the State's functional custody. This special relationship applies to all of the Defendants. See Schwartz v. Booker, 702 F.3d at 581-82. The Court will determine whether the Defendants abdicated their professional judgment while they had a special relationship with the children in Part C below.

### B. THE PLAINTIFFS DO NOT ESTABLISH A DANGER-CREATION CLAIM AGAINST ROYBAL AND PLACENCIO, AND THEY ARE ENTITLED TO QUALIFIED IMMUNITY.

The second exception to the rule that the Due Process Clause offers no shelter from private violence is the danger-creation doctrine, which comes into play if a state actor creates a danger to the plaintiff or increases the plaintiff's vulnerability to that danger. See DeShaney, 489 U.S. at 201. The Tenth Circuit has explained the elements necessary to invoke the danger-creation exception:

> 1) plaintiff was a member of a limited and specifically definable group; 2) Defendant's conduct put Plaintiff at substantial risk of serious, immediate, and proximate harm; 3) the risk was obvious or known; 4) Defendant acted recklessly in conscious disregard of that risk; . . . 5) such conduct, when viewed in total, is conscience shocking[;] and 6) defendant . . . created the danger or increased the plaintiff's vulnerability to the danger in some way.

Gray v. Univ. of Colo. Hosp. Auth., 672 F.3d at 920. Additionally, the Tenth Circuit imposes two pre-conditions: (i) a state actor must take affirmative conduct to place the children in danger; and (ii) a private actor must commit the violence. See Gray v. Univ. of Colo. Hosp. Auth., 672 F.3d at 928.

Contrary to the Defendants' suggestions, see Roybal MTD at 19-21; CYFD MTD at 15-18, it is an "unremarkable proposition in the Tenth Circuit" that the "state-created danger theory is a means by which a state actor might be held liable for an act of private violence absent a custodial relationship between the victim and the State." Gray v. Univ. of Colo. Hosp. Auth., 672 F.3d at 922.  See Armijo v. Wagon Mount Pub. Sch., 159 F.3d 1253, 1263 (10th Cir. 1998)(observing that "a constitutional duty to protect an individual against private violence may exist in a non-custodial setting if the state has taken affirmative action which increases the individual's danger of, or vulnerability to, such violence"); L.W. v. Grubbs, 974 F.2d 119, 122 (9th Cir. 1992)("[C]ustody is not a prerequisite to the 'danger creation' basis for a section 1983 third party harm claim . . . ."). The Tenth Circuit has gone one step further, stating that "application of the state-created danger theory depends upon the absence of a custodial relationship between the victim and the State." Gray v. Univ. of Colo. Hosp. Auth., 672 F.3d at 922-23 (emphasis added).  Additionally, the Plaintiffs' danger-creation exception to DeShaney is not barred "simply because the child[ren] had been placed with a parent rather than a foster parent." Currier v. Doran, 23 F. Supp. 2d 1277, 1281 (D.N.M. 1998)(Black, J.)(describing Ford v. Johnson, 899 F. Supp. 227, 233-34 (W.D. Pa. 1995)(Ambrose, J.), where the court allowed a claim to proceed when the state placed a child, who was in the state's custody, in the child's biological father's custody), affirmed in part and reversed in part by Currier v. Doran, 242 F.3d 905 (10th Cir. 2001)).  See Tazioly v. City of Philadelphia, 1998 WL 633747 (E.D. Pa. 1998)(Kauffman, J.)(concluding that the danger-creation claim could proceed when "the state terminated a satisfactory foster care situation and placed the child in the custody of a biological mother with known propensities for violent and bizarre behavior").

The Plaintiffs have not plausibly pled all of the elements necessary to state a claim under the danger-creation theory.   Regarding the Tenth Circuit's two preconditions -- affirmative conduct and private violence -- the Plaintiffs allege that: (i) Roybal's and Placencio's affirmative actions caused the children's harm, see Complaint ¶¶ 96-104, at 34-37 (pointing to the Defendants' affirmatively placing the children, first with Sotelo and then with S. Varela); and (ii) a private actor, S. Varela, committed the harm, see Complaint ¶¶ 53-63, at 18-23.   Nonetheless, while the Plaintiffs plausibly allege that Roybal and Placencio created or enhanced the children's vulnerability to danger, they do not plausibly allege all of the elements necessary to allege a state-created danger claim.   Specifically, they do not show that Roybal's and Placencio's actions were conscience-shocking.   See Uhlrig v. Harder, 64 F.3d at 573 (stating that it is "not enough to show that the state increased the danger of harm from third persons; the [§] 1983 plaintiff must also show that the state acted with the requisite degree of culpability in failing to protect the plaintiff . . . . or in a 'conscience shocking' manner.'" (alterations in original)).

## 1. The Complaint Alleges that Roybal Created or Enhanced a Danger to the Children.

The Plaintiffs allege that Roybal's Memo subjected the children to more danger than had he done nothing at all, because he "remov[ed] what would otherwise be safety valves" for the children.   Currier v. Doran, 242 F.3d at 922.   By encouraging schools and other agencies to believe that Roybal was investigating S. Varela's caretaking abilities, the Memo "cut[] off potential sources of private aid," like PB&J Services' family services, and state aid.   Currier v. Doran, 242 F.3d at 922.   Although Sotelo used the Memo to obtain the children's Social Security benefits, health care, and school enrollment, Roybal's failure to use the New Mexico Children's Code procedures may have cut off some formal sources of public aid.   See Complaint ¶ 37, at 14-15.   Courts have previously held defendants liable for creating a danger by cutting off public or

private aid, even though the defendants' actions of cutting off aid in those cases more directly caused the victim's harm.  See Dwares v. City of New York, 985 F.2d 94, 96-97 (2d Cir. 1993)(concluding that police officers created  a danger where they "directly told the citizens committing the violence that they would not interfere with the citizens' assault on other private citizens"); Freeman v. Ferguson, 911 F.2d 52, 53-54 (8th Cir. 1990)(concluding that a police chief created a danger when he directed officers not to respond to a woman's complaint that her estranged husband, who eventually killed her, was violating his restraining order); Currier v. Doran, 242 F.3d at 922 (concluding that a social worker created a danger when she directed a child's mother to stop reporting possible child abuse from the child's father, who later killed the child, but denying liability on qualified immunity grounds).  Although the connection between Roybal's actions and the harm ultimately suffered is more tangential, the Plaintiffs have alleged that Roybal at the very least increased the children's vulnerability to danger.

**2.  The Complaint Alleges that Placencio Created or Enhanced a Danger to the Children.**

Regarding Placencio, the Plaintiffs fail to establish the elements necessary for a danger-creation claim, but they again demonstrate that he created a danger or increased the children's vulnerability to that danger.   The Plaintiffs contend that he "took the affirmative and extraordinary step of phoning Essie and threatening her with a criminal prosecution" to bring the children to S. Varela.  Response at 24.  They further allege that the children "would not have been exposed to the dangers from their [mother] but for the affirmative acts of the state." Response at 24-25 (quoting Currier v. Doran, 242 F.3d at 918)(alterations in Response). Although Placencio was returning the children to their biological mother, the facts are materially different from DeShaney.  There, Joshua DeShaney was in the hospital's temporary custody for only several days, whereas the children here were in the State's functional custody for

approximately one-and-a-half years.  See DeShaney, 489 U.S. at 192.  In DeShaney, the State returned Joshua to the same situation that he left.  See DeShaney, 489 U.S. at 192.  Here, Placencio exposed the children to a new danger.  S. Varela's living situation had substantially changed to include Casaus, a convicted felon, E.V., a baby who tested positive for cocaine at birth, and a different physical residence.  See Complaint ¶ 79, at 29.  Moreover, S. Varela had twice been incarcerated at the Bernalillo County Metropolitan Detention Center.  See Complaint ¶ 79, at 29.  Further, in DeShaney, the state returned Joshua to his parent after a pediatrician, a psychologist, a police detective, a lawyer, social service caseworkers, and various hospital personnel collectively concluded that "there was insufficient evidence of child abuse to retain Joshua in the custody of the court."  DeShaney, 489 U.S. at 192.  In comparison, Placencio made no investigation into S. Varela's living situation in the face of evidence that S. Varela might present a danger.  See Complaint ¶ 99, at 36-37.  These facts plausibly allege that Placencio created a danger for O. Varela and N.V.

### 3.     Roybal's and Placencio's Conduct Does Not Shock the Conscience.

Even if the Plaintiffs plausibly allege that Roybal and Placencio created a danger, the Plaintiffs do not come within the danger-creation exception, because they do not sufficiently allege that Roybal's and Placencio's actions shock the conscience.  While the end result -- a mother kicking her son to death -- is shocking, and the police's conduct is disappointing, Roybal's and Placencio's conduct, as social workers, does not depart so far from negligence that it shocks the conscience.  While Roybal's conduct creates a custodial relationship without following state procedures, he removed the children from harm's way.  Although Placencio did not do what a professional should have done, his actions do not depart so far as to shock the conscience.

### a.   <u>Roybal's Actions Do Not Shock the Conscience</u>.

Roybal's actions do not shock the Court's conscience, which is required to establish that the Defendants violated the children's constitutional rights.  See <u>Johnson ex rel. Estate of Cano v. Holmes</u>, 455 F.3d at 1142 (stating that the "shocks the conscience standard applies to both" special-relationship suits and danger-creation suits)(emphasis omitted); <u>Uhlrig v. Harder</u>, 64 F.3d at 573-74 (stating that a § 1983 plaintiff can establish that a defendant's actions shock the conscience when the defendant's actions were "predicated on . . . either: (1) an intent to harm; or (2) an intent to place a person unreasonably at risk of harm").  Compared to the previous cases that the Tenth Circuit has found conscience-shocking, the Court concludes that Roybal's actions do not shock the conscience, even if the Plaintiffs obtain all of the discovery they seek to prove that this conduct was conscience-shocking.  See <u>Uhlrig v. Harder</u>, 64 F.3d at 573-74 (explaining that "the Due Process Clause's protection against 'conscience shocking' conduct traditionally only involved deliberately wrongful government decisions rather than merely negligent govern conduct").

Roybal did not use formal, mandatory procedures to transfer the children to Sotelo's care, but he removed the children from a potentially harmful situation with S. Varela.  Roybal based his decision on his knowledge that Sotelo had properly been caring for the children.  See Reply at 6.  Because: (i) the children had been safe with Sotelo; and (ii) it was not obvious that later social workers would fail to evaluate S. Varela's home situation before returning the children to her, Roybal did not consciously disregard "a known or obvious risk that was so great that it was highly probable that serious harm would follow."  <u>Medina v. City & Cty. of Denver</u>, 960 F.2d at 1496.  Roybal's behavior is not on the same level as those social workers who repeatedly failed to investigate bruises and abuse allegations, then recommended that the alleged abuser -- who also was seriously financially irresponsible and failed to pay child support in the past -- assume

legal custody.   See Currier v. Doran, 242 F.3d at 920.   In sum, the Plaintiffs have not "demonstrate[d] a degree of outrageousness and magnitude of potential or actual harm that is truly conscience shocking." Uhlrig v. Harder, 64 F.3d at 574.

The Plaintiffs contend that further discovery will reveal that Roybal's actions are conscience-shocking.   They explain: if discovery reveals that the CYFD has never before used a Memo to take functional control over a child's placement, this would demonstrate that Roybal's actions not only abdicated professional judgment, but shock the conscience.   Even if the CYFD had never taken these actions before, Roybal's unprecedented action does not amount to conscience-shocking behavior.   Roybal removed the children from S. Varela's dangerous home, even if he violated state law to do so.   Accordingly, the Plaintiffs do not state a claim that Roybal violated the children's constitutional rights.

### b.   Placencio's Actions Do Not Shock the Conscience.

Placencio's behavior does not shock the Court's conscience.   He based his decision on his determination that S. Varela, the children's biological mother, was legally entitled to custody of her children without formal procedures, because the State had not formally taken the children into custody.   See Reply at 14.   No former abuse allegations had been substantiated, so Placencio did not know that S. Varela presented a significant danger.   See CYFD MTD at 9 (noting that "all abuse and neglect referrals against Ms. Varela had been unsubstantiated").   Nor were there any current abuse referrals against S. Varela when Placencio ordered the children to return to her.   See CYFD MTD at 8.   With no outstanding abuse allegations, and no former substantiated abuse allegations, Placencio could have believed that he need not conduct any home investigations before returning the children to their biological mother.   See Reply at 8-9 ("Without a referral alleging abuse, there was no basis for CYFD to conduct an investigation or to prevent Ms. Varela from assuming custody in March, 2011.").   He made a decision that social

workers make daily; he made the wrong one.  But being wrong is not enough to shock the conscience.

Moreover, state "employees who withhold a child from her family run the risk of being sued by the family for infringing their liberty of familial association." K.H. Through Murphy v. Morgan, 914 F.2d 846, 853 (7th Cir. 1990).  Placencio therefore had to balance the children's rights to associate with their family and their rights to be free from danger while in the State's functional custody.  Hence, Placencio had "run the risk of being sued by the family for infringing their liberty of familial association." K.H. ex rel. Murphy, 914 F.2d at 852-53.  Furthermore, Placencio did not know of all the dangers that S. Varela might pose.  See Complaint ¶ 79, at 28-29 (asserting that "there is no record that Defendant Bennie Placencio had any knowledge or awareness" of the changes to S. Varela's living situation).  See Rochin v. California, 342 U.S. 165, 173-74 (1952)(concluding that the defendants' actions shocked the conscience when they acted with full appreciation of the "brutality" of their acts).  Accepting the Complaint's allegations that he made no "effort to learn" of the potentially more dangerous changes in S. Varela's home, Complaint ¶ 99, at 36-37, Placencio was more negligent in failing to investigate the full situation than he was acting intentionally.  With no outstanding abuse allegations against S. Varela, Placencio's decision to return the children to their biological mother does not amount to such a reckless decision that it shocks the Court's conscience.  Again, even if the Plaintiffs demonstrate that no CYFD social worker has ever taken these same actions, Placencio's behavior does not shock the Court's conscience.  "[W]e must be careful not to second guess Defendants' decisions based on the benefit of hindsight, especially where their decision stemmed from a balancing of 'competing social, political, and economic forces,'" or in this case, competing constitutional rights.  Uhlrig v. Harder, 64 F.3d at 576.

4.      __Roybal and Placencio are Entitled to Qualified Immunity__.

Even if the Plaintiffs come within the danger-creation exception, qualified immunity bars the Plaintiffs' state-created danger claim against both Roybal and Placencio.  Tenth Circuit case law clearly establishes that "reckless, conscience shocking conduct that altered the status quo and placed a child at substantial risk of serious, immediate, and proximate harm was unconstitutional."  Currier v. Doran, 242 F.3d at 924.  Denying qualified immunity requires more, however.  It requires that every reasonable official in the Defendants' shoes would have known that the actions in question violated clearly established law.  See Currier v. Doran, 242 F.3d at 925 (granting qualified immunity, because the "particular theory of danger creation on which Plaintiffs have stated a claim . . . is substantially less established in the case law").  The Plaintiffs' citations to Currier v. Doran do not persuade the Court that the law was clearly established.  In Currier v. Doran, the state formally removed a child from a mother's custody and legally placed the child with the father.  See 242 F.3d at 918-19 ("When the state affirmatively acts to remove a child from the custody of one parent and then places the child with another parent, *DeShaney* does not foreclose constitutional liability.")(emphasis added).  The Tenth Circuit's opinion is predicated on the fact that the state, which had formal, legal custody of a child, placed the child with a new parent.  See 242 F.3d at 918-19.  No case in the Tenth Circuit or elsewhere establishes that returning children who are not in the state's formal, legal custody to their biological mother affirmatively creates a danger and violates a child's constitutional rights.  The closest case is Currier v. Doran, but there: (i) the State had formal, legal custody over the child; and (ii) the State placed a child with a different parent.  See Kerns v. Bader, 663 F.3d at 1188 (stating that the law is not clearly established where "a distinction might make a constitutional difference")(emphasis in original).

Moreover, when courts have held defendants liable for creating a danger by cutting off public or private aid, the defendants' actions in cutting off the aid directly causes the victim's harm.  See Dwares v. City of New York, 985 F.2d at 96-97 (concluding that police officers created a danger where they "directly told the citizens committing the violence that they would not interfere with the citizens' assault on other private citizens"); Freeman v. Ferguson, 911 F.2d at 53-54 (concluding that a police chief created a danger when he directed officers not to respond to a woman's complaint that her estranged husband, who eventually killed her, was violating his restraining order).  Even in Currier v. Doran, the Tenth Circuit found that the defendant created a danger, but nevertheless granted qualified immunity on the ground that the other cases "involve circumstances which are not sufficiently analogous to those surrounding [the defendant's] involvement in this case to constitute clearly established law."  242 F.3d at 922.  "[T]hat we are 'morally outraged' . . . by the alleged conduct . . . does not mean necessarily that the office[ers] should have realized that it violated a constitutional right of access."  Lynch v. Barrett, 703 F.3d at 1163 (quoting Foster v. City of Lake Jackson, 28 F.3d 425, 430 (5th Cir. 1994))(alteration in original).  A reasonable official in the Defendants' position would not have understood that his conduct came within the danger-creation theory.   The Defendants are therefore entitled to qualified immunity.

The Plaintiffs contend that the Supreme Court's recent cases, including Mullenix v. Luna, 136 S. Ct. 305 (2015), indicate that the Supreme Court's need for a high degree of factual congruity between former cases and the facts at hand arises in the Fourth Amendment context, but not necessarily the substantive due-process context.  See Tr. at 82:14-21 (Schultz).   In Mullenix v. Luna, the Supreme Court held that a police officer was entitled to qualified immunity in the Fourth Amendment context and criticized the Fifth Circuit for defining the

- 108 -

"clearly established right" with too much generality.  136 S. Ct at 308-312.  The Supreme Court emphasized that the qualified-immunity analysis "'must be undertaken in light of the specific context of the case, not as a broad general proposition.'"  136 S. Ct. at 308.  The Supreme Court observed that "[s]uch specificity is especially important in the Fourth Amendment context," where the Court has recognized that "[i]t is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts."  136 S. Ct. at 308.  It stated that the Fourth Amendment context "depends very much on the facts of each case," and explained that defendants are entitled to qualified immunity when "[n]one of [the cases] *squarely governs* the case here."   136 S. Ct. at 309 (alterations and emphasis in original).

    If the Supreme Court requires a more rigorous analysis in the Fourth Amendment context, it likely stems from the Supreme Court's understanding that police officers -- who are often the defendants in Fourth Amendment qualified immunity cases -- must often make split-second constitutional decisions.  See Mullenix v. Luna, 136 S. Ct. at 308  (recognizing that "[i]t is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts").  If the Supreme Court is going to have a qualified immunity analysis at all -- and the Court has expressed reservations about the defense -- police officers may have a need for a demanding qualified immunity standard.  They must determine whether their behavior violates the Constitution in high-intensity and quickly evolving situations.  See Pasco v. Knoblauch, 566 F.3d 572, 580 (5th Cir. 2009)("[I]t would be unreasonable to expect a police officer to make the numerous legal conclusions necessary to apply [*Tennessee v.*] *Garner*[, 471 U.S. 1 (1985),] to a high-speed car chase . . . .")(alterations added).  Nevertheless, it would be a mistake to create a distinct qualified-immunity standard

solely in the Fourth Amendment context on the basis that police officers often must make split-second decisions.  In many instances, Fourth Amendment cases do not involve rapidly evolving constitutional decisions.  Similarly, other state officials must also make quick constitutional decisions in contexts outside of the Fourth Amendment context.  In short, state actors must make quick constitutional decisions in all contexts, even if police officers must make them more often than others.  Instead of creating a dichotomous standard, the Supreme Court takes a holistic approach, directing lower courts to examine the facts of each case.  Qualified immunity is not a one-size-fits-all doctrine.  In those cases where the Supreme Court recognizes that a defendant had only seconds to make a difficult constitutional decision, it may require precedent to be more similar to the facts at hand.  Despite this application, however, it does not make sense to create a separate standard in the Fourth Amendment context when state actors must make such decisions in all areas.

Furthermore, although the Supreme Court suggested that Fourth Amendment cases require an exacting analysis, it never limited its language -- which requires that "*every* reasonable official" know that his conduct violates the Constitution to deny qualified immunity -- to the Fourth Amendment context.  Mullenix v. Luna, 136 S. Ct. at 308 (emphasis added).  It never suggested that courts should disregard this language and apply a less stringent analysis to other constitutional rights.  In other words, even if the Supreme Court scrutinizes a case's facts very closely in the Fourth Amendment context, it has not lowered the qualified immunity standard in other contexts.  For all cases, courts must undertake the qualified immunity analysis "in light of the specific context of the case, not as a broad general proposition."  Mullenix v. Luna, 136 S. Ct. at 308 (quoting Brosseau v. Haugen, 543 U.S. 194, 198 (2004)(per curiam)).

Thus, while the Supreme Court may be expanding the qualified-immunity analysis in the Fourth Amendment context, it has not limited the doctrine in other areas.

If anything, the Court's survey of the Supreme Court's qualified immunity precedent demonstrates the Supreme Court's general expansion of qualified immunity in all areas.  See Kit Kinports, The Supreme Court's Quiet Expansion of Qualified Immunity, 100 Minn. L. Rev. 62 (2016)("[T]he Court has engaged in a pattern of covertly broadening the defense, describing it in increasingly generous terms and inexplicably adding qualifiers to precedent that then take on a life of their own.").  This pattern began with Ashcroft v. al-Kidd in 2011, where the Supreme Court reformulated the qualified immunity standard to require "*every* 'reasonable official' . . . [to] underst[an]d that what he is doing violates that right.'"  131 S. Ct. at 2083 (quoting Anderson v. Creighton, 483 U.S. at 640)(emphasis added).  In comparison, a little more than two decades earlier in Malley v. Briggs, 475 U.S. 335 (1986), the Honorable Lewis F. Powell, Associate Justice of the Supreme Court, stated that, under the qualified immunity standard, "we need not consider whether this information would be viewed by *every* reasonable officer as sufficient evidence of probable cause for the issuance of a warrant."  475 U.S. at 350 (emphasis in original).  Failing to acknowledge the Supreme Court's substitution of "every" for "a" in Aschcroft v. al-Kidd, the Supreme Court continued on to say: "We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate."  Ashcroft v. al-Kidd, 131 S. Ct. at 2083.  The Supreme Court's language in Ashcroft v. al-Kidd departs from Malley v. Briggs' statement that the relevant inquiry is "whether a reasonably well-trained officer in petitioner's position would have known that his affidavit failed to establish probable cause . . . ."  Malley v. Briggs, 475 U.S. at 345.  Now, qualified immunity

protects "all but the plainly incompetent or those who knowingly violate the law."[14]  Mullenix v. Luna, 136 S. Ct. at 308.   Absent from the Supreme Court's recent statements of qualified immunity law is any reference to the plaintiff's countervailing interests in vindicating constitutional rights and compensation for constitutional injury, which the Supreme Court recognized in Harlow v. Fitzgerald.  See Harlow v. Fitzgerald, 457 U.S. at 813-14.  As the Supreme Court has not cabined this language to any particular context, these general characterizations of the qualified immunity defense place a thumb on the scales favoring state actors in all cases, and not just in the Fourth Amendment context.[15]

Finally, the Court is bound by the Tenth Circuit's precedent, which states that a state official is entitled to qualified immunity when the facts of a previous case are different enough to create the potential of a constitutionally significant difference.  See Kerns v. Bader, 663 F.3d at

---

[14]Interestingly, this language initially appeared in Malley v. Briggs.  See 475 U.S. at 341.  There, however, the Supreme Court did not use the language to explain the qualified immunity standard or to grant qualified immunity.  See 475 U.S. at 341.  Instead, it used the language to explain why the qualified immunity defense provides police officers who execute a warrant without probable cause adequate protection and, therefore, absolute immunity is unnecessary. See 475 U.S. at 341; Kinports, supra, at 66.

[15]The Plaintiffs contended that a recent law review article supported their contention that the Supreme Court applies the qualified immunity doctrine differently in the Fourth Amendment. See Tr. at 86:7-17 (Schultz).  Although the Plaintiffs did not cite the specific law review article, the law review article that the Court found supports the Plaintiffs' statement, but only in part.  In The Supreme Court's Quiet Expansion of Qualified Immunity, Penn State Law Professor Kit Kinports argues that the Supreme Court is "silently expanding the qualified immunity defense" in general -- not just in the Fourth Amendment context.  Kinports, supra, at 72.  Kinports' argument on the Fourth Amendment is that, formerly, the Supreme Court "equated the qualified immunity inquiry with the analysis used in applying the good-faith exception to the exclusionary rule."  Supra, at 72.  Recently, Kinports explains, the Supreme Court has "signal[ed] a retreat from the precedents analogizing qualified immunity and the good-faith exception to the exclusionary rule" by defining qualified immunity in more generous terms.  Kinports, supra, at 77.  Accordingly, while Kinports' article recognizes that the Supreme Court has expanded the qualified immunity defense in the Fourth Amendment area, her predominant argument is that the Court has "covertly expand[ed] the qualified immunity defense" in general, making it into a "'forgiving' defense."  Kinports, supra, at 77.

1188.  Although the Tenth Circuit's opinion dealt with a Fourth Amendment case, nowhere did it limit its holding to the Fourth Amendment context.  The Court has also used qualified immunity in other contexts and cited Fourth Amendment cases.  See, e.g., Hare v. Bd. of Cty. Comm'rs of Lea Cty, 2015 WL 10385200, at *19-20, 24 (D.N.M. Nov. 30, 2015)(Browning, J.).  The Court will therefore continue to apply the law as the Supreme Court and Tenth Circuit have stated it. This standard, as explained above, leads the Court to conclude that Roybal and Placencio are entitled to qualified immunity.

> ### C.   THE FACTS SUFFICIENTLY ALLEGE THAT ROYBAL AND PLACENCIO ABDICATED THEIR PROFESSIONAL JUDGMENT, BUT THEY ARE ENTITLED TO QUALIFIED IMMUNITY.

The Tenth Circuit has "explicitly recognized that foster children have a substantive due process right to 'protection while in foster care.'"  Schwartz v. Booker, 702 F.3d at 580 (quoting Yvonne L., 959 F.2d at 892-93).  See Youngberg v. Romeo, 457 U.S. at 324 (holding that persons committed to state institutions have a constitutional right to "reasonable care and safety").  To show that the Defendants violated the children's constitutional rights under the special relationship theory, the Plaintiffs must also show that the Defendants either: (i) "knew of the asserted danger" to O. Varela; or (ii) "failed to exercise professional judgment and abdicated [their] duty to act professionally, thereby causing [O. Varela's] injuries."  Whitley v. N.M. Children, Youth & Families Dep't, 184 F. Supp. 2d 1146, 1157 (D.N.M. 2001)(Smith, M.J.). See Yvonne L., 959 F.2d at 890, 893-94.  A professional's decision is presumptively valid, so a court will impose liability only if the professional's decision is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment.  See Youngberg v. Romeo, 457 U.S. at 323.  See Johnson ex rel. Estate of Cano v. Holmes, 455 F.3d 1133 (10th Cir. 2006)("Failure to exercise professional judgment requires more than mere negligence: it requires

an abdication of professional responsibility.").  It is not the Court's role to specify which of several professionally acceptable choices the professional should have made, nor should the Court attempt to second guess professionals in their decision making.  See Youngberg v. Romeo, 457 U.S. at 321; Bailey v. Pacheco, 108 F. Supp. 2d at 1221; Whitley v. CYFD, 184 F. Supp. 2d at 1162 ("The inquiry is whether there was a failure to act professionally, not whether there was a departure from a standard of care.").  Finally, for § 1983 liability, the State's action must "'shock the conscience' of federal judges."  Collins v. City of Harker Heights Tex., 503 U.S. 115, 126 (1992).

## 1. The Plaintiffs Sufficiently Allege That Roybal Abdicated Professional Judgment.

The Plaintiffs allege facts sufficient to show that Roybal and Placencio may have abdicated their professional judgment.  As for Roybal, the Plaintiffs allege that he "abdicat[ed] the duty to act professionally in making the placements," Yvonne L., 959 F.2d at 894, by "solidifying Essie's custody through the unilateral issuance of a memorandum, . . . instead of a petition to Children's Court," Response at 17.  See Complaint ¶¶ 65-89, at 24-32.  Furthermore, the Plaintiffs allege that Roybal's actions caused the tragedy that followed by making it easier for Placencio to return the children to S. Varela.  See Complaint ¶¶ 65-89, at 24-32.  Although violating state regulations does not establish a constitutional violation, Roybal's failure to follow state procedures prevented the children from receiving the aid and benefits that accompany legal custodial relationships with the State, including the Children's Code's procedural safeguards. See Cty. of Sacramento v. Lewis, 523 U.S. at 849; Uhlrig v. Harder, 64 F.3d at 573 ("[A] substantive due process violation must be more than an ordinary tort to be actionable under § 1983."); Johnson ex rel. Estate of Cano v. Holmes, 377 F. Supp. 2d 1051 (D.N.M. 2004)(Browning, J.)("Second D. Ct. Johnson MOO")("Failure to follow every state regulation is

not a violation of the standard of professional judgment."), reversed on other grounds by Johnson ex rel. Estate of Cano v. Holmes, 455 F.3d 1133 (10th Cir. 2006).  See Bailey v. Pacheco, No. CIV 96-959, Memorandum Opinion and Order at 9 (D.N.M. filed April 6, 2000)(Hansen, J.)(holding that failure to follow state regulations does not constitute absence of professional judgment).

As discussed at the hearing, discovery may reveal that no CYFD social worker has ever placed a child with a non-licensed foster care worker who is not a relative, who moved out of state, all the while knowing that the biological mother wants her children back.  See Tr. at 62:10-16 (Schultz).  It may have been Roybal's personal judgment that the children were better off with Sotelo, but the law requires social workers to "pursue legal custody of the child" when the social worker determines that "a child cannot safely remain in his or her home."  N.M.A.C. § 8.10.8.10 ("When a child cannot safely remain in his or her home, PSD shall pursue legal custody of the child.").  Furthermore, by failing to use the Administrative Code's Voluntary Placement mechanism, Roybal deprived the children of the protections that the placement mechanism affords.  See N.M.A.C. § 8.10.8.11(D) ("In no event shall a child remain in voluntary placement for a period in excess of three hundred sixty-five days in any two-year period.").  Finally, Roybal deprived them of the protections that out-of-state foster children receive, such as visits "at least every six months."  N.M.A.C. § 8.10.8.20.

When Roybal decided that the children were better off with Sotelo, therefore, he may have abdicated professional judgment in transferring the children using a mechanism that deprived the children of all of the protections that the Children's Code provides.  Expert testimony may reveal that Roybal's actions not only violated state regulations, but also violated professional standards.  See Johnson ex rel. Estate of Cano v. Holmes, 455 F.3d at 1145

(concluding that summary judgment was improper when an expert testified that the defendant social worker's failure to investigate changes in the child's home constituted "an abandonment of professional judgment").  Without any legal basis, Roybal denied S. Varela her children, he kept them with Sotelo, he allowed Sotelo to take the children to Arizona, he failed to investigate whether Sotelo was a proper caregiver, he failed to visit her or ensure she was properly taking care of the children, and he failed to ensure that the children had access to all the state benefits that State custody provides.  Furthermore, after finishing his investigation into S. Varela in 2009, he did nothing to attempt to reunite the family or to help S. Varela improve her parenting skills while the children remained with Sotelo.  See Tr. at 72:6-15 (Schultz).  Currently, the Court cannot determine whether the facts will ultimately demonstrate that such conduct violates professional standards, but the Plaintiffs have plausibly alleged that Roybal abdicated his professional judgment.

### 2.    The Plaintiffs Sufficiently Allege That Placencio Abdicated Professional Judgment.

Regarding Placencio and John Does 1-5, the Plaintiffs allege that they abdicated professional judgment by demanding that Sotelo return the children to New Mexico "for placement in a home whose safety [Placencio] had never bothered to access, 'despite years of documentation that [Synthia] was unfit to parent these children and the lack of any record that she had completed any kind [of] parenting skills training or substance abuse counseling.'"[16] Response at 18-19 (quoting Complaint ¶¶ 30-31, 34, at 13-14)(alterations in Response).  The

---

[16]The Defendants contend that they did not abdicate their professional judgment, because the children's placement with Sotelo was "wholly voluntary" and did not create a custodial relationship.  CYFD MTD at 13-14.  As the Court found earlier, however, the placement was initially voluntary, but when Roybal did not return the children to S. Varela after her requests in September 2009, the placement gave the State functional custody over the children. Accordingly, the Defendants had a duty not to place the children in a more dangerous situation. The Defendants do not argue that they adhered to professional judgment in the event that a custodial relationship existed.

Plaintiffs allege that Placencio failed to investigate the asserted danger: residing with a mother who recently confessed to using cocaine while pregnant and the mother's boyfriend, who recently left prison for a felony offense.  See Complaint ¶ 79, at 28-29 (asserting that "there is no record that Defendant Bennie Placencio had any knowledge or awareness" of the changes to S. Varela's home); id. ¶ 87, at 32 (alleging that the Defendants "substantially departed from accepted professional judgment, practice, or standards in such a way as to abdicate reliance on professional judgment, and knowingly or recklessly subjected Omaree and N.V. to a grave and immediate danger that was known or obvious to Defendants").   The Complaint sufficiently alleges that Placencio abdicated his professional judgment when he placed the children with S. Varela without evaluating her home or her caretaking abilities, and without following the New Mexico Children's Code procedures.  See Johnson ex rel. Estate of Cano v. Holmes, 455 F.3d at 1145 (concluding that summary judgment was improper when an expert testified that the defendant social worker's failure to investigate changes in the child's home constituted "an abandonment of professional judgment").

### 3.        The Law Was Not Clearly Established and Roybal and Placencio are Entitled to Qualified Immunity.

Even if Roybal and Placencio abdicated their professional judgment and exhibited conscience-shocking behavior, the law was not clearly established and Roybal and Placencio are entitled to qualified immunity.  Supreme Court and Tenth Circuit case law made clear that children in state custody have a constitutional right not to be placed in a dangerous situation, and that the state's failure to use professional judgment in placing children can violate the children's constitutional rights.  See Schwartz v. Booker, 702 F.3d at 587 ("[C]ase law has clearly established that foster children have a Fourteenth Amendment constitutional right to be reasonably safe while in the State's custody."); Yvonne L., 959 F.2d at 890-92.  In contrast, the

law was not clearly established that a biological mother who placed her children with friends, even with a memorandum like Roybal's, were in functional custody that gave state employees a further duty to use professional judgment in all of their dealings with the children. In other words, a reasonable state official would not have known that he could violate children's constitutional rights when he failed to use state regulations regarding children's placement, and instead used informal procedures, when those children were not in the State's formal legal custody. Although transferring children without following formal procedures may have been negligent, "the unconstitutionality of Defendant Officers' misfeasance simply was not clear." Lynch v. Barrett, 703 F.3d at 1162.

Moreover, although Johnson ex rel. Estate of Cano v. Holmes established that social workers with legal custody over a child can be liable for abuse that a parent inflicts once the child is placed with that parent, that case involved placing children with adoptive parents. See 455 F.3d at 1135-36. In contrast, this case involves placing children with biological parents. This difference creates the possibility of a constitutionally significant difference. See Kerns v. Bader, 663 F.3d at 1188 (stating that the law is not clearly established where "a distinction might make a constitutional difference")(emphasis in original). In the adoption context, potential adoptive parents have no right to custody over the children before the CYFD follows certain legal procedures to establish that custody. In contrast, biological parents have a constitutional right to familial association. See Stanley v. Illinois, 405 U.S. 645, 657-58 (1972); K.H. Through Murphy v. Morgan, 914 F.2d at 853. The Court does "not want to place child welfare workers on a razors edge -- damned if they return the child to its family and damned if they retain custody of the child or place him in a foster home or institution." K.H. Through Murphy v. Morgan, 914 F.2d at 853. A reasonable state official might not have known that returning children, who were

not legally in the State's custody, to their biological mother without evaluating the home would violate a child's right to be free from danger while in state custody.  The Court has not found any cases in the Tenth Circuit or elsewhere holding that the State's failure to follow state regulations involving a child's placement violates the child's constitutional rights.  Accordingly, the Defendants did not violate the children's clearly established constitutional rights not to be endangered while in a special relationship with the State, and they are entitled to qualified immunity.

## II.   THE PLAINTIFFS PLAUSIBLY ALLEGE THAT ROYBAL AND PLACENCIO VIOLATED THE CHILDREN'S RIGHT TO COURT ACCESS, BUT ROYBAL AND PLACENCIO ARE ENTITLED TO QUALIFIED IMMUNITY.

In Count III, the Plaintiffs allege that, by engineering the children's living arrangements without following the New Mexico Children's Code, Roybal and Placencio unconstitutionally denied the children access to the courts.  See Response at 25.  The Tenth Circuit has recognized that foster children have the same substantive due process rights as the mentally committed and the criminally convicted.  See Yvonne L., 959 F.2d at 891-93 (noting that, when "the State by the affirmative exercise of its power remove[s a child] from free society and place[s] him in a foster home operated by its agents, . . . [the] situation [may be] sufficiently analogous to incarceration or institutionalization to give rise to an affirmative duty to protect").   One of the constitutional rights that the criminally and mentally committed enjoy is a right to court access.  See Bounds v. Smith, 430 U.S. at 821-22 (stating that it is "established beyond a doubt that prisoners have a constitutional right of access to the courts," and that such access must be adequate, effective and meaningful"); Ward v. Kort, 762 F.2d at 858 (holding that "a person under mental commitment[] is entitled to protection of his right of access to the courts"); A.M. v. N.M. Dep't of Health, 2015 WL 8481923, *55-56 (D.N.M. Dec. 7, 2015)(Browning, J.)("Second A.M. MOO")(concluding that the right to court access for involuntarily committed persons was established in the Tenth

Circuit as of 1985). "Indeed, custodians of a minor may well have a greater obligation to take action to ensure the minor's 'meaningful access' to the courts than do the custodians of an adult inmate, because of the minor's greater reliance on the [state] for care and protection." <u>Germany v. Vance</u>, 868 F.2d 9, 16 (1st Cir. 1988).

The Plaintiffs have plausibly alleged that both Roybal and Placencio violated the children's rights to court access. First, Roybal's "unilateral decision to remove Omaree and N.V. from the home of their biological parent and affirmatively place them under the exclusive care and control of a non-relative" constitutes a custody determination which can "normally be made only in a manner consistent with, and governed by, the requirements of the New Mexico Children's Code." Complaint ¶¶ 107-108, at 38. By transferring custody without following state law, Roybal deprived the children of the Children's Code's protections and safeguards, which prevented the children from accessing the court system and seeking placement with a safe and appropriate care-giver. <u>See</u> Complaint ¶¶ 109-10, at 38-40. Similarly, when Placencio removed the children from Sotelo and placed them with S. Varela without following the Children's Code, he again prevented the children from accessing the courts and seeking a safe and healthy placement. <u>See</u> Complaint ¶ 111, at 44. Roybal's and Placencio's failure to use formal procedures to transfer the children interfered with their ability to secure a safe placement and to ensure that custodial decisions were fully informed, and it deprived them of their rights to:

> (1) a preliminary hearing to determine whether probable cause exists to justify additional custody and proceedings, <u>see</u> [N.M. Stat. Ann.] § 32A-4-18; (2) an adjudicatory hearing, <u>see</u> § 32A-4-19; (3) a dispositional hearing which results in extensive factual findings and a determination of the level of state services necessary for the child, <u>see</u> § 32A-4-22; (4) periodic reviews of the child's welfare following the dispositional hearing, <u>see</u> § 32A-4-25; and (5) a permanency hearing to determine when and if the child should be returned to his or her parents. <u>See</u> § 32A-4-25.1.

<u>Joseph A. v. Ingram</u>, 275 F.3d 1253, 1268 n.3 (10th Cir. 2002).

- 120 -

The children's opportunity to obtain legal process under the Children's Code has passed.  See Lynch v. Barrett, 703 F.3d at 1157.  Furthermore, they did not obtain a comparable measure of damages in a prior suit against the Defendants, which is the reason that the Tenth Circuit foreclosed the plaintiff's right to court access claim in Jennings v. City of Stillwater.  See Jennings v. City of Stillwater, 383 F.3d at 1209 (stating that the plaintiff could not pursue her court-access claim, because she "pursued her claims and reached a monetary settlement," which demonstrated that she "had access to the courts, and obtained a remedy" that was adequate); Lynch v. Barrett, 703 F.3d at 1162, n.3.  Accordingly, the Plaintiffs have plausibly stated a backward-looking denial of court access claim.

Nevertheless, the law was not clearly established, which entitles Roybal and Placencio to qualified immunity.  The law establishes only that children in the State's formal, legal custody have a right to court access.  See Yvonne L., 959 F.2d at 885, 893 (concluding that the State has a duty to "minor children who were in the physical and legal custody of the state" not to place them in a "foster home or institution that they know or suspect to be dangerous").  The Tenth Circuit has not held that state employees can violate a child's constitutional rights when that child is not in the state's formal, legal custody.  The Plaintiffs cite a Fifth Circuit case, Chrissy F. v. Mississippi Department of Public Welfare, 925 F.2d 844 (5th Cir. 1991)("Chrissy F."), to argue that children outside of formal, legal custody have a right to court access.  Response at 29.  This case does not demonstrate that Tenth Circuit law clearly establishes that Roybal's and Placencio's actions violate the law.  First, one Fifth Circuit case does not clearly establish the law in the Tenth Circuit.  Second, the Fifth Circuit case involves different facts than the facts here.

In Chrissy F., Chrissy alleged that District Attorney Richard Douglass "injured her by repeatedly failing to report the charge that she had been abused to MDPW[17] as specifically required by the Youth Court Law,[18] failing to initiate an investigation into her abuse, [and] failing to disclose medical reports of abuse at the Youth Court."  924 F.2d at 850.  Even though numerous doctors repeatedly concluded and confirmed that Chrissy suffered from sexual molestation, Douglass refused to investigate Chrissy's abuse allegations or to report the allegations to the Youth Court, as Mississippi law required.  See 924 F.2d at 846-47.  An assistant district attorney sent Douglass all of the relevant documents and doctors' reports, urging him to prosecute the abuser on at least three occasions, yet Douglass "neither investigated the matter nor reported it to . . . the Youth Court, as required by the Mississippi Youth Court Law."  924 F.2d at 846-47.  The Fifth Circuit concluded that Douglass' alleged "failure to report allegations that Chrissy had been abused effectively blocked her access to the Youth Court" and violated her right to meaningfully access the courts.  924 F.2d at 851.

Only at a high level of generality does Chrissy F. establish the law.  At best, it establishes that children outside of formal custody have rights to meaningfully access the courts, at least in the Fifth Circuit.  See Chrissy F. v. Miss. Dep't of Pub. Welfare, 924 F.2d at 851.  It does not,

----

[17]"MDPW" stands for the Mississippi Department of Public Welfare.  Chrissy F., 925 F.2d at 846.

[18]Section 43-21-353 of the Mississippi Code states:

> Duty to inform the court. (1) Any attorney, . . . social worker, . . . law enforcement officer, or any other person having reasonable cause to suspect that a child . . . [is] an abused child, shall cause an oral report to be made immediately by telephone or otherwise and followed as soon thereafter as possible by a report in writing to the Department of Public Welfare, and immediately a referral shall be made by the Department of Public Welfare to the intake unit and where appropriate to the youth court prosecutor.

Miss. Code Ann. § 43-21-353 (1972 & Supp. 1990).

however, demonstrate that Roybal's and Placencio's particular actions violate a child's constitutional rights to court access.  Under a § 1983 court-access claim,

> the second prong of a qualified immunity analysis requires that the contours of the right "be sufficiently clear that a reasonable official would understand that what he was doing violates that right." Lynch v. Barrett, 703 F.3d at 1161.  To overcome a defendant's claim of qualified immunity, a plaintiff must show that the scope of his or her court access right "was sufficiently clear" such that a reasonable state actor would have understood that his or her actions against the plaintiff "were not merely ill-advised, but violate that right."  703 F.3d at 1161.  To simply say that "the Constitution recognizes a right to court access casts too high a level of generality over our inquiry."  Lynch v. Barrett, 703 F.3d at 1161.

A.M. v. New Mexico Department of Health, 2015 WL 8481923, at *36.

   At the level that the qualified immunity analysis requires, Chrissy F. establishes only that failing to report and investigate sexual abuse allegations in the face of confirmed reports violates a child's constitutional rights to court access.  See Chrissy F., 924 F.2d at 851.  The action that violated the law in Chrissy F. -- failing to investigate and report confirmed abuse -- is distinct from the actions here -- failing to follow formal procedures for transferring custody.  The Court agrees with the Plaintiffs that, when the State effectively places a child in a new home, similar to placing a child with a foster parent, that child should be entitled to the same legal protections available to a foster child.  Despite the Court's conclusion, however, neither the Tenth Circuit law that the Plaintiffs cite nor any other cases establish that Roybal's and Placencio's actions violate clearly established law.

   In sum, a reasonable social worker would not have understood that writing a Memo maintaining the children's placement would: (i) functionally take the children into custody; and (ii) require the State to provide those children full access to the court system.  Similarly, a reasonable social worker would not have known that transferring children, who were not in the State's formal custody, back to their biological mother without following the Children's Code's

- 123 -

procedures would violate the children's constitutional rights.  With respect to both Roybal and Placencio, a social worker would not have known that functionally transferring a child without following the Children's Code's formal, legal procedures would violate those children's constitutional rights to access the courts.  Roybal and Placencio are therefore entitled to qualified immunity.

## III.   THE COURT DECLINES TO EXERCISE SUPPLEMENTAL JURISDICTION OVER THE PLAINTIFFS' REMAINING CLAIM.

The Court declines to exercise supplemental jurisdiction over the Plaintiffs' remaining claims.  In addition to the federal claims, the Plaintiffs bring a tort claim against the CYFD.  See Complaint ¶¶ 116-132, at 41-43.  In this Memorandum Opinion and Order, the Court dismisses the Plaintiffs' federal claims.  Because the Plaintiffs' remaining claim arises under state law, the Court will decline to exercise supplemental jurisdiction over the claim and will remand it to state court.  See Estate of Hashman v. Jackson Hole Mountain Resort Corp., 379 F.3d 1161, 1165 (10th Cir. 2004)(stating that district courts retain discretion to decline to exercise supplemental jurisdiction); Young v. City of Albuquerque, 77 F. Supp. 3d 1154, 1188 (D.N.M. 2014)(Browning, J.)(declining to exercise supplemental jurisdiction and remanding the state-law claims to state court); Salazar v. City of Albuquerque, 2014 WL 6065603, at *49 (D.N.M. Oct. 27, 2014)(Browning, J.)("[T]he Court will refuse to exercise supplemental jurisdiction over these [state-law] claims and will dismiss them without prejudice.").

**IT IS ORDERED** that the requests in Defendants Bennie Placencio and the New Mexico Children, Youth, and Families Department's Motion to Dismiss and Memorandum in Support Thereof, filed December 15, 2015 (Doc. 10), and Defendant Joe Roybal's Motion to Dismiss and Memorandum in Support Thereof, filed January 12, 2016 (Doc. 14), are granted in part and denied in part.  The federal claims in the Complaint for Civil Rights Violations and Violations of

- 124 -

the New Mexico Tort Claims Act, filed November 13, 2015 (Doc. 1-1), are dismissed with

prejudice and the remaining state tort claim is remanded to state court.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

F. Michael Hart
Kelly A. Stout Sanchez
Martinez, Hart & Thompson, P.C.
Albuquerque, New Mexico

-- and --

Andrew G. Schultz
Rodey, Dickason, Sloan, Akin & Robb
Albuquerque, New Mexico

      *Attorneys for Plaintiff Gabrielle Valdez*

Rachel E. Higgins
Albuquerque, New Mexico

      *Attorney for Plaintiff Jill Marron*

Patricia Williams
Wiggins, Williams & Wiggins
Albuquerque, New Mexico

      *Attorneys for the Defendants*